**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| WILLIAM MURRAY and JUNE OMURA, | ) |
|  | ) |
| Plaintiffs, | ) Civil Case No. |
|  | ) 1:19-CV-1498[LEK/TWD] |
| -against- | ) **COMPLAINT FOR** |
|  | ) **DECLARATORY AND** |
|  | ) **INJUNCTIVE RELIEF** |
| ANDREW WHEELER, in his official capacity as Administrator of the | ) |
| U.S. Environmental Protection Agency, the  U.S. ENVIRONMENTAL | ) |
| PROTECTION AGENCY and R.D. JAMES, in his official capacity as | ) |
| the Assistant Secretary of the Army (Civil Works) and the U.S. ARMY | ) |
| CORPS OF ENGINEERS, | ) |
|  | ) |
| Defendants. | ) |

## INTRODUCTION

1.      Plaintiffs bring this action to annul defendants' repeal and removal of the Clean

Water Rule (2015 Rule) from the Code of Federal Regulations. (40 CFR §230.3). See 84

Federal Register (FR) 56626, (October 22, 2019); "Definition of 'Waters of the United

States'—Recodification of Pre-Existing Rules" (Repeal Rule).

2.      Defendants, the United States Environmental Protection Agency (EPA) and the

Department of the Army (the agencies), adopted the 2015 Rule to define the "waters of

the United States" (WOTUS) regulated under the Federal Water Pollution Control Act

*a.k.a.* Clean Water Act (CWA). 33 United States Code (USC) §1251 et seq. (1972). 80

FR 37053.

3.      The agencies promulgated the 2015 Rule to bring clarity to the confusion wrought

by the fractured ruling in *Rapanos v. United States*, 547 U.S. 715 (2006) (*Rapanos*),

where Justice Kennedy's "significant nexus" test gained plurality consent as the method

to utilize in determining the extent of WOTUS regulated under the CWA. 80 FR 37053.

4.      The 2015 Rule relied upon EPA's 408-page Science Report to advance the CWA's goals "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters… and to complement statutes that protect the navigability of waters, such as the Rivers and Harbors Act. 33 USC 401, 403, 404, 407." 80 FR 37055.

5.       By contrast,  the agencies' Repeal Rule is contrary to the CWA's plain language, legislative history and judicial precedent and will unlawfully reverse the water quality protection purposes of the 2015 Rule.

6.      The agencies also violated the Administrative Procedure Act (APA) by failing to base the Repeal Rule on a reasoned determination.

7.      Instead, the agencies attempt to rationalize their predetermination to repeal the 2015 Rule upon inaccurate claims that the adoption of the 2015 Rule was a "power grab" that regulated "puddles" (See ¶¶ 52, 60, 63, 68 and 87 below.)

8.      The agencies further acted unlawfully by failing to consider the Science Report's findings and by failing to identify the Repeal Rule's impact on the Nation's water quality and States' economies.

9.      And, the agencies unlawful actions are a violation of plaintiffs' Due Process rights under the Constitution.

10.      Therefore, plaintiffs respectfully request this Court annul the agencies' Repeal Rule as its adoption was arbitrary, capricious, an abuse of discretion and not in accordance with law. 5 USC §706(2)(A).

## JURISDICTION AND VENUE

11.      This Court has jurisdiction pursuant to 28 USC. §§1331 and 2201(a). The Repeal Rule is subject to judicial review under the APA as a final agency action for which there

is no other adequate remedy. 5 USC §§ 702, 704. The relief sought is authorized by 28

USC §2201(a), 28 USC §2202 and 5 USC §706.

12.     Venue is proper in the Northern District of New York under 28 USC

§1391(e)(1)(A) because this is a civil action brought against agencies of the United States

and officers of the United States acting in their official capacities, and plaintiffs William

Murray and June Omura reside and own property within the Northern District of New

York in Ulster County, New York.

## PARTIES

13.     Defendant Andrew Wheeler, EPA Administrator, signed the Repeal Rule.  This

complaint names Administrator Wheeler as a defendant in his official capacity.

14.     Defendant EPA is an agency of the U.S. government. EPA is responsible for

implementing and enforcing many of the CWA's programs.

15.     Defendant R. D. James is named as a defendant in his official capacity as

Assistant Secretary of the Army (Civil Works). Mr. James signed the challenged rule on

behalf of the U.S. Army Corps of Engineers (Corps).

16.     Defendant Corps is a federal agency within the U.S. Army. The Corps

implements the permit program for the discharge of dredged and fill material into waters

of the United States. 33 U.S.C. § 1344(a).

17.     Plaintiffs William Murray and June Omura reside and own property within the

Northern District of New York in Ulster County, New York. Their property in New Paltz,

New York, includes ephemeral streams and tributaries that were considered WOTUS

prior to the agencies' adoption of the Repeal Rule. Plaintiffs have standing as the

agencies' Repeal Rule terminates the status of plaintiffs' ephemeral streams and tributaries as federally protected WOTUS.

## BACKGROUND

18.     Federal authority over U.S. waters arose from the sovereignty over same. Thus, the soil beneath the low-water mark was dedicated to the public trust for "the enjoyment of certain public rights, among which is the common liberty of taking fish, as well shellfish as floating fish." *Smith v. Md.*, 59 U.S. 71, 74-75 (1855).

19.     The Supreme Court affirmed federal jurisdiction over navigable waters in *The Daniel Ball*, 77 U.S. 557, 563 (1870), *i.e.* waters that are "used, or . . . susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water,"

20.     The Rivers and Harbors Act of 1899, (RHA), sought to prevent obstruction and pollution of the nation's waters. (Mar. 3, 1899, ch. 425, § 10; 33 USC §403).  The RHA included the Refuse Act affirming federal jurisdiction over the tributaries and areas where refuse might wash into navigable waters. 33 USC §407.

21.     In 1948, Congress passed the Water Pollution Control Act (WPCA) and the Acts of 1956 and 1961 were designed to address water pollution on a case-by-case basis.

22.     The 1965 WPCA amendments gave individual states the authority to develop and enforce water quality standards for interstate waters. If states did not develop and enforce water quality standards, the Federal government would do so.

23.     However, the state level approach was non-uniform and states with lenient regulations attracted the heaviest polluters.

24.     Congress enacted the 1972 WPCA amendments, *a.k.a.* the Clean Water Act, partly in reaction to rivers catching fire during the late 1960's, including the Buffalo River in 1968, the Rouge River in Detroit in 1969 and most famously the Cuyahoga River fire of 1969 in Cleveland.

25.     The CWA established a structure for regulating pollutant discharges into WOTUS and gave EPA the authority to implement pollution control programs.

26.     The CWA's "major purpose" was "to establish a comprehensive long-range policy for the elimination of water pollution." S. Rep. No. 92-414, p. 95 (1971), reprinted in 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93-1, p. 1511 (1971).

27.     The CWA's objective "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 USC §1251(a).

28.     And, agencies were directed to "develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters." 33 USC §1252.

29.     In 1985, the Supreme Court unanimously described the CWA's objective as "a broad, systemic view of the goal of maintaining and improving water quality" which granted the agencies broad authority to protect "water quality and aquatic ecosystems," including wetlands adjacent to navigable waters. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132-133 (1985).

30.     However, in 1986, the Supreme Court issued a split ruling (5-4), in reviewing whether certain waters were WOTUS.  *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 167 (2001) (*SWANCC*).

31.     The *SWANCC* majority ruled that the federal jurisdiction did not extend to isolated bodies of water, in part, because that "would result in a significant impingement of the States' traditional and primary power over land and water use." 531 U.S. at 174.

32.     Notably, Justice Stevens' dissent argued that the majority's reliance on the Commerce Clause was misplaced as the CWA had marked "a shift in the focus of federal water regulation from protecting navigability toward environmental protection."  531 U.S. at 179.  The dissent contended the CWA required federal agencies to give "due regard," not to the interest of unobstructed navigation, but rather to "improvements which are necessary to conserve such waters for the protection and propagation of fish and aquatic life and wildlife [and] recreational purposes." 531 U.S. at 180.

33.     In 2003, EPA published guidance to assist the agencies in applying the definition of WOTUS in the wake of *SWANCC*. 68 FR 1995.

34.     Then, in 2006, the Supreme Court issued a fractured (4-1-4) decision in *Rapanos* failing to agree on whether wetlands adjacent to non-navigable tributaries were WOTUS.

35.     Justice Kennedy's discussion of a "significant nexus" test used to define WOTUS was accepted by the four dissenting Justices, (*Rapanos*, 547 U.S. at 810, footnote 14), and has been followed in subsequent federal rulings.

**Post-Rapanos Confusion and Enforcement Failures**

36.     The *SWANCC* and *Rapanos* decisions had a negative impact on water quality by removing CWA regulation for nearly half of U.S. rivers and streams.  https://lib.dr.

iastate.edu/cgi/viewcontent.cgi?article=1591&context=card_workingpapers –

"Consequences of the Clean Water Act and the Demand for Water Quality" Center for

Agricultural and Rural Development, Iowa State University (January 2017) at page 2.

37.     In a four-year period following *Rapanos*, EPA dropped more than 1,500

investigations against polluters as *SWANCC* and *Rapanos* created uncertainty as to the

definition of WOTUS. https://www.nytimes.com/2010/03/01/us/01water.html?_r=1.

38.     In 2008, EPA issued guidance interpreting Justice Kennedy's "significant nexus"

test. https://www.epa.gov/cwa-404/2008-rapanos-guidance-and-related-documents-

under-cwa-section-404.

39.     However, the agencies made clear this guidance was <u>not</u> a regulation:

>  This guidance does not substitute for those provisions or regulations, nor is it a
> regulation itself. It does not impose legally binding requirements on EPA, the
> Corps, or the regulated community, and may not apply to a particular situation
> depending on the circumstances.

2008 Guidance at Page 4, footnote 17, https://www.epa.gov/sites/production

/files/2016-02/documents/cwa_jurisdiction_following_rapanos120208.pdf.

40.     And, although Justice Kennedy had ruled that the CWA protects wetlands and

other upstream waters that have a collectively significant impact on downstream waters,

(547 U.S. at 780-81),  the 2008 Guidance did not address the collective importance of

many similarly situated waters. (2008 Guidance at 4, 8-12).

**The agencies' reasons for adopting the 2015 Rule**

41.     Many parties joined with Justice Breyer's call for rulemaking in *Rapanos*, to

settle the definition of WOTUS. *Rapanos* at 812; 84 FR 4160.

42.     Significantly, EPA's 2009 "Clean Water Act Enforcement Action Plan"

identified *SWANCC* and *Rapanos* as hindering water quality protection efforts:

> Many of the nation's waters are not meeting water quality standards, and
> the threat to drinking water sources is growing…. There are significant
> water quality problems facing too many communities; there are expanding
> universes of diffuse pollution sources, many which are not effectively
> regulated by the CWA; and there are significant limitations that affect
> EPA's ability to identify serious problems quickly and take prompt action
> to correct them. Among these limitations are two Supreme Court decisions
> – its 2001 decision in [*SWANCC* and *Rapanos*] that added layers of
> confusion regarding which water bodies are covered by the CWA in many
> parts of the country.

https://www.epa.gov/compliance/clean-water-act-cwa-action-plan.

43.     EPA then spent the next six years studying the connectivity of waters and

reviewed more than 1,200 peer-reviewed scientific publications in preparing a "Science

Report" in support of its rulemaking to define WOTUS. 82 FR 34899, 34901.

44.     Preliminary drafts of the Science Report and its conclusions were corroborated by

independent peer reviews by scientists and scientific panels from 2011 to 2015. Preface

of Science Report at https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414.

45.     EPA also repeatedly invited the public to submit comments and attend meetings.

80 FR 37062. All told, "[o]ver 133,000 public comments were received" by the panel,

and "[e]very meeting [it held] was open to the public, noticed in the Federal Register, and

had time allotted for the public to present their views." 78 FR 15012; 80 FR at 37057.

46.     The rulemaking included over 400 meetings with state, tribal and local officials

and business, environmental and public health organizations.

47.     The agencies received more than one million comments on the newly proposed

definition of WOTUS, 87% of which were supportive.

48.     EPA released its Science Report on January 15, 2015, "to summarize current

scientific understanding about the connectivity and mechanisms by which streams and

wetlands, singly or in aggregate, affect the physical, chemical, and biological integrity of

downstream waters."  80 FR 2100; "U.S. EPA. Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (Final Report)."

49.     Regarding the economic impact of the 2015 Rule, on May 20, 2015, EPA published an 87-page report finding that the proposed rule's benefits of between $555 million and $572 million outweighed estimated costs of between $236 million and $465 million. https://www.epa.gov/sites/production/files/2015-06/documents/508-final_clean_water_rule_economic_analysis_5-20-15.pdf.

50.     The agencies published the 2015 Rule on June 29, 2015, identifying water quality improvement as the prime objective. 80 FR 37054.

**Opposition to the 2015 Rule**

51.     In 2014, the Attorney General of Oklahoma, Scott Pruitt, signed comments opposing the proposed Rule claiming in part that "[t]he Proposed Rule unlawfully and unconstitutionally seeks to assert federal jurisdiction over local water and land use management…" Comments of the Attorneys General of West Virginia, *et al.*, on the Proposed Definition of "Waters of the United States" (Docket No. EPA-HQ-OW-2011-0880; Oct. 8, 2014).

52.     Then, Mr. Pruitt testified before Congress attacking the proposed 2015 Rule as "a naked power grab by the EPA" and "a classic case of overreach"—one "flatly contrary to the will of Congress, who, with the passing of the Clean Water Act, decided that it was the States who should plan the development and use of local land and water resources." Impacts of the Proposed "Waters of the United States" Rule on State and Local Governments: Joint Hearing before the Comm. on Transp. and Infra., U.S. House of Representatives, and the Comm. on Envt. and Pub. Works, U.S. Senate, 114th Cong. 70 (2015).

53.     Mr. Pruitt stated the proposed 2015 Rule was "unlawful and should be withdrawn." *Id*. at 71.

54.     Mr. Pruitt then sued to annul the 2015 Rule. *Okla. ex rel. Pruitt v. United States EPA,* Case No. 15-CV-0381-CVE-FHM (N.D. Okla. July 31, 2015).

55.     Mr. Pruitt's lawsuit was consolidated with other challenges and the Court issued a stay of the Rule on October 9, 2015 in certain states. *Ohio v. United States Army Corps of Eng'rs (In re EPA & DOD Final Rule)*, 803 F.3d 804, 808 (6th Cir. 2015).

56.     In total, the agencies implemented the 2015 Rule in all but 13 states.  *North Dakota v. U.S. EPA*, 127 F.Supp.3d 1047 (D.N.D. 2015) (issuing preliminary injunction against 2015 Rule); *North Dakota v. U.S. EPA*, No. 3:15-cv-59, Order Limiting the Scope of Preliminary Injunction to the Plaintiffs (D.N.D. Sept. 4, 2015) (clarifying that injunction applied only in 13 states that had sued in that court).

57.     In early 2017, the agencies vigorously defended the 2015 Rule by filing a 245-page brief arguing that the 2015 Rule "is a carefully tailored response to Supreme Court precedent, peer-reviewed science, and the Agencies' long experience in implementing the Act." *In re: EPA*, No. 15-3751, Brief for Respondents, at 2 (6th Cir. Jan. 13, 2017).

58.     However, EPA reversed its defense of the 2015 Rule when President Trump appointed Scott Pruitt to be its Administrator on February 17, 2017.

59.     On February 28, 2017, President Trump issued Executive Order No. 13778 directing that EPA "shall consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*." https://www.whitehouse.gov/the-press-office/2017/02/28/presidential-executive-order-restoring-rule-law-federalism-and-economic.

60.    While signing the Order, President Trump stated he was "directing the EPA to take action, paving the way for the elimination of this very destructive and horrible rule," which he claimed regulated "nearly every puddle." Remarks by President Trump at signing of Executive Order No. 13778.

61.    The claim was inaccurate because the 2015 Rule exempted all puddles from the definition of WOTUS. 33 CFR §328.3(b)(4)(vii).

62.    Mr. Pruitt signed the notice of intent to withdraw the 2015 Rule eight minutes after President Trump signed Executive Order No. 13778. (See page 159 of "Response to Comments for Definition of 'Waters of the United States'—Recodification of Pre-Existing Rules U.S. Environmental Protection Agency and Department of the Army"; September 5, 2019 ["Responses to Comments on SNPRM"] available at https://www.regulations.gov/ document?D=EPA-HQ-OW-2017-0203-15694.)

63.    Later that same day, (February 28, 2017), Mr. Pruitt began a months long public campaign against the 2015 Rule attacking it as a "power grab" which unlawfully exercised jurisdiction over "puddles." (https://www.youtube.com/watch?v=yVzz3IYrpac; https://www.agri-pulse.com/articles/8981-pruitt-epa-rewrite-will-limit-reach-of-wotus-rule; https://www.sayanythingblog.com/entry/audio-epa-administrator-scott-pruitt-touts-friendlier-cooperative-relationship-states/.

64.    In June 2017, Mr. Pruitt's deputies ordered EPA staffers to "to produce a new analysis of the rule — one that stripped away the half-billion-dollar economic benefits associated with protecting wetlands" as EPA had determined in May 2015. https://www.nytimes.com/2017/08/11/us/politics/scott-pruitt-epa.html.

65.     Thus, EPA issued a revised economic report finding that the 2015 Rule's $572 million dollars in benefits were "not quantified." https://www.epa.gov/sites/production/files/2017-06/documents/economic_analysis_proposed_step1_rule.pdf.

**The agencies' reversal of policy**

66.     On July 27, 2017, the agencies published a notice of proposed rulemaking ("NPRM") to repeal the 2015 Rule. 82 FR 34899.

67.     The agencies new economic analysis directly conflicted with EPA's economic analysis prepared for the 2015 Rule. (See ¶64 above and https://www.epa.gov/sites/production/files/2017-06/documents/economic_analysis_proposed_step1_rule.pdf.)

68.     After publishing the NPRM, Mr. Pruitt continued to campaign against the 2015 Rule telling an Iowa audience in August 2017, "[n]o one in Congress ever thought that a puddle in Iowa should be considered a water of the U.S." https://www.iowafarmbureau.com/Article/EPA-leader-pledges-to-rescind-and-replace-WOTUS-rule.

69.     On November 22, 2017, seeking to prevent further implementation of the 2015 Rule, the agencies proposed to suspend the 2015 Rule with an "applicability date" delaying its effective date until 2020. 82 FR 55542.

70.     The agencies adopted the final Suspension Rule on February 6, 2018. 83 FR 5200.

71.     However, on August 16, 2018, the United States District Court for the District of South Carolina annulled the Suspension Rule ruling the agencies had violated the APA. *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959 (D.S.C. 2018).

72.     Notably, the agencies' refusal to consider or receive public comments on the substance of the new rule, or identify what the status of the law would be in the absence

of the 2015 Rule, did not provide a "meaningful opportunity for comment" as required by the APA. 318 F.Supp.3d at 965.

73.     Similarly, on November 26, 2018, the United States District Court for the Western District of Washington annulled the Suspension Rule finding it violated the APA by "expressly exclud[ing] substantive comments on either the pre-2015 definition of 'waters of the United States' or the scope of the definition that the Agencies should adopt if they repealed and revised the WOTUS Rule." Moreover, the agencies improperly restricted the content of public comment "to the issue of 'whether it is desirable and appropriate to add an applicability date to the [WOTUS Rule].'" Order, *Puget Soundkeeper Alliance v. Wheeler*, No. C15-1342-JCC, 2018 U.S. Dist. LEXIS 199358, 2018 WL 6169196, at *5 (W.D. Wash. Nov. 26, 2018).

74.     While the above litigation was pending, the agencies published a supplemental notice of proposed rulemaking ("SNPRM") to repeal the 2015 Rule. 83 FR 32227; July 12, 2018.

75.     The SNPRM clearly identified the predetermined outcome of the rulemaking stating "the agencies reiterate that this regulatory action is intended to permanently repeal the 2015 Rule in its entirety, and we invite all interested persons to comment on whether the 2015 Rule should be repealed." 83 FR 32228.

76.     Like the original NPRM, the SNPRM did not compare, or seek comment on, the relative merits of the 2015 Rule and EPA's pre-2015 Rule method of defining WOTUS.

77.     And, like the original NPRM, the SNPRM did not publish the actual rules the agencies proposed to implement upon repeal of the 2015 Rule.

78.     Further, both the NPRM and SNPRM failed to address the loss of the minimum

90 million dollar net economic benefit as EPA had reported in its economic analysis

published May 20, 2015.

79.     In fact, the agencies abandoned its economic impact review stating "[w]hile

economic analyses are informative in the rulemaking context, the agencies are not relying

on the economic analysis performed pursuant to Executive Orders 12866 and 13563 . . .

as a basis for this proposed action." 83 FR 32250.

80.     Regarding the proposed Repeal Rule's impacts on water quality, comments on the

SNPRM:

> …referenced EPA's summary of states' reported water quality data, and
> one commenter referenced the prior administration's statements that over
> 60 percent of streams and millions of acres of wetlands lack adequate
> safeguards from degradation and should be protected under the CWA.

See page 84 of Responses to Comments on SNPRM;  citation at ¶62, above.

81.     Indeed, EPA's "National Water Quality Inventory," identifies that 70 percent of

lakes, reservoirs, and ponds, 78 percent of bays and estuaries and 55 percent of rivers and

streams in the U.S. are impaired by pollution and do not meet minimum water quality

standards. http://www.nacdnet.org/about-nacd/what-we-do/water/.

82.     The agencies' responses to its SNPRM did not address the status of the Nation's

waters, but instead generally claimed that the 2015 Rule was an overreach of authority.

Responses to Comments on SNPRM at page 86.

83.     On February 14, 2019, the agencies proposed to replace the 2015 Rule with a

Revised WOTUS Rule (RWOTUS), 84 FR 4154, and received approximately 620,000

comments. 84 FR 56665.

84.     The agencies published the final Repeal Rule on October 22, 2019. 84 FR 56626.

85.     All of the above agency notices followed Executive Order No. 13778 and
Administrator Pruitt's order with a singular, predetermined goal – repeal the 2015 Rule.

86.     Mr. Pruitt's commencing rulemaking with an "unalterably closed mind" is
demonstrated by "the disconnect between the text of Executive Order 13778, which
directed the agencies to 'consider' revising or repealing the 2015 Rule, and the notice of
intent to withdraw the 2015 Rule signed eight minutes later by former Administrator
Pruitt." Responses to Comments on SNPRM at page 159.

87.     And, while Mr. Pruitt resigned as EPA's administrator on July 5, 2018, his
successor, Andrew Wheeler, has demonstrated the same "unalterably closed mind" by
stating the repeal and replacement of the 2015 Rule "puts an end to the previous
administration's power grab." https://www.wsj.com/articles/epa-chief-calls-for-
narrowing-scope-of-clean-water-rule-11544504460 (Wall Street Journal 12/11/18).

88.     In fact, the agencies announced in 2017 that they would repeal the 2015 Rule with
no substantive review: "[t]he agencies do not intend to engage in substantive reevaluation
of the definition of 'waters of the United States' until the second step of the rulemaking."
https://www.epa.gov/sites/production/ files/2017-06/documents/wotus_prepublication
_version.pdf at page 18 of 42 and see 82 FR 34903.

89.     However, while the agencies stated the proposed repeal would "define the scope
of 'waters of the United States,'" the agencies have refused to "undertake any substantive
reconsideration" of the issue. 82 FR 34900, 34903.

90.     Instead, the agencies argued that repealing the 2015 Rule would do nothing at all,
eliminating any need for informed deliberation. The agencies claimed that because the
2015 Rule "ha[d] already been stayed by the Sixth Circuit," the proposed repeal would

"simply codify the legal status quo . . . [as] a temporary, interim measure pending substantive rulemaking[.]" 82 FR 34903.

91.     However, the Repeal Rule is significant as it permanently removes the 2015 Rule from the CFR - a significant, and intended, change to the "legal status quo." 82 FR 34899-34900.

92.     Thus, the agencies deprived the public of a meaningful opportunity to comment by simply soliciting public comments to support their predetermined conclusions.

93.     And, despite a significant record supporting the 2015 Rule, the agencies did nothing to address the facts in that record.

94.     Further, the agencies admitted that the revived case-by-case approach would not follow the regulatory text they proposed to codify, but instead would be "informed by applicable guidance documents (e.g., the 2003 and 2008 guidance documents, as well as relevant memoranda and regulatory guidance letters)." 82 FR 34902.

95.     Yet, the text of these guidance documents, memoranda, and letters was not set forth in either the NPRM or SNPRM or presented to the public to allow for a meaningful opportunity for comment.

96.     Moreover, these guidance documents expressly provided that they are not to be considered regulations and thus EPA's attempt to use these documents as "regulations by default" is illegal.

**The Repeal Rule's impacts on water quality**

97.     The regulatory uncertainty caused by *SWANCC* and *Rapanos* negatively impacted water quality and repealing the 2015 Rule will further damage water quality. (See Hearing before the Senate Committee on Environment and Public Works, April 26, 2017;

"A Review of the Technical, Scientific, and Legal Basis of the WOTUS Rule,"

https://www.hsdl.org/?view&did=802856.)

98.     Therefore, as set forth in the following causes of action, the agencies' repeal of

the 2015 Rule was unlawful and must be judicially annulled.

### FIRST CAUSE OF ACTION

**The agencies violated the Administrative Procedure Act and Due Process Clause
arbitrarily and unlawfully predetermining to repeal the 2015 Rule**

99.     The allegations of the preceding paragraphs are incorporated here by reference.

100.    From its inception, the agencies' repeal of the 2015 Rule was formulated and

predetermined for political purposes in violation of the due process rights of millions of

citizens, such as plaintiffs, who rely upon the CWA to protect their health, safety and

drinking water supplies.

101.    A "reasoned explanation" is needed for an agency to disregard facts and

circumstances that underlay a policy it is replacing. *FCC v. Fox Television Stations, Inc.*,

556 U.S. 502, 515-16 (2009).

102.    "The reasoned explanation requirement of administrative law . . . is meant to

ensure that agencies offer genuine justifications for important decisions, reasons that can

be scrutinized by courts and the interested public." *Dept. of Commerce v. New York*, 139

S. Ct. 2551, 2575-76 (June 27, 2019). "Accepting contrived reasons would defeat the

purpose for the enterprise[.]" *Id.* at 2576.

103.    The Due Process Clause of the Constitution also requires rulemakings to be

undertaken with an open mind. *Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1170

(D.C. Cir. 1979). Decisionmakers violate the Due Process Clause and must be

disqualified when they act with an unalterably closed mind and are unwilling to rationally

consider arguments. *Air Transp. Ass'n of Am. v. Nat'l Mediation Bd.*, 663 F.3d 476, 487 (D.C. Cir. 2011).

104.    Here, prior to the Repeal Rule being published, the agencies "had already reached a prejudged political conclusion" to repeal the 2015 Rule. *Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1261 (D. Wyo. 2004).

105.    As above, in 2014, former EPA Administrator Scott Pruitt opposed the proposed 2015 Rule in written comments and commenced litigation to annul the 2015 Rule.

106.    Since President Trump's Executive Order No. 13778 in February 2017, the agencies have pursued a pre-determined goal to repeal and replace the 2015 Rule.

107.    As EPA Administrator, Mr. Pruitt campaigned to repeal the 2015 Rule repeatedly misrepresenting its purpose as a "power grab" and falsely claiming it regulated puddles.

108.    Consistent with the agencies' predetermined result, the agencies prohibited comment on the substance of both the 2015 Rule and the agencies' prior case-by-case method for determining WOTUS under certain circumstances. 82 FR 34903.

109.    And, in the SNPRM to justify the repeal, the agencies set forth "proposed" conclusions, with no supporting analysis, and solicited comments in support of their proposed conclusions. 83 FR 32228.

110.    Further, the agencies attempt to justify the repeal by citing the Southern District of Georgia's decision in *Georgia v. Wheeler*, No. 2:15-cv-00079, 2019 WL 3949922, (S.D. Ga. Aug. 21, 2019). However, the justification is misplaced because *Georgia v. Wheeler* was decided over a month after the agencies produced their revised Economic Analysis and sent the Final Repeal Rule to the Office of Management and Budget.

111.    Therefore, because the agencies operated with an unalterably closed mind pursuing a predetermined result with no meaningful review of the Repeal Rule, their repeal of the 2015 Rule violated the APA and the Due Process Clause of the Constitution and was arbitrary, capricious and an abuse of discretion and must be annulled.

## SECOND CAUSE OF ACTION

**The Repeal Rule must be annulled as the agencies failed to identify the current status of U.S. waters or draw comparisons with the 2015 Rule**

112.    The allegations of the preceding paragraphs are incorporated here by reference.

113.    A rulemaking is arbitrary and capricious if the agency failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

114.    The agencies adopted the 2015 Rule to promote regulatory clarity and consistency, and to protect the nation's waters furthering the CWA's purposes. An extensive record spanning six years, which included the Science Report, supported the Rule's conclusion that it would promote regulatory clarity and consistency. 80 FR 2100.

115.    However, in repealing the 2015 Rule, the agencies failed to identify, even in a cursory manner, the status of water quality in the U.S.

116.    And, the agencies made no attempt to compare how the quality of U.S. waters – as defined under *SWANCC/Rapanos*, the 2015 Rule or otherwise – would suffer, improve or remain the same if the 2015 Rule were repealed.

117.    As above,  an agency may not disregard facts and circumstances that underlay a policy it is replacing. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

118.    Therefore, the agencies' repeal of the 2015 Rule was arbitrary, capricious and an abuse of discretion and must be judicially annulled.

### THIRD CAUSE OF ACTION

**The Repeal Rule is arbitrary and capricious as it is not founded on science**

119.    The allegations of the preceding paragraphs are incorporated here by reference.

120.    Executive Order No. 13778 directs that the agencies "shall consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*…" See ¶59 above.

121.    However, Justice Scalia's definition of WOTUS was not supported by science but instead, relied upon Webster dictionary's definition of "waters." *Rapanos* at 739.

122.    By contrast, the agencies relied upon the Science Report's findings on the connectivity of waters to support the 2015 Rule's definition of WOTUS. 80 FR 37061.

123.    Nonetheless, as above, while signing the Order, President Trump made clear that he was "directing the EPA to take action, paving the way for the elimination of this very destructive and horrible rule." See ¶60 above.

124.    And, although seeming to direct the EPA to "consider" repealing the 2015 Rule, Administrator Pruitt almost immediately (within 8 minutes), signed a notice of proposed repeal, summarily rejecting the years of work EPA spent in drafting the Science Report.

125.    Therefore, the agencies' repeal of the 2015 Rule is arbitrary, capricious and an abuse of discretion and must be judicially annulled.

### FOURTH CAUSE OF ACTION

**The Repeal Rule is arbitrary and capricious as it effects an overreach of the Executive Branch**

126.    The allegations of the preceding paragraphs are incorporated here by reference.

127.    As above, President Trump directed that the agencies "shall consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos...*"

128.    However, because the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States," Executive Order No. 13778 is an unlawful overreach of executive authority.

129.    Therefore, the agencies' immediate response to effect the repeal of the 2015 Rule with no meaningful review is arbitrary, capricious and an abuse of discretion and must be judicially annulled.

### FIFTH CAUSE OF ACTION

**The Repeal Rule is arbitrary and capricious as it fails to comply with the legislative intent and plain language of the CWA**

130.    The allegations of the preceding paragraphs are incorporated here by reference.

131.    The Supreme Court has recognized that maintaining the "integrity" of water quality is central to the CWA's purposes. *United States v. Riverside Bayview Homes, Inc*., 474 U.S. 121, 132-33 (1985).

132.    And, the scope of the CWA includes the Refuse Act. *Wyoming v Hoffman*, 437 F.Supp 114, 117 (D Wyo 1977).

133.    The Repeal Rule will not advance the CWA's purposes "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" as it removes millions of acres of wetlands and streams from federal jurisdiction. 33 USC §1251(a).

134.    Indeed, in Texas alone, the 2015 Rule had "restored federal protections to more than 143,000 miles of Texas streams" yet that is now reversed by the Repeal Rule. https://www.epa.gov/sites/production/files/2015-06/documents/2009_10_15 _wetlands_science_surface_drinking_water_surface_drinking_water_tx.pdf.

135.    In sum, the Repeal Rule is invalid as it fails to make any cogent argument or present any evidence that it will result in the restoration and maintenance of the chemical, physical and biological integrity of the Nation's waters.

136.    And, the agencies' attempt to limit the definition of WOTUS to Justice Scalia's *Rapanos* definition, violates the intent of the CWA as expressed by Congress.

137.    Therefore, the agencies' repeal of the 2015 Rule is arbitrary, capricious and an abuse of discretion and must be judicially annulled.

### SIXTH CAUSE OF ACTION

**The Repeal Rule must be annulled as it would negatively impact state economies**

138.    The allegations of the preceding paragraphs are incorporated here by reference.

139.    "[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable…" *Nat'l Assn'n of Home Builders v. EPA*, 682 F.3d 1032, 1039-50 (D.C. Cir. 2012).

140.    More than 25 years ago, EPA documented the economic benefits of wetlands. "Wetlands Fact Sheet # 4 Economic Benefits of Wetlands" (1993).

141.    However, the agencies' 2017 revised economic impact analysis was fatally flawed as it left wetlands-related economic benefits entirely unquantified.

142.    Indeed, although the agencies valued wetlands benefits at up to $500 million per year in 2015, the agencies excluded all wetlands values in the 2017 analysis prepared in advance of, and in support of, the Repeal Rule. See ¶64 above.

143.    Therefore, without a rational economic impact analysis, the agencies' repeal of the 2015 Rule is arbitrary, capricious and an abuse of discretion and must be annulled.

## SEVENTH CAUSE OF ACTION

### The Repeal Rule must be annulled as it improperly defers CWA enforcement to the states

144.    The allegations of the preceding paragraphs are incorporated here by reference.

145.    The Repeal Rule repeatedly cites the preservation of states' rights as a primary basis for the repeal. 84 FR 56654.

146.    Indeed, the agencies found that there are "certain waters that are more appropriately left solely in the jurisdiction of States." 84 FR 56654.

147.    However, Congress determined in 1977 that broad federal jurisdiction is needed as state enforcement is severely lacking due to an absence of funding and political will. (See Comm. on Env't & Pub. Works, Committee Print, 95th Cong., 2d Sess., Legislative History of the Clean Water Act of 1977, at 908, 920, 922 and 923 [Oct. 1978]).

148.    And, EPA's own reports prove that the states have failed to protect water quality as a majority of the Nation's waters violate water quality standards. See ¶81 above.

149.    The Repeal Rule will not result in water quality improvement nor will it promote the CWA's goals "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

150.    Instead, the Repeal Rule will allow the loss of millions of acres of wetlands across the U.S. imperiling the public health and ecosystems upon which the public welfare

depends. And, as above, the agencies have not considered the Repeal Rule's costs resulting from the loss of wetlands' flood storage, water filtration and other benefits.

151.    Therefore, the agencies' repeal of the 2015 Rule is arbitrary, capricious and an abuse of discretion and must be judicially annulled.

## EIGHTH CAUSE OF ACTION

**The final Repeal must be annulled as it is inconsistent with the 1899 Refuse Act**

152.    The allegations of the preceding paragraphs are incorporated here by reference.

153.    The agencies have indicated the Repeal Rule is based, in part, upon the agencies' interpretation of their jurisdiction being limited by the Commerce Clause.  "Fact sheet: Proposed Revised Definition of Waters of the United States" (12-10-18); https://www.epa.gov/sites/production/files/2018-12/documents/factsheet_-_wotus_revision_overview_12.10_1.pdf.

154.    However, the agencies ignore the fact that Congress intended the CWA to extend federal jurisdiction to areas covered by the 1899 Refuse Act. *United States v Consolidation Coal Co*. 354 F. Supp. 173, (N.D. W Va 1973).

155.    The agencies' limiting the CWA's jurisdiction based upon Justice Scalia's *Rapanos* opinion is contrary to the Refuse Act's provisions, and thus the Repeal Rule must be annulled as its adoption was arbitrary, capricious and an abuse of discretion.

## NINETH CAUSE OF ACTION

**The agencies fail to identify sufficient reason to repeal the 2015 Rule**

156.    The allegations of the preceding paragraphs are incorporated here by reference.

157.    To alter an administrative policy, the agency must "show that there are good reasons" to do so and the new policy must be informed by the agency's expertise and rest

upon principles that are rational and neutral. *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 250 (2012); and see *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 535-536 (2009);

158.    Here, the agencies' the 2015 Rule was grounded in science requiring judicial deference to the agencies' expertise. *Nat'l Envtl. Dev. Association's Clean Air Project v. EPA*, 686 F.3d 803, 810 (D.C. Cir. 2012).

159.    The agencies offer no science-based or objective reason to repeal the 2015 Rule, which was based on years of rigorous analysis, peer-reviews and stakeholder input.

160.    Because the agencies' Repeal Rule is not grounded in science, it is invalid. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

161.    Therefore, the agencies' repeal of the 2015 Rule was arbitrary, capricious and an abuse of discretion and must be judicially annulled.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Declare that defendant agencies acted arbitrarily and unlawfully in promulgating the challenged rule, "Definition of 'Waters of the United States'— Recodification of Pre-Existing Rules," 84 FR 56626 (Oct. 22, 2019);

2.    Vacate and set aside the challenged rule as the agencies violated procedural and substantive provisions of the APA, Due Process Clause of the Constitution, judicial precedent and the CWA's statutory provisions and legislative history, as set forth above;

3.    Grant plaintiffs their costs of suit including reasonable attorney fees to the extent permitted by law; and

4.    Grant plaintiffs such further relief as the Court may deem just and proper.

Respectfully submitted this 4th day of December, 2019.

James Bacon

Attorney for Plaintiffs
N.D.N.Y. Bar No. 700116
baconesq@yahoo.com
P.O. Box 575
New Paltz, New York 12561
Telephone: (845) 419-2338