## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| WILLIAM MURRAY and JUNE OMURA, | ) )  ) Case No.  1:19-cv-1498 |
| Plaintiffs, | ) ) LEK/TWD |
| -against- | ) ) **AMENDED COMPLAINT** |
| ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental Protection Agency, the  U.S. ENVIRONMENTAL PROTECTION AGENCY and R.D. JAMES, in his official capacity as the Assistant Secretary of the Army (Civil Works) and the U.S. ARMY CORPS OF ENGINEERS, | ) **FOR DECLARATORY** ) **RELIEF** ) ) ) ) ) |
| Defendants. | ) ) |

_____

### INTRODUCTION

1.     Plaintiffs amend their complaint to challenge defendants' rulemaking to repeal and replace the 2015 definition of "Waters of the United States," (WOTUS), known as the Clean Water Rule (2015 Rule). Title 33 of the Code of Federal Regulations, (CFR), §328.3 and 40 CFR §120.2.

2.     Defendants, the United States Environmental Protection Agency (EPA) and the Department of the Army (the Agencies), repealed the 2015 Rule on October 22, 2019. See 84 Federal Register (Fed. Reg.) 56626; "Definition of 'Waters of the United States'—Recodification of Pre-Existing Rules" (Repeal Rule).

3.     On April 21, 2020, the Agencies replaced the 2015 Rule with the "Navigable Waters Protection Rule," (NWPR or replacement rule), re-defining the scope of WOTUS regulated under the Federal Water Pollution Control Act, Title 33 of the United States Code (USC) §1251 et seq. (1972), commonly known as the Clean Water Act (CWA). 85 Fed. Reg. 22250  amending 33 CFR §328.3 and 40 CFR §120.2.

1

4.      The Agencies had adopted the 2015 Rule to bring clarity to the confusion wrought by the Supreme Court's fractured ruling in *Rapanos v United States*, 547 US 715 (2006) (*Rapanos*), where Justice Kennedy's "significant nexus" test gained plurality consent as the method to utilize in determining the extent of WOTUS regulated under the CWA. 80 Fed. Reg. 37053.

5.      The 2015 Rule relied upon EPA's 408-page Science Report to advance the CWA's goals "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters… and to complement statutes that protect the navigability of waters, such as the Rivers and Harbors Act. 33 USC §§401, 403, 404, 407." 80 Fed. Reg. 37055.

6.       By contrast,  the Agencies' repeal and replacement of the 2015 is not science-based and is contrary to the CWA's plain language, legislative history and judicial precedent and will reverse the water quality protection purposes of the 2015 Rule.

7.      In fact, the NWPR will remove federal jurisdiction from over half of United States waters previously subject to CWA regulation.

8.      The Agencies violated the Administrative Procedure Act (APA) by failing to base the Repeal Rule and NWPR on a reasoned determination.

9.      Instead, the Agencies predetermined to repeal and replace the 2015 Rule upon inaccurate claims that the adoption of the 2015 Rule was a "power grab" that regulated "puddles," among other claims.

10.     The Agencies acted unlawfully by failing to consider the Science Report's findings and by failing to identify how the repeal and replacement of the 2015 Rule would impact the Nation's water quality and States' economies.

11.     And, the Agencies' unlawful actions are a violation of plaintiffs' substantive due process rights guaranteed them pursuant to the 14th Amendment of the United States Constitution.

12.     Therefore, plaintiffs respectfully request this Court annul the Agencies' Repeal Rule and the NWPR as their adoption was arbitrary, capricious, an abuse of discretion and not in accordance with law. 5 USC §706(2)(A).

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 USC. §§1331 and 2201(a). The Repeal Rule and NWPR are subject to judicial review under the APA as final agency actions for which there is no other adequate remedy. 5 USC §§ 702, 704. The relief sought is authorized by 28 USC §2201(a), 28 USC §2202 and 5 USC §706.

14.     Venue is proper in the Northern District of New York under 28 USC §1391(e)(1)(A) because this is a civil action brought against agencies and officers of the United States acting in their official capacities, and plaintiffs William Murray and June Omura reside and own property within the Northern District of New York, in Ulster County, New York.

## DEFENDANTS

15.     Defendant Andrew Wheeler, EPA Administrator, signed the Repeal Rule and NWPR.  This amended complaint names Administrator Wheeler as a defendant in his official capacity.

16.     Defendant EPA is an agency of the U.S. government. EPA is responsible for implementing and enforcing many of the CWA's programs.

17.     Defendant R. D. James is named as a defendant in his official capacity as Assistant Secretary of the Army (Civil Works). Mr. James signed the challenged rules on behalf of the U.S. Army Corps of Engineers (Corps).

18.     Defendant Corps is a federal agency within the U.S. Army. The Corps implements the permit program for the discharge of dredged and fill material into waters of the United States. 33 U.S.C. §1344(a).

## PLAINTIFFS

19.     Plaintiffs William Murray and June Omura reside and own property at 263 Rt. 32 North, in the Town of New Paltz in Ulster County, New York (Tax Map 78.15-1-34). See Exhibit A attached to the Affirmation in Support of James Bacon[1] herewith.

20.     Plaintiffs' property includes approximately 0.46 acres of wetlands designated as "PEM1E" by the United States Fish and Wildlife Service's (USFWS), National Wetland Inventory (NWI) map. PEM1E has no surface water connection to any other waterbody. Exhibits A and B.

21.     PEM1E is about 425 feet from another wetland designated as PFO1E which has surface water connections to tributaries of the Wallkill River. Exhibits B and C.

22.     PEM1E is linked with PFO1E by hydric soils identified as "probable wetlands" by New York State Department of Environmental Conservation (NYSDEC). Exhibit C.

23.     PEM1E is within 4,000 feet of the Wallkill River, a traditional navigable water, and the area includes a system of interconnected wetlands, tributaries and hydric soils. Exhibit D.

---

[1] All exhibits referred to herein are attached to the Affirmation in Support of James Bacon.

24.     Plaintiffs' residence is served by a private well approximately 150 feet deep which relies upon unconsolidated aquifer No. 77512462 located beneath all of PEM1E on plaintiffs' property. Exhibit E.

25.     Wetlands such as PEM1E, recharge aquifers, such as aquifer No. 77512462, which are subject to pollution from the surface. Bacon Affirmation at ¶8.

26.     Immediately north and adjacent to plaintiffs' property is a 1-acre site used as a commercial paving business, known as Dean's Paving, which includes approximately 0.3 acres of PEM1E. Exhibit F.

27.     Dean's Paving loads, parks and stores its trucks and stores asphalt in open piles and in trucks in PEM1E. Exhibit G.

28.     Upon information and belief, pursuant to the 2015 Clean Water Rule's definitions of "adjacent waters," "similarly situated" waters and "significant nexus," PEM1E would be classified as a federal jurisdictional water due to its linkage with downstream wetlands by hydric soils, proximity to the Wallkill River and proximity to other wetlands and tributaries and being located at the headwaters of a tributary/wetland branch extending from the Wallkill River.

29.     However, under the NWPR, PEM1E is not jurisdictional as it is defined as a "non-adjacent wetland" having no specific surface water connection to WOTUS and does not "touch at least one point or side of—a territorial sea, traditional navigable water, tributary, lake, pond, or impoundment of a jurisdictional water." 85 Fed. Reg. 22279.

30.     Thus, with the adoption of the NWPR, there is no federal prohibition on Dean's Paving completely filling in PEM1E or allowing untreated stormwater into the wetland.

31.     Thus, untreated stormwater runoff containing petroleum products will enter PEM1E and gravitate onto plaintiffs' neighboring property and infiltrate to aquifer No. 77512462 thereby threatening the safety of plaintiffs' drinking water.

32.     Therefore, plaintiffs have a personal stake in reversing the Agencies' unlawful Repeal Rule and NWPR which terminates the status of PEM1E as federally protected WOTUS.

## BACKGROUND

33.     The Supreme Court affirmed federal jurisdiction over navigable waters in *The Daniel Ball*, 77 US 557, 563 (1870), *i.e.* waters that are "used, or . . . susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water,"

34.     The Rivers and Harbors Act of 1899, (RHA), sought to prevent obstruction and pollution of the nation's waters. (Mar. 3, 1899, ch. 425, § 10; 33 USC §403).  The RHA included the Refuse Act affirming federal jurisdiction over the tributaries and areas where refuse might wash into navigable waters. 33 USC §407.

35.     In 1948, Congress passed the Water Pollution Control Act (WPCA) and the Acts of 1956 and 1961 were designed to address water pollution on a case-by-case basis.

36.     The 1965 WPCA amendments gave individual states the authority to develop and enforce water quality standards for interstate waters. If states did not develop and enforce water quality standards, the Federal government would do so.

37.     However, the state level approach was non-uniform and states with lenient regulations attracted the heaviest polluters.

38.     Congress enacted the 1972 WPCA amendments, *a.k.a.* the Clean Water Act, partly in reaction to rivers catching fire during the late 1960's, including the Buffalo River in 1968, the Rouge River in Detroit in 1969 and most famously the Cuyahoga River fire of 1969 in Cleveland.

39.     The CWA established a structure for regulating pollutant discharges into WOTUS and gave EPA the authority to implement pollution control programs.

40.     The CWA's "major purpose" was "to establish a comprehensive long-range policy for the elimination of water pollution." S. Rep. No. 92-414, p. 95 (1971), reprinted in 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93-1, p. 1511 (1971).

41.     The statutory objective "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 USC §1251(a).

42.     The statute directed the Agencies to "develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters." 33 USC §1252.

43.     The Agencies established permitting programs to control polluted stormwater and limit the filling of wetlands. The Agencies also adopted regulations defining WOTUS which were challenged in many different jurisdictions with varying fact patterns.

44.     In 1985, the Supreme Court unanimously described the CWA's objective as "a broad, systemic view of the goal of maintaining and improving water quality" which granted the Agencies broad authority to protect "water quality and aquatic ecosystems,"

including wetlands adjacent to navigable waters. *United States v Riverside Bayview Homes, Inc*., 474 US 121, 132-133 (1985).

45.     However, in 1986, the Supreme Court issued a split ruling (5-4), in reviewing whether certain waters were WOTUS.  *Solid Waste Agency of N. Cook Cty. v US Army Corps of Eng'rs*, 531 US 159 (2001) (*SWANCC*).

46.     The *SWANCC* majority ruled that federal jurisdiction did not extend to certain isolated bodies of water, in part, because that "would result in a significant impingement of the States' traditional and primary power over land and water use." 531 US at 174.

47.     Justice Stevens' argued the majority's reliance on the Commerce Clause was misplaced as the CWA had marked "a shift in the focus of federal water regulation from protecting navigability toward environmental protection."  531 US at 179.

48.     The dissent contended the CWA required federal Agencies to give "due regard," not to the interest of unobstructed navigation, but rather to "improvements which are necessary to conserve such waters for the protection and propagation of fish and aquatic life and wildlife [and] recreational purposes." 531 US at 180.

49.     In 2003, EPA published guidance to assist the Agencies in applying the definition of WOTUS in the wake of *SWANCC*. 68 Fed. Reg. 1995.

50.     Then, in 2006, the Supreme Court issued a fractured, (4-1-4), decision in *Rapanos v United States*, 547 US 715 (2006), offering several opinions as to whether wetlands adjacent to non-navigable tributaries were WOTUS.

51.     Justice Kennedy's discussion of a "significant nexus" test used to define WOTUS was accepted by the four dissenting Justices, (*Rapanos*, 547 US at 810, footnote 14), and has been followed in subsequent federal rulings.

52.     As a result of the fractured ruling, many parties joined with Justice Breyer's call

for rulemaking to bring clarity to the definition of WOTUS. *Rapanos* at 812; 84 Fed.

Reg. 4160 (February 14, 2019).

### The Agencies' reasons for adopting the 2015 Rule

#### A.  The *SWANCC/Rapanos* water quality damage

53.     The *SWANCC* decision resulted in the removal of millions of acres of wetlands

from federal jurisdiction.

54.     As reported in 2001:

> …SWANCC's impacts are likely to be environmentally significant.
> Tentative state estimates…  suggest 30% to 79% of total wetland acreage
> may be affected… This is considerably higher than the 15% to 20% figure
> often suggested for isolated wetland acreage in the past years. Even if
> SWANCC results in only a one percent loss of America's wetlands, the
> decision would cause more wetlands to be destroyed than were lost in the
> past decade…

 "The SWANCC Decision and State Regulation of Wetlands" (2001).[2]

55.     By 2017, wetland losses had increased to nearly 14,000 acres per year.[3]

56.     Together, *SWANCC* and *Rapanos* removed CWA regulation for nearly half of

U.S. rivers and streams.  "Consequences of the Clean Water Act and the Demand for

Water Quality" Center for Agricultural and Rural Development, Iowa State University

(January 2017) at page 2. https://academic.oup.com/qje/article/134/1/349/5092609.

57.     And, in a four-year period following *Rapanos*, EPA dropped more than 1,500

investigations against polluters due the uncertainty in defining WOTUS in the wake of

*SWANCC* and *Rapanos*. https://www.nytimes.com/2010/03/01/us/01water.html?_r=1.

---

[2] Association of State Wetlands Managers;
https://www.aswm.org/pdf_lib/swancc_and_state_regulation_060101.pdf at pg 8.
[3] (See Congressional Research Report at
https://www.everycrsreport.com/reports/RL33483.html at page 2.)

58.     EPA identified the *SWANCC/Rapanos* rulings' negative impact on water quality

protection efforts:

> Many of the nation's waters are not meeting water quality standards, and
> the threat to drinking water sources is growing…. There are significant
> water quality problems facing too many communities; there are expanding
> universes of diffuse pollution sources, many which are not effectively
> regulated by the CWA; and there are significant limitations that affect
> EPA's ability to identify serious problems quickly and take prompt action
> to correct them. Among these limitations are two Supreme Court decisions
> – its 2001 decision in [*SWANCC* and *Rapanos*] that added layers of
> confusion regarding which water bodies are covered by the CWA in many
> parts of the country.

"Clean Water Act Enforcement Action Plan" (2009);  https://www.epa.gov/compliance/

clean-water-act-cwa-action-plan.

59.     Indeed, more than half the rivers and streams of the United States are polluted.[4]

60.     The top causes of pollution associated with impairment in rivers and streams are

pathogens, sediment smothering stream beds and nutrients such as phosphorus and

nitrogen, which at excess levels stimulate the growth of undesirable algae and aquatic

weeds and lead to reduced levels of dissolved oxygen. And, according to that 2009

report, 21% of the nation's lakes are hypereutrophic, 34% are eutrophic and 35% are

mesotrophic. Further, 32% of the nation's wetlands are in poor biological condition, with

leading stressors including soil compaction and vegetation removal.

**B.   The economic benefits of wetlands**

61.     More than 25 years ago, EPA documented the economic benefits of wetlands.

"Wetlands Fact Sheet # 4 Economic Benefits of Wetlands" (1993).

62.     As reported by the Conservation Fund:

> One of the economically valuable roles wetlands play is pollutant
> filtration. As an example, a bottomland hardwood swamp in South

---

[4] "2017 National Water Quality Inventory Report to Congress,"

Carolina was studied for its filtration services. It was found that the swamp removed a quantity of pollutants from the surrounding watershed equal to that of a water treatment plant. The cost-saving of protecting the wetlands was estimated at $5 million, or the cost of building the water treatment plant (EPA publication 832-R-93-005).

Wetlands also buffer surrounding areas from flood damage. Wetlands soak up rain runoff, reducing the frequency and intensity of flooding. Maintaining only 15% of the land area of a watershed in wetlands can reduce flood peaks by as much as 60%, saving enormous costs on flood damage (EPA publication 843-F-06-004).

The Conservation Fund (in collaboration with Houston-Galveston Area Council and Houston Wilderness) assessed ecosystem services in the 13-county Houston-Galveston region. This assessment estimated ecological systems provide the region $15 billion dollars per year of water quality, air quality, water supply, flood protection, and carbon sequestration benefits.

Of this number, wetlands serve as local water storage reserves providing services totaling $9,000/acre/year. Wetlands were also estimated to reduce flood damage by $8,000/acre/year by absorbing stormwater. The cost saving for removal of carbon from the atmosphere is $2 of damage prevention annually per ton of carbon removed. Wetlands are estimated to store between 81 and 216 metric tons of carbon per acre. Forests and prairies store their share of carbon as well (between 47 and 74 metric tons per acre for forests and 78 tons per acre for prairies).[5]

63.    Wetland areas have declined nationwide from more than 220 million acres to

110.1 million acres as of 2009.  Approximately 83 million wetland acres are on private

lands. https://www.everycrsreport.com/reports/RL33483.html.

64.    On May 20, 2015, EPA published an 87-page economic report finding that the

2015 Rule's economic benefits outweighed costs by at least 90 million dollars. ($555-

$572 million in benefits vs. $236-$465 million in costs. (See  https://www.epa.gov/

sites/production/files/2015-06/documents/508-final_clean_water_rule_economic_

analysis_5-20-15.pdf.)

---

[5] Conservation Fund, Houston-Galveston, "Green Infrastructure and Ecosystem Services Assessment," 2013, last visited April 29, 2020 here:
http://www.conservationfund.org/images/projects/files/Houston_Galveston_Report.pdf

### C.  Reliance on science

65.     EPA also spent six years studying the connectivity of waters and reviewed more than 1,200 peer-reviewed scientific publications in preparing a "Science Report" in support of the 2015 Rule. 82 Fed. Reg. 34899, 34901.

66.     Preliminary drafts of the Science Report and its conclusions were corroborated by independent peer reviews by scientists and scientific panels from 2011 to 2015. (See Science Report Preface; https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414.)

67.     EPA also repeatedly invited the public to submit comments and attend meetings. 80 Fed. Reg. 37062. All told, "[o]ver 133,000 public comments were received" by the panel, and "[e]very meeting [it held] was open to the public, noticed in the Federal Register, and had time allotted for the public to present their views." 78 Fed. Reg. 15012; 80 Fed. Reg. at 37057.

68.     The rulemaking included over 400 meetings with state, tribal and local officials and business, environmental and public health organizations.

69.     The Agencies received more than one million comments on the 2015 Rule, 87% of which were supportive.

70.     EPA released its Science Report on January 15, 2015, "to summarize current scientific understanding about the connectivity and mechanisms by which streams and wetlands, singly or in aggregate, affect the physical, chemical, and biological integrity of downstream waters."  80 Fed. Reg. 2100; "U.S. EPA. Connectivity of Streams and Wetlands to Downstream Waters: A Review and Synthesis of the Scientific Evidence (Final Report)."

71.    The Agencies published the 2015 Rule on June 29, 2015, identifying water quality

improvement as the prime objective. 80 Fed. Reg. 37054.

**Opposition to the 2015 Rule**

72.    In 2014, the Attorney General of Oklahoma, Scott Pruitt, opposed the proposed

rule claiming in part that "[t]he Proposed Rule unlawfully and unconstitutionally seeks to

assert federal jurisdiction over local water and land use management…" Comments of the

Attorneys General of West Virginia, *et al.*, on the Proposed Definition of "Waters of the

United States" (Docket No. EPA-HQ-OW-2011-0880; Oct. 8, 2014).

73.    Mr. Pruitt attacked the proposed 2015 Rule before Congress claiming it was "a

naked power grab by the EPA" and "a classic case of overreach"—one "flatly contrary to

the will of Congress, who, with the passing of the Clean Water Act, decided that it was

the States who should plan the development and use of local land and water resources."

Impacts of the Proposed "Waters of the United States" Rule on State and Local

Governments: Joint Hearing before the Comm. on Transp. and Infra., U.S. House of

Representatives, and the Comm. on Envt. and Pub. Works, U.S. Senate, 114th Cong. 70

(2015).

74.    Mr. Pruitt then sued to annul the 2015 Rule. *Okla. ex rel. Pruitt v. United States*

*EPA,* Case No. 15-CV-0381-CVE-FHM (ND Okla July 31, 2015).

75.    Mr. Pruitt's lawsuit was consolidated with other challenges and the Court issued a

stay of the Rule on October 9, 2015 in certain states. *Ohio v United States Army Corps of*

*Eng'rs (In re EPA & DOD Final Rule)*, 803 F3d 804 (6th Cir 2015).

76.    In total, the Agencies implemented the 2015 Rule in all but 13 states.  *North*

*Dakota v US EPA*, 127 F Supp 3d 1047 (DND 2015); issuing preliminary injunction

against 2015 Rule; *North Dakota v US EPA*, No. 3:15-cv-59, Order Limiting the Scope of Preliminary Injunction to the Plaintiffs (DND Sept. 4, 2015); clarifying that the injunction applied only in 13 states that had sued in that court.

77.     In early 2017, the Agencies vigorously defended the 2015 Rule by filing a 245-page brief arguing that the 2015 Rule "is a carefully tailored response to Supreme Court precedent, peer-reviewed science, and the Agencies' long experience in implementing the Act." *In re: EPA*, No. 15-3751, Brief for Respondents, at 2 (6th Cir Jan. 13, 2017).

78.     However, EPA reversed its defense of the 2015 Rule when President Trump appointed Scott Pruitt to be its Administrator on February 17, 2017.

**The Trump Administration's reversal of policy**

**A.     Executive Action**

79.     On February 28, 2017, President Trump issued Executive Order No. 13778 directing that EPA "shall consider interpreting the term 'navigable waters,' as defined in 33 USC 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*." https://www.whitehouse.gov/the-press-office/2017/02/28/presidential-executive-order-restoring-rule-law-federalism-and-economic.

80.     While signing the Order, President Trump stated he was "directing the EPA to take action, paving the way for the elimination of this very destructive and horrible rule," which he claimed regulated "nearly every puddle." Remarks by President Trump at signing of Executive Order No. 13778.

81.     The claim was inaccurate because the 2015 Rule exempted all puddles from the definition of WOTUS. 33 CFR §328.3(b)(4)(vii).

82.     Mr. Pruitt signed the notice of intent to withdraw the 2015 Rule eight minutes after President Trump signed Executive Order No. 13778. (See page 159 of "Response to Comments for Definition of 'Waters of the United States'—Recodification of Pre-Existing Rules U.S. Environmental Protection Agency and Department of the Army"; September 5, 2019 ["Responses to Comments on SNPRM"] available at https://www.regulations.gov/ document?D=EPA-HQ-OW-2017-0203-15694.)

83.     Later that same day, (February 28, 2017), Mr. Pruitt began a months-long public campaign against the 2015 Rule attacking it as a "power grab" which unlawfully exercised jurisdiction over "puddles." (https://www.youtube.com/watch?v=yVzz3IYrpac; https://www.agri-pulse.com/articles/8981-pruitt-epa-rewrite-will-limit-reach-of-wotus-rule; https://www.sayanythingblog.com/entry/audio-epa-administrator-scott-pruitt-touts-friendlier-cooperative-relationship-states/.

**B.     Defendants' illegal attempt to suspend the 2015 Rule**

84.     On November 22, 2017, the Agencies proposed to suspend the 2015 Rule with an "applicability date" delaying its effective date until 2020. 82 Fed. Reg. 55542.

85.     The Agencies adopted the final Suspension Rule on February 6, 2018. 83 Fed. Reg. 5200.

86.     However, on August 16, 2018, the United States District Court for the District of South Carolina annulled the Suspension Rule ruling the Agencies had violated the APA. *S.C. Coastal Conservation League v. Pruitt*, 318 F Supp 3d 959 (DSC 2018).

87.     The Agencies' refusal to consider or receive public comments on the substance of the new rule, or identify what the status of the law would be in the absence of the 2015 Rule, did not provide a "meaningful opportunity for comment" as required by the APA.

318 F Supp 3d at 965.  (See also *Puget Soundkeeper Alliance v Wheeler*, No. C15-1342-JCC, 2018 US Dist LEXIS 199358, 2018 WL 6169196, at *5 [WD Wash Nov. 26, 2018] voiding of the Suspension Rule.)

### C.    The Agencies' Proposed and Supplemental Rulemaking to Repeal and Replace the 2015 Rule

88.    On July 27, 2017, the Agencies published a notice of proposed rulemaking (NPRM) to repeal the 2015 Rule. 82 Fed. Reg. 34899.

89.    The Agencies' internal documents indicated that at least 18% of streams and 51% of wetlands nationwide would not be protected under the Agencies' replacement rule. https://www.sciencemag.org/news/2018/12/epa-claims-no-data-impact-weakening -water-rule-numbers-exist.

90.    In preparing the replacement rule, Mr. Pruitt's deputies ordered staffers "to produce a new analysis of the rule — one that stripped away the half-billion-dollar economic benefits associated with protecting wetlands."  https://www.nytimes.com/2017/08/11/us/politics/scott-pruitt-epa.html.

91.    Thus, EPA issued a revised economic report claiming wetlands' economic benefits were not quantified by EPA's prior economic analysis prepared for the 2015 Rule. (See https://www.epa.gov/ sites/production/files/2017-06/documents/economic_analysis_proposed_step1_rule.pdf.)

92.    Mr. Pruitt continued to campaign against the 2015 Rule telling an Iowa audience in, "[n]o one in Congress ever thought that a puddle in Iowa should be considered a water of the U.S."  (August 2017, https://www.iowafarmbureau. com/Article/EPA-leader-pledges-to-rescind-and-replace-WOTUS-rule.

93.     In July, 2018, the Agencies published a supplemental notice of proposed rulemaking (SNPRM) to repeal the 2015 Rule. 83 Fed. Reg. 32227 (July 12, 2018).

94.     The SNPRM identified the predetermined outcome of the rulemaking stating "the Agencies reiterate that this regulatory action is intended to permanently repeal the 2015 Rule in its entirety, and we invite all interested persons to comment on whether the 2015 Rule should be repealed." 83 Fed. Reg. 32228.

95.     Like the original NPRM, the SNPRM did not compare, or seek comment on, the relative merits of the 2015 Rule and EPA's pre-2015 Rule method of defining WOTUS.

96.     And, like the original NPRM, the SNPRM did not publish the actual rules the Agencies proposed to implement upon repeal of the 2015 Rule.

97.     Further, both the NPRM and SNPRM failed to address the loss of the minimum 90 million dollar economic benefit as EPA had reported in its 2015 economic analysis.

98.     In fact, the Agencies abandoned any economic impact review stating "[w]hile economic analyses are informative in the rulemaking context, the Agencies are not relying on the economic analysis performed pursuant to Executive Orders 12866 and 13563 . . . as a basis for this proposed action." 83 Fed. Reg. 32250.

99.     The Agencies' responses to its SNPRM did not address the status of the Nation's waters, but instead claimed that the 2015 Rule was an overreach of authority. Responses to Comments on SNPRM at page 86, citation at ¶83, above.

100.    On February 14, 2019, the Agencies proposed to replace the 2015 Rule with a Revised WOTUS Rule, (NWPR), 84 Fed. Reg. 4154 (February 14, 2019), and received approximately 620,000 comments. 84 Fed. Reg. 56665 (October  22, 2019).

101.    The Agencies advised they were not being guided by science:

> The Agencies today are proposing to establish a regulation that would define "waters of the United States" in simple, understandable, and implementable terms to reflect the ordinary meaning of the statutory term, as well as to adhere to Constitutional and statutory limitations, the policies of the CWA, and case law, and to meet the needs of regulatory Agencies and the regulated community.

84 Fed. Reg. 4163. (February 14, 2019).

102.   And:

> The Agencies interpret their authority to include promulgation of a new regulatory definition of "waters of the United States," consistent with the guidance in Executive Order 13778, so long as the new definition is authorized under the law and based on a reasoned explanation.

84 Fed. Reg. 4169 (February 14, 2019).

103.   The Agencies published the final Repeal Rule on October 22, 2019. 84 Fed. Reg.

56626.

### **The Repeal Rule's impact on water quality**

104.   Regarding the Repeal Rule, comments on the SNPRM noted EPA's statements

that "over 60 percent of streams and millions of acres of wetlands lack adequate

safeguards from degradation and should be protected under the CWA." See page 84 of

Responses to Comments on SNPRM;  citation at ¶82, above.

105.   Indeed, EPA's "National Water Quality Inventory," identified that 70 percent of

lakes, reservoirs, and ponds, 78 percent of bays and estuaries and 55 percent of rivers and

streams in the U.S. are impaired by pollution and do not meet minimum water quality

standards. http://www.nacdnet.org/about-nacd/what-we-do/water/.

106.   Thus, the repeal of the 2015 Rule left a majority of the Nation's waters in peril

and thereby threatened public safety.

**The Replacement Rule – The Navigable Waters Protection Rule**

107.    The proposed replacement rule published in February, 2019, identified two alternate definitions of WOTUS - waterbodies that 1) "have a specific connection" or 2) have a "surface connection" to traditionally navigable waters. 84 Fed. Reg. 4170.

108.    However, the final rule contains only one alternative - a "specific surface water connection" to define WOTUS. In so doing, the NWPR eliminates Justice Kennedy's "significant nexus" test. 85 Fed. Reg. 22250 (April 21, 2020).

109.    Specifically, the final NWPR rule states:

> [WOTUS] encompass relatively permanent flowing and standing waterbodies that are traditional navigable waters in their own right or that have a specific *surface water* connection to traditional navigable waters, as well as wetlands that abut or are otherwise inseparably bound up with such relatively permanent waters.

85 Fed. Reg. 22273 (April 21, 2020); emphasis added.

110.    Thus, the Agencies carried out President Trump's order to define WOTUS "consistent with the opinion of Justice Antonin Scalia in Rapanos" and limit WOTUS to waterbodies with surface water connections to traditionally navigable waters.

111.    And, the NWPR rejects science-based rulemaking contrary to EPA's Science Board's, (SAB), recommendations:

> The SAB's draft commentary asserted that the proposed rule did not fully incorporate the Connectivity Report and offers no comparable body of peer reviewed evidence to support this departure.

85 Fed. Reg. 22261.

112.    Like the Repeal Rule, the NWPR fails to address the state of the nations' waters.

113.    The NWPR also fails to explain how its new definitions of "tributary" and "adjacent wetland" will benefit water quality and advance the goals of the CWA as compared with the 2015 Rule's definitions.

114.    Therefore, as set forth in the following causes of action, in the absence of science supporting the NWPR and the rejection of Justice Kennedy's "significant nexus" test, the Agencies' predetermining to repeal and replace the 2015 Rule was unlawful and contrary to the purposes and goals of the CWA and must be judicially annulled.

### FIRST CAUSE OF ACTION

**The Agencies violated the Administrative Procedure Act and Due Process Clause arbitrarily and unlawfully predetermining to repeal and replace the 2015 Rule**

115.    The allegations of the preceding paragraphs are incorporated here by reference.

116.    From its inception, the Agencies' repeal and replacement of the 2015 Rule was formulated and predetermined for political purposes in violation of the due process rights of millions of citizens, such as plaintiffs, who rely upon the CWA to protect their health, safety and drinking water supplies.

117.    A "reasoned explanation" is needed for an agency to disregard facts and circumstances that underlay a policy it is replacing, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), and rulemaking must be undertaken with an open mind. *Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979).

118.    Here, the Agencies "had already reached a prejudged political conclusion" to repeal and replace the 2015 Rule following President Trump's Executive Order No. 13778. *Int'l Snowmobile Mfrs.Ass'n v. Norton*, 340 F Supp 2d 1249, 1261 (D Wyo 2004).

119.    Administrator Pruitt almost immediately signed a notice of proposed repeal, summarily rejecting the years of work EPA spent in drafting the Science Report.

120.    In following the President's order, the Agencies allowed politics to override years of scientific investigation which was the basis for the 2015 Rule.

121.    Consistent with a predetermined result, the Agencies prohibited comment on the substance of both the 2015 Rule and the Agencies' prior case-by-case method for determining WOTUS. 82 Fed. Reg. 34903; (July 27, 2017); "Definition of 'Waters of the United States'-Recodification of Pre-Existing Rules."

122.    And, in the SNPRM to justify the repeal, the Agencies set forth "proposed" conclusions, with no supporting analysis, and solicited comments in support of their proposed conclusions. 83 Fed. Reg. 32228 (July 12, 2018).

123.    Further, the Agencies attempted to justify the repeal of the 2015 Rule by citing *Georgia v. Wheeler*, No. 2:15-cv-00079, 2019 WL 3949922, (SD Ga Aug. 21, 2019). However, the justification is misplaced because *Georgia v Wheeler* was decided over a month after the Agencies produced their revised Economic Analysis and sent the Final Repeal Rule to the Office of Management and Budget.

124.    Therefore, because the Agencies operated with an unalterably closed mind pursuing a predetermined result with no meaningful review of the repeal and replacement of the 2015 Rule, the Agencies violated the APA and the Due Process Clause of the Constitution and its rulemakings were arbitrary, capricious and an abuse of discretion and must be annulled.

## SECOND CAUSE OF ACTION

**The Repeal Rule and the NWPR must be annulled as the Agencies failed to identify the current status of U.S. waters or draw comparisons with the 2015 Rule**

125.    The allegations of the preceding paragraphs are incorporated here by reference.

126.    A rulemaking is arbitrary and capricious if the agency failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v State Farm Mut. Auto. Ins. Co.*, 463 US 29, 43 (1983).

127.    The Agencies adopted the 2015 Rule to promote regulatory clarity and consistency, and to protect the nation's waters thus furthering the CWA's purposes.

128.    The Agencies supported their rulemaking with an extensive record spanning six years and its Science Report, finding that the 2015 Rule would promote regulatory clarity and consistency and be economically beneficial. 80 Fed. Reg. 2100, (January 15, 2015).

129.    However, in repealing the 2015 Rule, the Agencies failed to identify, even in a cursory manner, the status of water quality in the U.S.

130.    And, the Agencies made no attempt to compare how the quality of U.S. waters – as defined under *SWANCC/Rapanos*, the 2015 Rule or otherwise – would suffer, improve or remain the same if the 2015 Rule were repealed and replaced.

131.    As above,  an agency may not disregard facts and circumstances that underlay a policy it is replacing. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009).

132.    Therefore, the Agencies' repeal and replacement of the 2015 Rule with the NWPR was arbitrary, capricious and an abuse of discretion and must be judicially annulled.

## THIRD CAUSE OF ACTION

### The Agencies' repeal and replacement of the 2015 Rule was arbitrary and capricious as the actions were not founded on science

133.    The allegations of the preceding paragraphs are incorporated here by reference.

134.    To alter an administrative policy, the agency must "show that there are good reasons" to do so and the new policy must be informed by the agency's expertise and rest upon principles that are rational and neutral. *FCC v Fox TV Stations, Inc.*, 567 US 239, 250 (2012); and see *FCC v. Fox TV Stations, Inc.*, 556 US 502, 535-536 (2009);

135.    Here, while signing the Order, President Trump made clear that he was "directing the EPA to take action, paving the way for the elimination of this very destructive and horrible rule." See ¶80 above.

136.    However, Justice Scalia's definition of WOTUS was not supported by science but by Webster dictionary's definition of "waters." *Rapanos* at 739.

137.    By contrast, the Agencies' 2015 Rule was grounded in science after years of rigorous analysis, peer-reviews and stakeholder input regarding the connectivity of waters and more remote waters' importance to biological functions and maintaining water quality standards. 80 Fed. Reg. 37061 (June 29, 2015).

138.    The Agencies' six years in drafting its Science Report requires judicial deference to the Agencies' expertise. *Nat'l Envtl. Dev. Association's Clean Air Project v. EPA*, 686 F3d 803, 810 (DC Cir 2012).

139.    Because the Agencies evinced no expertise in failing to ground the Repeal Rule and NWPR in science, the Agencies' repeal and replacement of the 2015 Rule was arbitrary, capricious and an abuse of discretion and must be judicially annulled.

## FOURTH CAUSE OF ACTION

### The Agencies' repeal and replacement of the 2015 Rule was arbitrary and capricious as it effects an overreach of the Executive Branch

140.    The allegations of the preceding paragraphs are incorporated here by reference.

141.    The United States Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States."

142.    Therefore, the Agencies' implementation of Executive Order No. 13778, repealing and replacing the 2015 Rule with Justice's Scalia's definition of WOTUS with no meaningful review was arbitrary, capricious and an abuse of discretion and must be judicially annulled.

## FIFTH CAUSE OF ACTION

### The Agencies' repeal and replacement of the 2015 Rule was arbitrary and capricious as actions are contrary to the legislative intent and language of the CWA

143.    The allegations of the preceding paragraphs are incorporated here by reference.

144.    Maintaining the "integrity" of water quality is central to the CWA's purposes. *United States v Riverside Bayview Homes, Inc*., 474 US 121, 132-33 (1985).

145.    The repeal and replacement of the 2015 Rule will not advance the CWA's purposes "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" as it removes millions of acres of wetlands and streams from federal jurisdiction. 33 USC §1251(a).

146.    Indeed, in Texas alone, the 2015 Rule had "restored federal protections to more than 143,000 miles of Texas streams." However, those protections are now reversed. https://www.epa.gov/sites/production/files/2015-06/documents/2009_10_15_wetlands_ science_surface_drinking_water_surface_drinking_water_tx.pdf.

147.    In sum, the NWPR is invalid as it fails to make any argument or present any evidence demonstrating its implementation will result in the restoration and maintenance of the chemical, physical and biological integrity of the Nation's waters as required by the CWA.

148.    Therefore, the Agencies' repeal and replacement of the 2015 Rule with the NWPR was arbitrary, capricious and an abuse of discretion and must be judicially annulled.

## SIXTH CAUSE OF ACTION

### The NWPR must be annulled as it would negatively impact state economies

149.    The allegations of the preceding paragraphs are incorporated here by reference.

150.    "[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable…" *Nat'l Assn'n of Home Builders v. EPA*, 682 F3d 1032, 1039-50 (DC Cir 2012).

151.    As above, EPA estimated the 2015 Rule would result in a net 90 million dollar benefit as reported in its economic analysis published May 20, 2015.

152.    However, in June 2017, the new leadership ordered EPA analysts to reverse their findings regarding the 2015 Rule's economic benefits.

153.    Thus, EPA revised its economic impact analysis leaving wetlands-related economic benefits unquantified.

154.    Instead of valuing wetlands benefits at up to $500 million per year, EPA excluded all wetlands values in its 2017 analysis prepared in advance of, and in support of, repealing and replacing the 2015 Rule.

155.    The NWPR will cause roughly half of the remaining 83 million acres of wetlands in private hands to lose federal regulatory status. The cost of losing 41.5 million acres of wetlands would be in the hundreds of trillions of dollars.

156.    Therefore, without a rational economic impact analysis justifying the Agencies' rejection of their 2015 economic analysis, the Agencies' repeal and replacement of the 2015 Rule is arbitrary, capricious and an abuse of discretion and must be annulled.

## SEVENTH CAUSE OF ACTION

**The Repeal Rule and the NWPR must be annulled as these rules improperly defer CWA enforcement to the states**

157.    The allegations of the preceding paragraphs are incorporated here by reference.

158.    Both the Repeal Rule and the NWPR repeatedly cite the preservation of States' rights as a primary basis for the repeal. 84 Fed. Reg. 56654 (Oct. 22, 2019), 85 Fed. Reg. 22250 (April 21, 2020).

159.    Indeed, the Agencies found that there are "certain waters that are more appropriately left solely in the jurisdiction of States." 84 Fed. Reg. 56654 and 85 Fed. Reg. 22252.

160.    However, Congress determined in 1977 that broad federal jurisdiction was needed over waters of the United States precisely because state enforcement was severely lacking due to an absence of funding and political will. (See Comm. on Env't & Pub. Works, Committee Print, 95th Cong., 2d Sess., Legislative History of the Clean Water Act of 1977, at 908, 920, 922 and 923 [Oct. 1978]).

161.    And, EPA's own reports prove that the states have failed to protect water quality as a majority of the Nation's waters violate water quality standards. See above ¶¶58-60.

162.    And, the Agencies conceded they did not examine how the loss of federal jurisdiction might be addressed by the States, *i.e.* "some States may regulate only a subset of affected waters, but the agencies did not have sufficient information to incorporate that level of detail into the analysis…  States may or may not choose to regulate that [non-jurisdictional] water." 85 Fed. Reg. 22334.

163.    Thus, the NWPR provides no reasoned elaboration as to the impact of the NWPR on water quality.

164.    The repeal and replacement of the 2015 Rule will not result in water quality improvement nor will it promote the CWA's goals "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

165.    Instead, the NWPR will allow the loss of millions of acres of wetlands across the U.S. costing the economy billions of dollars resulting from the loss of wetlands' flood storage, water filtration benefits each year and imperiling the public health and ecosystems upon which the public welfare depends.

166.    Therefore, the Agencies' repeal of the 2015 Rule and replacement of the Rule with the NWPR was arbitrary, capricious and an abuse of discretion and must be judicially annulled.

### EIGHTH CAUSE OF ACTION

**The Agencies' repeal and replacement rules must be annulled as they are inconsistent with the 1899 Refuse Act**

167.    The allegations of the preceding paragraphs are incorporated here by reference.

168.    Congress intended the CWA to extend federal jurisdiction to areas covered by the 1899 Refuse Act. *United States v Consolidation Coal Co*. 354 F Supp. 173 (ND W Va 1973).

169.     The Agencies' limiting the CWA's jurisdiction based upon Justice Scalia's *Rapanos* opinion is contrary to the Refuse Act's provisions, and thus the Repeal Rule and the NWPR must be annulled as their adoption was arbitrary, capricious and an abuse of discretion.

## NINETH CAUSE OF ACTION

**The Repeal and Replacement of the 2015 Rule violates the
CWA's anti-degradation provisions**

170.     [P]ursuant to the Clean Water Act's "antidegradation policy," a state's water quality standards must "be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation." Id. at 705, 114 S.Ct. 1900 (citing 33 U.S.C. § 1313(d)(4)(B)). The mandate's broad reach is reflected in 40 C.F.R. § 131.12(a)(2), which provides that states "shall assure water quality adequate to protect existing uses fully." Thus, no activity that would "'partially or completely eliminate any existing use'" is permitted, even if it would leave the majority of a given body of water undisturbed. *Islander East Pipeline Co., LLC v. McCarthy*, 525 F. 3d 141, 144 (2nd Cir. 2008).

171.     EPA's "total maximum daily load" (TMDL) program is designed to bring impaired water supplies back into compliance with water quality standards.

172.     In adopting the repeal and replacement rules, the Agencies did not consider the rules' impacts upon the CWA's anti-degradation provisions or the TMDL program.

173.     However, the loss of federal jurisdiction over millions of acres of wetlands and watercourses will result in widespread filling of those previously jurisdictional areas.

174.     This will result in untold violations of water quality standards across the United States caused by pollutant loadings comprised of sediment and nutrients, along with countless other pollutants, carried by stormwater into those already impaired waterbodies.

175.    The Agencies' failure to consider the impacts upon the CWA's anti-degradation and TMDL provisions renders void its rulemaking process used in repealing and replacing the 2015 Rule.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that this Court:

1.    Declare that the Agencies acted arbitrarily and unlawfully in promulgating the challenged rules, "Definition of 'Waters of the United States'—Recodification of Pre-Existing Rules," 84 Fed. Reg. 56626 (Oct. 22, 2019) and the "Navigable Waters Protection Rule: Definition of "Waters of the United States." 85 Fed. Reg. 22250 (April 21, 2020);

2.    Vacate and set aside the challenged rules as the Agencies violated procedural and substantive provisions of the APA, Due Process Clause of the Constitution, judicial precedent and the CWA's statutory provisions and legislative history;

3.    Grant plaintiffs their costs of suit including reasonable attorney fees to the extent permitted by law; and

4.    Grant plaintiffs such further relief as the Court may deem just and proper.


Respectfully submitted this 11th day of May, 2020.


James Bacon

Attorney for Plaintiffs
N.D.N.Y. Bar No. 700116
baconesq@yahoo.com
P.O. Box 575
New Paltz, New York 12561
Telephone: (845) 419-2338