# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| WILLIAM MURRAY and JUNE OMURA, | ) |
| | ) |
| Plaintiffs, | ) Case No.  1:19-cv-1498 |
| | )              LEK/TWD |
| -against- | ) |
| | ) |
| ANDREW WHEELER, in his official capacity as Administrator of the U.S. Environmental Protection Agency, the  U.S. ENVIRONMENTAL PROTECTION AGENCY and R.D. JAMES, in his official capacity as the Assistant Secretary of the Army (Civil Works) and the U.S. ARMY CORPS OF ENGINEERS, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

_____

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## SUMMARY JUDGMENT

James Bacon
Attorney for Plaintiffs
N.D.N.Y. Bar No. 700116
P.O. Box 575
New Paltz, New York 12561
(845) 419-2338
Baconesq@yahoo.com

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**………………………………………………..…………..…...ii

**PRELIMINARY STATEMENT**………………………………...……..……………….1

**STATEMENT OF FACTS**……………………...……………………..……………..…1

      A.  **Background**……………………………………………………………..1
      B.  **The *SWANCC/Rapanos* water quality impacts**……………………………7
      C.  **The water quality and economic benefits of wetlands and ephemeral streams**….9
      D.  **The 2015 Rule's water protection goals**…………………………………...11
      E.  **Opposition to the 2015 Rule**…………………………………………13
      F.  **The Trump Administration's reversal of policy**…………………………14
      G.  **The Replacement Rule – the Navigable Waters Protection (2020) Rule**………..16

**STANDARD OF REVIEW**…………………………………………..…………......18

**POINT I**

**THE 2020 RULE IS VOID AS THE AGENCIES FAILED TO IDENTIFY
FUNDAMENTAL ENVIRONMENTAL IMPACTS RESULTING FROM ITS
DECISIONMAKING**……………………………………………………………...19

**POINT II**

**THE 2020 RULE VIOLATES THE CWA'S ANTI-DEGRADATION PROVISIONS**……24

**POINT III**

**THE AGENCIES' PRE-DETERMINING CRITICAL ISSUES WAS ARBITRARY
AND CAPRICIOUS AND PREVENTED MEANINGFUL ADMINISTRATIVE
REVIEW**…………………………………………………………………..25

**POINT IV**

**PLAINTIFFS' CIRCUMSTANCES ILLUSTRATE PRECISELY HOW THE 2020
RULE'S ELIMINATION OF FEDERAL JURISDICTION THREATENS PUBLIC
HEALTH AND SAFETY**……………………………………………………34

**CONCLUSION**………………………………………………………….....38

i

**TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Motor Vehicle Manufacturers Ass'n v State Farm Mutual Auto. Insurance Co.,* 463 US 29, 43
(1983)..............................................................................................18, 24, 38

*Rapanos v United States*, 547 US 715 (2006).........................................6, 7, 8, 14, 16, 38

*Solid Waste Agency of Northern Cook County v U.S. Army Corps of Engineers*, 531 US 159
(2001).................................................................................................6, 7, 8

*The Daniel Ball,* 77 US 557, 563 (1870)...............................................................1

*United States v. Riverside Bayview Homes, Inc*., 474 US 121 (1985).............................5, 22

**Federal Cases**

*Am. Farm Bureau Fed'n v United States EPA,* 792 F3d 281 (3rd Cir 2015)..........................4

*Anchorage v United States,* 980 F2d 1320 (9th Cir 1992)...........................................20

*Association of National Advertisers, Inc. v* FTC, 627 F 2d 1151 (DC Cir 1979),
*cert. denied*, 447 US 921 (1980)..................................................................26

*Bechtel v Admin. Review Bd.*, 710 F3d 443 (2d Cir 2013) .................................... 19, 27

*Bodhankar v United States Citizenship & Immigration Servs.,* No. 1:19-CV-706 (MAD/CFH),
2020 US Dist LEXIS 26914, (NDNY Feb. 18, 2020)...............................................18

*FCC v Fox Television Stations, Inc.,* 556 US 502 (2009)........................................24, 25

*FCC v Fox TV Stations, Inc.,* 567 US 239 (2012)...................................................25

*Guertin v United States*, 743 F3d 382 (2d Cir 2014).................................... 19, 27, 39

*In re: EPA*, No. 15-3751 (6th Cir Jan. 13, 2017)...................................................13

*International Harvester Co. v Ruckelshaus,* 478 F2d 615 (DC Cir 1973)..........................21

*Islander E. Pipeline Co., v McCarthy*, 525 F3d 141 (2d Cir 2008)............................... 27

*Massachusetts v United States Veterans Admin.*, 541 F2d 119 (1st Cir 1976)............................ 34

*Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, 551 US 644 (2007))........................19

*Nat'l Assn'n of Home Builders v EPA*, 682 F3d 1032 (DC Cir 2012).................................... 19, 29

*Nat'l Black Media Coal. v FCC*, 791 F2d 1016 (2d Cir 1986)...............................................22

*Natural Res. Defense Council, Inc. v U.S. Envtl. Prot. Agency*, 658 F3d 200 (2d Cir 2011)......19

*Okla. ex rel. Pruitt v United States EPA,* Case No. 15-CV-0381-CVE-FHM (ND Okla July 31,

    2015)......................................................................................................................13

*Portland Cement Ass'n v Ruckelshaus*, 486 F2d 375 (1973)................................................. 20, 38

*Pud No. 1 v Wash. Dep't of Ecology,* 511 US 700 (1994)............................................24

*Puerto Rico v Alexander,* 438 F Supp. 90 (DDC 1977)............................................29

*Puget Soundkeeper Alliance v Wheeler*, No. C15-1342-JCC, 2018 WL 6169196, (WD Wash

    Nov. 26, 2018) ......................................................................................... 15, 26

*Residents of Sane Trash Solutions, Inc. v United States Army Corps of Eng'rs,*

    31 F Supp 3d 571 (SDNY 2014).............................................................................18

*Riegel v Medtronic, Inc.,* 451 F3d 104 (2d Cir 2006)............................................24

*Middle Rio Grande Conservancy Dist. v Norton,* 294 F3d 1220, 1226 (10th Cir 2002)...........39

*S.C. Coastal Conservation League v Pruitt*, 318 F Supp 3d 959 (DSC 2018) ...................... 15, 26

*United States v Esso Standard Oil Co. of Puerto Rico,* 375 F2d 621 (3rd Cir 1967)..............33

*United States v Granite State Packing Co.,* 470 F2d 303 (1st Cir 1972)...........................33

*United States v Nova Scotia Food Prods. Corp.*, 568 F2d 240 (2d Cir. 1977).....................22

*United States v Pennsylvania Industrial Chemical Corp.,* 411 US 655 (1973)....................33

*United States v White Fuel Corp.,* 498 F2d 619 (1st Cir 1974)......................................34

*United Steelworkers of Am. v Marshall*, 647 F2d 1189 (DC Cir 1981)..............................25

iii

*Wyoming v Hoffman*, 437 F Supp 114 (D Wyo 1977)………..………………………..……5, 23, 33

**United States Code**

CWA at §1251(a)(1)-(2) ............................................................................................ 2

33 USC §403 Rivers and Harbors Act of 1899 (Mar. 3, 1899), ch. 425, §10 …………….............1

33 USC §407………………………………………………………..…….……………..1, 33

33 USC §1251 ......................................................................................................... 20

33 USC §1251(a) ........................................................................................... 4, 24, 38

33 USC §1252 ........................................................................................................... 4

33 USC §1313(d)(4)(B)…………………………………………………………………….24

33 USC §1365 ..................................................................................................... 34, 37

**Code of Federal Regulations**

33 CFR §328.3(c)(5)(i-iv) .......................................................................................... 36

33 CFR 328.3(a)(6) ................................................................................................... 35

33 CFR 328.3(a)(8) ................................................................................................... 35

33 CFR §328.3(b)(4)(vii)…………………………………………………………….....14, 26

33 CFR 328.3(c)(5)(i-vi)............................................................................................ 36

40 CFR §1.1……………………………………………………………………………….3

40 CFR §1.3……………………………………………………………………………….3

40 CFR §131.12(a)(2)……………………………………………………………………..24

**Federal Register**

35 Fed. Reg. 15623…………………………………………………………………………3

68 Fed. Reg. 1995…………………………………………………………………………7

78 Fed. Reg. 15012………………………………………………………………………12

80 Fed. Reg. 2100, 37054, 37057……………………………………………………………..12

80 Fed. Reg. 37055…………………………………………………………………………....13

80 Fed. Reg. 37059, 37064, 37084, 37105-37106................................................................ 35

80 Fed. Reg. 337080 ................................................................................................... 35, 36

80 Fed. Reg. 37092, 37106…………………………………………………………………36

82 Fed. Reg. 34899. ………………………………………………………………………11, 15

82 Fed. Reg. 34901……………………………………………………………..……..11

82 Fed. Reg. 55542………………………………………………………………………14

82 Fed. Reg. 34899………………………………………………………………………15

83 Fed. Reg. 5200……………………………………………………………………………14

83 Fed. Reg. 32250………………………………………………………………………15

84 Fed. Reg. 4160…………………………………………………………………..……..7

84 Fed. Reg. 4163, 4169, 56626, 56665……………………………………………...16

84 Fed. Reg. 56654…………………………………………………………..…..30

85 Fed. Reg. 22250……………………………………………………………….17, 30

85 Fed. Reg. 22252, 22269, 22278…………………………………………………... 30

85 Fed. Reg. 22261………………………………………………………………….17, 27

85 Fed. Reg. 22271………………………………………………………….......27, 30, 32

85 Fed. Reg. 22273………………………………………………………….17, 27, 37

85 Fed. Reg. 22279,  22280……...…………………………………………….. 37

85 Fed. Reg. 22881…………………………………………………………………. 27

85 Fed. Reg. 22284, 22287………………………………………………………….30

85 Fed. Reg. 22317…………………………………………………………………....31

85 Fed. Reg. 22330, 22334…………………………………………………………... 32

**Other Authorities**

118 Congressional Record 33749 (10/4/72)……………………………………………………4

Comm. on Env't & Pub. Works, Committee Print, 95th Cong., 2d Sess., Legislative History of

the Clean Water Act of 1977, at 908, 920, 922 and 923 [Oct. 1978]). ..................................... 32

Federal Rules of Civil Procedure Rule 56………………………………………………...1

Ohio Constitution in Art. I, § 19b ................................................................................................ 31

Reorganization Plan No. 3 (1970)……………………………………………………………...2

S. Rep. No. 92-414, p. 95 (1971), reprinted in 2 Legislative History of the Water Pollution
Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on
Public Works by the Library of Congress), Ser. No. 93-1, p. 1511 (1971)……………………4, 5

Washington Constitution (Article VII, §10)……………………………………………..……31

## PRELIMINARY STATEMENT

Plaintiffs William Murray and June Omura submit this memorandum of law in support of summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Plaintiffs filed their complaint on December 12, 2019, challenging the repeal of the Clean Water Rule, (2015 Rule), by the United States Environmental Protection Agency, (EPA), and the Army Corps of Engineers, (the Agencies).  On April 21, 2020, the Agencies published the "Navigable Waters Protection Rule (2020 Rule)," replacing the 2015 Rule.  Plaintiffs amended their complaint to challenge the 2020 Rule while answering the affirmative defenses raised in Defendants' motion to dismiss.  By order of July 28, 2020, the Court set a two-phased summary judgment briefing schedule with the first phase addressing the Agencies' adoption of the 2020 Rule.

## STATEMENT OF FACTS[1]

### A.  Background

The Supreme Court affirmed federal jurisdiction over navigable waters in *The Daniel Ball*, 77 US 557, 563 (1870), *i.e.* waters that are "used, or . . . susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water,"

The Rivers and Harbors Act of 1899, (RHA), sought to prevent obstruction and pollution of the Nation's waters. (Mar. 3, 1899, ch. 425, § 10 codified at 33 United States Code [USC] §403).  The RHA included the Refuse Act affirming federal jurisdiction over the tributaries and areas where refuse might wash into navigable waters. 33 USC §407.

---

[1] Documents are identified by the Agencies' Index of the Record filed September 1, 2020 for rulemaking docket No. EPA-HQ-OW-2018-0149.

In 1948, Congress passed the Water Pollution Control Act (WPCA) and the Acts of 1956 and 1961 were designed to address water pollution on a case-by-case basis.

The 1965 WPCA amendments gave individual states the authority to develop and enforce water quality standards for interstate waters. If states did not develop and enforce water quality standards, the Federal government would do so. EPA-HQ-OW-2018-0149-0305.

However, the state level approach was non-uniform and states with lenient regulations attracted the heaviest polluters.

As a result, on July 9, 1970, President Nixon sent "Reorganization Plan No. 3" to Congress directing the establishment of EPA as "only by reorganizing our Federal efforts can we develop that knowledge, and effectively ensure the protection, development and enhancement of the total environment itself."  President Nixon's "Special Message" stated in part:

> The Government's environmentally-related activities have grown up piecemeal over the years. The time has come to organize them rationally and systematically.
>
> Our national government today is not structured to make a coordinated attack on the pollutants which debase the air we breathe, the water we drink, and the land that grows our food. Indeed, the present governmental structure for dealing with environmental pollution often defies effective and concerted action.
>
> This reorganization would permit response to environmental problems in a manner beyond the previous capability of our pollution control programs. The EPA would have the capacity to do research on important pollutants irrespective of the media in which they appear, and on the impact of these pollutants on the total environment. Both by itself and together with other agencies, the EPA would monitor the condition of the environment--biological as well as physical. With these data, the EPA would be able to establish quantitative "environmental baselines"--critical if we are to measure adequately the success or failure of our pollution abatement efforts.
>
> The EPA would be charged with protecting the environment by abating pollution… [and]
>
> The conduct of research on the adverse effects of pollution and on methods and equipment for controlling it, the gathering of information on pollution, and the use

2

of this information in strengthening environmental protection programs and recommending policy changes.

U.S. Code, Congressional and Administrative News, 91st Congress--2nd Session, Vol. 3, 1970, available at https://archive.epa.gov/epa/aboutepa/reorganization-plan-no-3-1970.html and 35 Fed. Reg. 15623 and see 40 Code of Federal Regulations (CFR) §1.1.

Congress then enacted the 1972 WPCA amendments, 33 USC §1251 *a.k.a.* the Clean Water Act, partly in reaction to rivers catching fire during the late 1960's, including the Buffalo River in 1968, the Rouge River in Detroit in 1969 and most famously, the Cuyahoga River fire of 1969 in Cleveland.[2]

The CWA established a structure for regulating pollutant discharges into "waters of the United States," (WOTUS), and gave EPA the authority to implement pollution control programs.

EPA was established to "to assure the protection of the environment by abating and controlling pollution on a systematic basis." 40 CFR §1.3.

EPA's Mission Statement provides:

> EPA works to ensure that:
>
> Americans have clean air, land and water;
>
> National efforts to reduce environmental risks are based on the best available scientific information;
>
> Federal laws protecting human health and the environment are administered and enforced fairly, effectively and as Congress intended…

See https://www.epa.gov/aboutepa/our-mission-and-what-we-do.

---

[2] See Comments of James Bacon in the record at EPA-HQ-OW-2018-0149-3110 citing "Consequences of the Clean Water Act and the Demand for Water Quality" (January 2017) at page 2; "The lower Cuyahoga has no visible life, not even low forms such as leeches and sludge worms that usually thrive on wastes. It is also literally a fire hazard."

Congress identified the CWA's "major purpose" was "to establish a comprehensive long-range policy for the elimination of water pollution."[3]  Thus, the statute's broad objective "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 USC §1251(a).

To do so, the CWA directed the Agencies to "develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters." 33 USC §1252.  See also *Am. Farm Bureau Fed'n v United States EPA*, 792 F3d 281, 297 (3rd Cir 2015); "[The CWA's] objective incorporated a broad, systemic view of the goal of maintaining and improving water quality.")

In discussing the Congressional Conference Report, Rep. Blatnick stated, "[t]his is an enormously complex bill, as it must be, to solve the enormous, and complex problem of protecting our water resources." 118 Congressional Record 33749 (10/4/72) at EPA-HQ-OW-2018-0149-0442.

The Senate stated that while "navigable waters of the United States" was not defined:

The Conferees fully intend that the term "navigable waters" be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes. Based on the history of consideration of this legislation, it is obvious that its provisions and the extent of application should be construed broadly.

EPA-HQ-OW-2018-0149-0443.

Federal Courts have recognized that "navigable waters" be construed to achieve the water quality goals of the CWA:

---

[3] S. Rep. No. 92-414, p. 95 (1971), reprinted in 2 Legislative History of the Water Pollution Control Act Amendments of 1972 (Committee Print compiled for the Senate Committee on Public Works by the Library of Congress), Ser. No. 93-1, p. 1511 (1971).

> [T]he conference bill defines the term "navigable waters" broadly for water
> quality purposes. It means all "the waters of the United States" in a geographical
> sense. . . . Thus, the new definition clearly encompasses all water bodies,
> including main streams and their tributaries, for water quality purposes. [Citing]
> 118 Cong. Rec. 9124-9125 (daily ed. Oct. 4, 1972).

*Wyoming v Hoffman*, 437 F Supp 114, 117 (D Wyo 1977).

And, regarding the definition of "integrity" of the Nation's waters, the Supreme Court

held unanimously:

> "[T]he word 'integrity' ... refers to a condition in which the natural structure and
> function of ecosystems [are] maintained." H.R. Rep. No. 92-911, 92nd Cong. 2d
> Sess. 76 (1972). Protection of aquatic ecosystems, Congress recognized,
> demanded broad federal authority to control pollution, for "[water] moves in
> hydrologic cycles and it is essential that discharge of pollutants be controlled at
> the source." S. Rep. No. 92-414, p. 77 (1972).

*United States v Riverside Bayview Homes, Inc*., 474 US 121, 132-33 (1985).

However, the U.S. did not always recognize the importance of maintaining the integrity

of the Nation's waters:

> At the time of European settlement in the early 1600's, the area that was to
> become the conterminous United States had approximately 221 million acres of
> wetlands. About 103 million acres remained as of the mid-1980's (Dahl and
> Johnson, 1991). Six States lost 85 percent or more of their original wetland
> acreage--twenty-two lost 50 percent or more…

> In 1849, Congress passed the first of the Swamp Land Acts, [affecting 65 million
> acres] which granted all swamp and overflow lands in Louisiana to the State for
> reclamation. In 1850, the Act was made applicable to 12 other States, and in 1860,
> it was extended to include lands in two additional States (Shaw and Fredine,
> 1956) (table 1). Although most States did not begin immediate large-scale
> reclamation projects, this legislation clearly set the tone that the Federal
> Government promoted wetland drainage and reclamation for settlement and
> development. This tone pervaded policy and land-use trends for the next
> century….

> In the 1930's, the U.S. Government, in essence, provided free engineering
> services to farmers to drain wetlands; and by the 1940's, the Government shared
> the cost of drainage projects (Burwell and Sugden, 1964). Organized drainage
> districts throughout the country coordinated efforts to remove surface water from
> wetlands (Wooten and Jones, 1955)…

By the 1960's, most political, financial, and institutional incentives to drain or destroy wetlands were in place. The Federal Government encouraged land drainage and wetland destruction through a variety of legislative and policy instruments. For example, the Watershed Protection and Flood Prevention Act (1954) directly and indirectly increased the drainage of wetlands near flood-control projects (Erickson and others, 1979). The Federal Government directly subsidized or facilitated wetland losses through its many public-works projects, technical practices, and cost-shared drainage programs administered by the U.S. Department of Agriculture (Erickson, 1979). Tile and open-ditch drainage were considered conservation practices under the Agriculture Conservation Program--whose policies caused wetland losses averaging 550,000 acres each year from the mid-1950's to the mid-1970's (Office of Technology Assessment, 1984)....

Estimates indicate that wetland losses in the conterminous United States from the mid-1970's to the mid-1980's were about 290,000 acres per year (Dahl and Johnson, 1991).

"'National Water Summary on Wetland Resources' United States Geological Survey Water Supply Paper 2425" (1994), at https://water.usgs.gov/nwsum/WSP2425/history.html.

Although wetland acreage had declined to 110.1 million acres by 2009, the national policy goal of no net loss of wetlands, endorsed by Administrations for the past two decades, had been reached by 2004. (See comments in the record at EPA-HQ-OW-2018-0149-3110 citing a Congressional Research Service report.)

However, two Supreme Court rulings caused a significant increase in wetland losses and water pollution - *Solid Waste Agency of Northern Cook County v U.S. Army Corps of Engineers*, 531 US 159 (2001), (*SWANCC*), and *Rapanos v United States*, 547 US 715 (2006), (*Rapanos)*.

In  *SWANCC*, the Supreme Court issued a split ruling (5-4), in reviewing whether certain waters were WOTUS.   The majority ruled that federal jurisdiction did not extend to certain isolated bodies of water, in part, because that "would result in a significant impingement of the States' traditional and primary power over land and water use." 531 US at 174.

The dissent argued the majority's reliance on the Commerce Clause was misplaced as the CWA had marked "a shift in the focus of federal water regulation from protecting navigability toward environmental protection." 531 US at 179. The dissent contended the CWA required federal Agencies to give "due regard," not to the interest of unobstructed navigation, but rather to "improvements which are necessary to conserve such waters for the protection and propagation of fish and aquatic life and wildlife [and] recreational purposes." 531 US at 180.

In 2003, EPA published guidance to assist the Agencies in applying the definition of WOTUS in the wake of the uncertainties caused by *SWANCC*. 68 Fed. Reg. 1995.

Then, in 2006, the Supreme Court issued the fractured, (4-1-4), *Rapanos* decision offering several opinions as to whether wetlands adjacent to non-navigable tributaries were WOTUS. Justice Kennedy's discussion of a "significant nexus" test was accepted by the four dissenting Justices, (547 US at 810, footnote 14), and has been followed in subsequent federal rulings. The fractured opinion resulted in many parties calling for rulemaking to bring clarity to the definition of WOTUS. 547 US at 812; 84 Fed. Reg. 4160.

### B.  The *SWANCC/Rapanos*  water quality impacts

The *SWANCC* decision resulted in the removal of millions of acres of wetlands from federal jurisdiction. As reported in 2001:

> …SWANCC's impacts are likely to be environmentally significant. Tentative state estimates… suggest 30% to 79% of total wetland acreage may be affected… Even if SWANCC results in only a one percent loss of America's wetlands, the decision would cause more wetlands to be destroyed than were lost in the past decade…

 "The SWANCC Decision and State Regulation of Wetlands" (2001) at EPA-HQ-OW-2018-0149-3110 citing https://www.aswm.org/pdf_lib/swancc_and_state_regulation_060101.pdf at 8.

In 2009, EPA identified the *SWANCC/Rapanos* rulings' as particularly having a negative impact on its water quality protection efforts:

> Many of the nation's waters are not meeting water quality standards, and the threat to drinking water sources is growing…. There are significant water quality problems facing too many communities; there are expanding universes of diffuse pollution sources, many which are not effectively regulated by the CWA; and there are significant limitations that affect EPA's ability to identify serious problems quickly and take prompt action to correct them. Among these limitations are two Supreme Court decisions – [*SWANCC* and *Rapanos*] - that added layers of confusion regarding which water bodies are covered by the CWA in many parts of the country.

(See *id*. citing EPA's "Clean Water Act Enforcement Action Plan" (2009), (Action Plan).

According to the Action Plan, 44% of the Nation's river and stream miles, 64% of lake and reservoir acres and 30% of bay and estuary square miles "were impaired, meaning they were not clean enough to support their designated uses, such as swimming or fishing." Moreover:

> EPA and states are also encountering significant impacts to sources of drinking water in many parts of the country due to contamination from many of these same dischargers (such as CAFOs) to surface waters. This is significant, as approximately 66 percent of the U.S. gets its drinking water from surface water sources.

*Id*. at pg. 2.

And, in the four years following *Rapanos*, EPA dropped more than 1,500 investigations against polluters due uncertainty as the definition of WOTUS caused by *SWANCC* and *Rapanos*. See *id*. at footnote 8.

By 2017, wetland losses had increased to nearly 14,000 acres per year. See *id*. citing Congressional Research Report "Wetlands: An Overview of Issues" at page 2.

Also in 2017, the Iowa State University "Center for Agricultural and Rural Development," reported *SWANCC* and *Rapanos* "removed Clean Water Act regulation for nearly

half of U.S. rivers and streams." See *id*. at footnote 7 citing "Consequences of the Clean Water Act and the Demand for Water Quality" at p. 351.

The same year, EPA reported that more than half the rivers and streams of the United States were polluted. EPA-HQ-OW-2018-0149-3110 citing EPA's "2017 National Water Quality Inventory Report to Congress.")

EPA's 2017 report identified the top causes of pollution in rivers and streams were pathogens, sediment smothering stream beds and nutrients such as phosphorus and nitrogen, which at excess levels stimulate the growth of undesirable algae and aquatic weeds and lead to reduced levels of dissolved oxygen. Further, EPA reported 32% of the Nation's wetlands were in poor biological condition, with leading stressors including soil compaction and vegetation removal. *Id.* available at https://echo.epa.gov/trends/comparative-maps-dashboards/state-water-dashboard?state=National&view=activity.

## C.  **The water quality and economic benefits of wetlands and ephemeral streams**

The Nation's wetlands perform many functions that are important to society, such as improving water quality, recharging groundwater, providing natural flood control, and supporting a wide variety of fish, wildlife and plants. The economic importance of wetlands to commercial fisheries and recreational uses is also enormous. The Nation has lost nearly half of the wetland acreage that existed in the lower 48 States prior to European settlement. The Nation's wetlands continue to be lost at a rate of hundreds of thousands of acres per year due to both human activity and natural processes. This continued loss occurs at great cost to society.

EPA-HQ-OW-2018-0149-0065; "Protecting America's Wetlands: A Fair, Flexible, and Effective Approach" at pg. 2.

Indeed, wetlands perform a critical role in filtering pollutants to maintain water quality:

After being slowed by a wetland, water moves around plants, allowing the suspended sediment to drop out and settle to the wetland floor. Nutrients from fertilizer application, manure, leaking septic tanks, and municipal sewage that are dissolved in the water are often absorbed by plant roots and microorganisms in the soil. Other pollutants stick to soil particles. In many cases, this filtration

9

> process removes much of the water's nutrient and pollutant load by the time it leaves a wetland. Some types of wetlands are so good at this filtration function that environmental managers construct similar artificial wetlands to treat storm water and wastewater.

EPA Publication "Functions and values of wetlands" (2005); EPA 843-F-05-002.

> And, wetlands' economic values are now understood and well documented:

> One of the economically valuable roles wetlands play is pollutant filtration. As an example, a bottomland hardwood swamp in South Carolina was studied for its filtration services. It was found that the swamp removed a quantity of pollutants from the surrounding watershed equal to that of a water treatment plant. The cost-saving of protecting the wetlands was estimated at $5 million, or the cost of building the water treatment plant (EPA publication 832-R-93-005).

> Wetlands also buffer surrounding areas from flood damage. Wetlands soak up rain runoff, reducing the frequency and intensity of flooding. Maintaining only 15% of the land area of a watershed in wetlands can reduce flood peaks by as much as 60%, saving enormous costs on flood damage (EPA publication 843-F-06-004).

> The Conservation Fund (in collaboration with Houston-Galveston Area Council and Houston Wilderness) assessed ecosystem services in the 13-county Houston-Galveston region. This assessment estimated ecological systems provide the region $15 billion dollars per year of water quality, air quality, water supply, flood protection, and carbon sequestration benefits.

> Of this number, wetlands serve as local water storage reserves providing services totaling $9,000/acre/year. Wetlands were also estimated to reduce flood damage by $8,000/acre/year by absorbing stormwater.

Comments at EPA-HQ-OW-2018-0149-3110 at pg. 32 citing the Conservation Fund, Houston-Galveston's "Green Infrastructure and Ecosystem Services Assessment," (2013).

The record includes EPA's "National Wetland Condition Assessment," (2011), which was "the first national evaluation of the ecological condition of the nation's wetlands."  EPA "found that nationally, 48% of the wetland area is in good condition, 20% is in fair condition and the remaining 32% of the area is in poor condition." EPA-HQ-OW-2018-0149-0036.

On May 20, 2015, EPA published an 87-page economic report finding that the 2015

Rule's economic benefits outweighed costs by at least 90 million dollars. ($555-$572 million in

benefits vs. $236-$465 million in costs).  See https://www.epa.gov/sites/production/files/2015-

06/documents/508-final_clean_water_rule_economic_analysis_5-20-15.pdf.

> Regarding the water quality benefits of ephemeral and intermittent streams:
>
> Ephemeral and intermittent streams make up approximately 59% of all streams in
> the United States (excluding Alaska), and over 81% in the arid and semi-arid
> Southwest… This comprehensive review of the present scientific understanding
> of the ecology and hydrology of ephemeral and intermittent streams will help
> place them in a watershed context, thereby highlighting their importance in
> maintaining water quality, overall watershed function or health, and provisioning
> of the essential human and biological requirements of clean water.
>
> Ephemeral and intermittent streams provide the same ecological and hydrological
> functions as perennial streams by moving water, nutrients, and sediment
> throughout the watershed. When functioning properly, these streams provide
> landscape hydrologic connections; stream energy dissipation during high-water
> flows to reduce erosion and improve water quality; surface and subsurface water
> storage and exchange; ground-water recharge and discharge; sediment transport,
> storage, and deposition to aid in floodplain maintenance and development;
> nutrient storage and cycling; wildlife habitat and migration corridors; support for
> vegetation communities to help stabilize stream banks and provide wildlife
> services; and water supply and water-quality filtering.

EPA-HQ-OW-2018-0149-0037 at pg. iii.

### D.  The 2015 Rule's water protection goals

EPA spent more than four years studying the connectivity of waters and reviewed more

than 1,200 peer-reviewed scientific publications in preparing a "Science Report" in support of

the 2015 Rule. 82 Fed. Reg. 34899, 34901; EPA-HQ-OW-2018-0149-11691.

Preliminary drafts of the Science Report and its conclusions were corroborated by

independent peer reviews by scientists and scientific panels from 2011 to 2015. See Science

Report Preface; https://cfpub.epa.gov/ncea/risk/recordisplay.cfm?deid=296414.

EPA repeatedly invited the public to submit comments and attend meetings. 80 Fed. Reg. 37062. "Over 133,000 public comments were received" by the panel, and "[e]very meeting [it held] was open to the public, noticed in the Federal Register, and had time allotted for the public to present their views." 78 Fed. Reg. 15012; 80 Fed. Reg. at 37057.

The rulemaking included over 400 meetings with state, tribal and local officials and business, environmental and public health organizations. 80 Fed. Reg. 37057.

The Agencies received more than one million comments on the 2015 Rule, a substantial majority, (reportedly 87%), which were supportive. *Id*.

EPA released its final Science Report on January 15, 2015, "to summarize current scientific understanding about the connectivity and mechanisms by which streams and wetlands, singly or in aggregate, affect the physical, chemical, and biological integrity of downstream waters." 80 Fed. Reg. 2100; EPA-HQ-OW-2018-0149-11691.

The Agencies then published the final 2015 Rule on June 29, 2015, identifying water quality improvement as the prime objective: "[t]he rule will ensure protection for the nation's public health and aquatic resources…" 80 Fed. Reg. 37054. The 2015 Rule recognized:

> Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," section 101(a), and to complement statutes that protect the navigability of waters, such as the Rivers and Harbors Act. 33 U.S.C. 401, 403, 404, 407. The CWA is the nation's single most important statute for protecting America's clean water against pollution, degradation, and destruction. To provide that protection, the Supreme Court has consistently agreed that the geographic scope of the CWA reaches beyond waters that are navigable in fact. Peer-reviewed science and practical experience demonstrate that upstream waters, including headwaters and wetlands, significantly affect the chemical, physical, and biological integrity of downstream waters by playing a crucial role in controlling sediment, filtering pollutants, reducing flooding, providing habitat for fish and other aquatic wildlife, and many other vital chemical, physical, and biological processes.

> This final rule interprets the CWA to cover those waters that require protection in order to restore and maintain the chemical, physical, or biological integrity of traditional navigable waters, interstate waters, and the territorial seas.

80 Fed. Reg. 37055.

### E.  Opposition to the 2015 Rule

In 2014, the Attorney General of Oklahoma, Scott Pruitt, opposed the draft 2015 Rule claiming in part that "[t]he Proposed Rule unlawfully and unconstitutionally seeks to assert federal jurisdiction over local water and land use management…" Comments of the Attorneys General of West Virginia, *et al.*, on the Proposed Definition of "Waters of the United States"; EPA-HQ-OW-2011-0880; (Oct. 8, 2014).

Mr. Pruitt attacked the proposed Rule before Congress claiming it was "a naked power grab by the EPA… a classic case of overreach… flatly contrary to the will of Congress, who, with the passing of the Clean Water Act, decided that it was the States who should plan the development and use of local land and water resources." EPA-HQ-OW-2018-0149-11729.

Mr. Pruitt then sued to annul the 2015 Rule. *Okla. ex rel. Pruitt v. United States EPA,* Case No. 15-CV-0381-CVE-FHM (ND Okla July 31, 2015).

The Agencies defended the 2015 Rule by filing a 245-page brief arguing that the rule "is a carefully tailored response to Supreme Court precedent, peer-reviewed science, and the Agencies' long experience in implementing the Act." *In re: EPA*, No. 15-3751, Brief for Respondents, at p. 2 (6th Cir Jan. 13, 2017).

However, EPA reversed its defense following President Trump's election and appointment of Scott Pruitt as EPA Administrator on February 17, 2017.

F.  **The Trump Administration's reversal of policy**

On February 28, 2017, President Trump ordered that EPA "shall consider interpreting the term 'navigable waters,' as defined in 33 USC 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos*." Executive Order No. 13778 "Restoring the Rule of Law, Federalism, and Economic Growth by Reviewing the `Waters of the United States' Rule."

President Trump stated he was "directing the EPA to take action, paving the way for the elimination of this very destructive and horrible rule," which he claimed regulated "nearly every puddle." Remarks by President Trump at signing of Executive Order No. 13778.

However, the 2015 Rule had explicitly exempted "puddles." 33 CFR §328.3(b)(4)(vii).

Administrator Pruitt signed the notice of intent to withdraw the 2015 Rule eight minutes after President Trump signed Executive Order No. 13778. (See page 159 of "Response to Comments" on SNPRM at EPA-HQ-OW-2018-0149-11693.)

Later that same day, Administrator Pruitt again attacked the 2015 Rule as a "power grab" with the federal government exercising unwarranted jurisdiction over "puddles." See comments at EPA-HQ-OW-2018-0149-3110 at pgs. 21-22 with citations.

And, on a radio broadcast in July, 2017, Mr. Pruitt repeated the false claim that the 2015 Rule covered puddles and in August 2017,  told an Iowa audience, "[n]o one in Congress ever thought that a puddle in Iowa should be considered a water of the U.S." *Id.* at pg. 22.

Mr. Pruitt's successor, Andrew Wheeler has similarly claimed the repeal of the 2015 Rule "puts an end to the previous administration's power grab." *Id.*

On November 22, 2017, the Agencies proposed to suspend the 2015 Rule, (82 Fed. Reg. 55542), and adopted a final Suspension Rule on February 6, 2018.  83 Fed. Reg. 5200.

14

However, on August 16, 2018, the United States District Court for South Carolina annulled the Suspension Rule ruling the Agencies had violated the Administrative Procedure Act, (APA). *S.C. Coastal Conservation League v Pruitt*, 318 F Supp 3d 959 (DSC 2018).

The Agencies' refusal to consider or receive public comments on the substance of the Suspension Rule, or identify what the status of the law would be in the absence of the 2015 Rule, did not provide a "meaningful opportunity for comment" as required by the APA. 318 F Supp 3d at 965; see also *Puget Soundkeeper Alliance v Wheeler*, No. C15-1342-JCC, 2018 WL 6169196, at *5 [WD Wash Nov. 26, 2018] voiding the Suspension Rule.

On July 27, 2017, the Agencies published a Notice of Proposed Rulemaking (NPRM) to repeal the 2015 Rule. 82 Fed. Reg. 34899.

Administrator Pruitt's deputies ordered staffers "to produce a new analysis of the rule — one that stripped away the half-billion-dollar economic benefits associated with protecting wetlands."  See Docket No. 17, Amended Complaint at ¶90.

Thus, EPA issued a revised economic report claiming wetlands' economic benefits were not quantified. (At https://www.epa.gov/sites/production/files/2017-06/documents/economic_ analysis_proposed_step1_rule.pdf.)

In July, 2018, the Agencies published a Supplemental Notice of Proposed Rulemaking (SNPRM) to repeal the 2015 Rule and abandoned any economic impact review stating "[w]hile economic analyses are informative in the rulemaking context, the Agencies are not relying on the economic analysis performed pursuant to Executive Orders 12866 and 13563 . . . as a basis for this proposed action." 83 Fed. Reg. 32250.

Comments on the SNPRM noted EPA's statements that "over 60 percent of streams and millions of acres of wetlands lack adequate safeguards from degradation and should be protected under the CWA." EPA-HQ-OW-2018-0149-11693 at page 84.

However, the Agencies' responses to its SNPRM did not address the status of the Nation's waters or how the repeal of the 2015 Rule would impact water quality. EPA-HQ-OW-2018-0147-11693 at page 86.

The Agencies published the final Repeal Rule on October 22, 2019. 84 Fed. Reg. 56626.

On February 14, 2019, the Agencies proposed to replace the 2015 Rule with the 2020 Rule, (84 Fed. Reg. 4154), and received approximately 620,000 comments, (See 84 Fed. Reg. 56665), including comments from Plaintiffs' attorney. EPA-HQ-OW-2018-0149-3110.

Unlike the 2015 Rule, the 2020 Rule was not intended to improve water quality:

The Agencies today are proposing to establish a regulation that would define "waters of the United States" in simple, understandable, and implementable terms to reflect the ordinary meaning of the statutory term, as well as to adhere to Constitutional and statutory limitations, the policies of the CWA, and case law, and to meet the needs of regulatory Agencies and the regulated community.

84 Fed. Reg. 4163. And:

The Agencies interpret their authority to include promulgation of a new regulatory definition of "waters of the United States," consistent with the guidance in Executive Order 13778, so long as the new definition is authorized under the law and based on a reasoned explanation.

84 Fed. Reg. 4169.

### G.  The Replacement Rule – The Navigable Waters Protection (2020) Rule

Instead of discussing whether it would advance the CWA's water quality goals, the 2020 Rule significantly narrows the definition of WOTUS and presents a legal justification drawing distinctions between the "Nation's waters" and "navigable waters" repeatedly citing Justice Scalia's *Rapanos* opinion.

16

Indeed, contrary to Justice Kennedy's "significant nexus test," the 2020 Rule requires a "specific surface water connection" to define WOTUS. 85 Fed. Reg. 22250. Specifically:

> [WOTUS] encompass relatively permanent flowing and standing waterbodies that are traditional navigable waters in their own right or that have a specific *surface water* connection to traditional navigable waters, as well as wetlands that abut or are otherwise inseparably bound up with such relatively permanent waters.

85 Fed. Reg. 22273; emphasis added.

However, the 2020 Rule does not identify fundamental baseline environmental data such as the fact that over half of the Nation's waters fail to meet water quality standards.

And, the 2020 Rule did not disclose the percentage of wetlands and watercourses that would lose federal jurisdiction.

Instead, that information was obtained by a Freedom of Information Act request for EPA's internal documents which identified that 51% of wetlands and 18% of streams nationwide, (300 miles of ephemeral streams), would no longer be jurisdictional under the 2020 Rule. EPA-HQ-OW-2018-0149-11767.

The 2020 Rule fails to explain how the loss of federal jurisdiction over these areas of wetlands and ephemeral streams would affect water quality or advance the goals of the CWA.

And, rather than basing the new rule on the totality of EPA's Science Report on the connectivity of waters, the 2020 Rule used a selective approach contrary to its Science Advisory Board's, (SAB), recommendations:

> The SAB's draft commentary asserted that the proposed rule did not fully incorporate the Connectivity Report and offers no comparable body of peer reviewed evidence to support this departure.

85 Fed. Reg. 22261.

Therefore, as set forth in Plaintiffs' Amended Complaint and discussed below, the Agencies' adoption of the 2020 Rule was arbitrary, capricious and an abuse of discretion and contrary to the purposes of the CWA and must be judicially annulled.

## STANDARD OF REVIEW

The scope of review is that the "reviewing court shall… hold unlawful and set aside agency action, findings, and conclusions found to be — (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706(2)(A).

The matter of *Motor Vehicle Manufacturers Ass'n v State Farm Mutual Auto. Insurance Co*., 463 US 29, 43 (1983), sets forth four factors to be considered when determining whether an agency's rulemaking is arbitrary and capricious:

1. Has the agency relied on factors Congress has not intended it to consider?
2. Has the agency entirely failed to consider an important aspect of the problem?
3. Is the agency's offered explanation for its decision one that runs counter to the evidence before the agency?
4. Is the agency's decision one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise? (That is, was there a rational connection between the facts found and the choice made.)

Summary judgment is the appropriate procedure to follow where, as here, there is no dispute concerning the administrative record:

> [S]ummary judgment is appropriate since "whether an agency action is supported by the administrative record and consistent with the APA standard of review is decided  as a matter of law."

*Bodhankar v United States Citizenship & Immigration Servs.*, No. 1:19-CV-706 (MAD/CFH), 2020 US Dist. LEXIS 26914, (NDNY Feb. 18, 2020) quoting *Residents of Sane Trash Solutions, Inc. v United States Army Corps of Eng'rs*, 31 F Supp 3d 571, 586 (SDNY 2014).

The APA limits judicial review of agency action. As relevant to this dispute, the APA provides that a reviewing court shall only "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. "Under this deferential standard of review, we must assess, among other matters, whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bechtel v. Admin. Review Bd*., 710 F.3d 443, 446 (2d Cir. 2013) (internal quotation marks omitted). In doing so, we "may not substitute [our] judgment for that of the agency"; however the "record must show that the agency examined the relevant data and articulated a satisfactory explanation for its action." *Natural Res. Defense Council, Inc. v. U.S. Envtl. Prot. Agency*, 658 F.3d 200, 215 (2d Cir. 2011) (citations and internal quotation marks omitted). An agency decision will thus only be set aside if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Bechtel*, 710 F.3d at 446 (quoting *Nat'l Assoc. of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658, 127 S. Ct. 2518, 168 L. Ed. 2d 467 (2007)).

*Guertin v United States*, 743 F3d 382, 385 (2d Cir. 2014).

Here, the basis for this motion are the facts submitted as part of the record with the comments of Plaintiffs' counsel, the Agencies' record as set forth in the "Index of Record" and the records maintained on websites maintained by the United States and its agencies.

## POINT I

## THE 2020 RULE IS VOID AS THE AGENCIES FAILED TO IDENTIFY FUNDAMENTAL ENVIRONMENTAL IMPACTS RESULTING FROM ITS DECISIONMAKING

Plaintiffs' second and third causes of action allege the Agencies' adoption of the 2020 Rule was arbitrary and capricious because the rulemaking did not assess baseline data regarding water quality and examine how the new rule would impact water quality.

The objectives to be carried out by EPA are clearly set forth in the statute:

SEC. 101. (a) The objective of this Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this Act— (1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985; (2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(b): It is further the policy of the Congress to support and aid research relating to the prevention, reduction, and elimination of pollution, and to provide Federal technical services and financial aid to State and interstate agencies and municipalities in connection with the prevention, reduction, and elimination of pollution.

SEC. 102. (a) The Administrator shall, after careful investigation… prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters. In the development of such comprehensive programs due regard shall be given to the improvements which are necessary to conserve such waters for the protection and propagation of fish and aquatic life and wildlife, recreational purposes, and the withdrawal of such waters for public water supply, agricultural, industrial, and other purposes.

33 USC 1251.

Congress intended that EPA's rulemaking consider whether its proposed actions were consistent with the CWA and be the functional equivalent of a comprehensive environmental review pursuant to the National Environmental Protection Act, (NEPA):

The purpose of NEPA is to ensure that federal agencies consider the environmental impact of their actions. Under the CWA, Congress has charged the Administrator of the EPA with the duty of cleaning up the nation's navigable waters. We are convinced that in the circumstances of this case an exemption from NEPA will facilitate the EPA's efforts to clean up the nation's waters while the statutory duties placed on EPA by Congress under the CWA properly ensure that the Agency will consider the environmental impact of it actions. In effect, Congress has policed the police and protected the environment.

*Anchorage v United States*, 980 F2d 1320, 1329 (9th Cir 1992).  Likewise, in *Portland Cement Ass'n v Ruckelshaus*, 486 F2d 375, 386 (1973), the Court advised: "[t]o the extent that EPA is

20

aware of significant adverse environmental consequences of its [rulemaking] proposal, good

faith requires appropriate reference in its reasons for the proposal and its underlying balancing

analysis. "

Similarly, in discussing the Clean Air Act, the Court in *International Harvester Co. v*

*Ruckelshaus*, 478 F2d 615, 650 n.130 (DC Cir 1973) advised EPA's rulemaking should be the

functional equivalent of preparing an environmental impact statement pursuant to NEPA:

> [W]e see little need in requiring a NEPA statement from an agency whose *raison*
> *d'etre* is the protection of the environment and whose decision on suspension is
> necessarily infused with the environmental considerations so pertinent to
> Congress in designing the statutory framework. To require a "statement," in
> addition to a decision setting forth the same considerations, would be a legalism
> carried to the extreme.

Both the Clean Air Act and CWA provisions direct that federal actions must be taken to

improve the air and water resources. Indeed, this is the very purpose of EPA.

Here, in addition to EPA having failed to achieve the Section 101 milestones for more

than thirty-five years, 70 percent of lakes, reservoirs, and ponds, 78 percent of bays and estuaries

and 55 percent of rivers and streams in the U.S. continue to be impaired by pollution and fail to

meet minimum water quality standards.

Yet, despite this glaring failure, the 2020 Rule foregoes any discussion of the current

state of the Nation's waters.

With no nationwide water quality baseline, the Agencies could not draw any comparisons

between how water quality might fair under the 2020 Rule compared to prior law.

Yet, EPA knew the 2020 Rule would result in 18% of ephemeral streams and 51% of

wetlands nationwide losing federal jurisdiction.

EPA's failure to address how the loss of jurisdiction would impact water quality is irrational and an abuse of discretion given that water quality protection is a primary reason EPA exists - as President Nixon identified in July, 1970.

Indeed, as recognized by the federal courts, Congress has charged EPA with the task of "cleaning up the Nation's navigable waters," (*Anchorage*, 980 F.2d at 1329), and maintaining the "integrity" of water quality is central to the CWA's purposes.  *United States v Riverside Bayview Homes, Inc*., 474 US 121, 132-33 (1985).

Thus, the Agencies' failure to consider water quality and discuss how the elimination of federal jurisdiction 50 million acres of wetlands and hundreds of miles of streams squares with the CWA's purpose to maintain the water quality and integrity of the Nation's waters renders its 2020 Rule void as arbitrary, capricious and an abuse of discretion.

And, EPA's failure to voluntarily disclose the percentage of wetlands and watercourses to be impacted by the new rule proves the rulemaking was arbitrary and capricious.  As the Second Circuit ruled in *Nat'l Black Media Coal. v FCC*, 791 F2d 1016, 1023 (2d Cir. 1986); "[i]t is clear that 'it is not consonant with the purpose of a rulemaking proceeding to promulgate rules on the basis of inadequate data or on data that, [in] critical degree *is known only to the agency*.'" *United States v Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 251 (2d Cir. 1977); emphasis supplied, quoting *Portland Cement Ass'n v Ruckelshaus*, 486 F2d 375, 393 (DC Cir 1973), *cert. denied*, 417 US 921 (1974).

Second, removing federal jurisdiction from 51% of wetlands and 18% of ephemeral streams is contrary to the CWA's purposes.

For example, the CWA Conference Report stated "[t]he conferees fully intend that the term 'navigable waters' be given the broadest possible constitutional interpretation

22

unencumbered by agency determinations which have been made or may be made for administrative purposes."[4]   The reason the House and Senate Committees did not define "navigable waters" was for fear the term might be given an unduly narrow reading:

> One term that the Committee was reluctant to define was the term "navigable waters." The reluctance was based on the fear that any interpretation would be read narrowly. However, this is not the Committee's intent. The Committee fully intends that the term "navigable waters" be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes.

Representative Dingell, in commenting on the bill which came from the Conference Committee, stated:

> Third, the conference bill defines the term "navigable waters" broadly for water quality purposes. It means all "the waters of the United States" in a geographical sense. It does not mean "navigable waters of the United States" in the technical sense as we sometimes see in some laws . . . Thus, the new definition clearly encompasses all water bodies, including main streams and their tributaries, for water quality purposes. No longer are the old narrow definitions of navigability, as determined by the Corps of Engineers, going to govern matters covered by this bill. [118 Cong. Rec. 9124-9125 (daily ed. Oct. 4, 1972).]

*Wyoming v Hoffman*, 437 F Supp 114 (Wyo Dis 1977) citing H.R. Rep. No. 911, 92d Cong., 2d Sess. 131 (1972).

Rather than construing the term broadly, the 2020 Rule removes federal jurisdiction from millions of wetland acres from and hundreds, if not thousands, of miles of ephemeral streams.

For example, in Texas alone:

> [The 2020 Rule] being proposed today would replace the 2015 Clean Water Rule, which restored federal protections to more than 143,000 miles of Texas streams (see attached map), which help provide drinking water to over 11.5 million Texans.

See comments at EPA-HQ-OW-2018-0149-3110 at pgs. 28-29 with citations.

---

[4] S. Conf. Rep. No. 1236, 92d Cong., 2d Sess. 144 (1972). (See also H.R. Rept. No. 92-1465, 144, 92d Cong., 2d Sess. [1972]).

As the record indicates both wetlands and ephemeral streams are critical to the "maintenance of the chemical, physical and biological integrity of the Nation's waters," (33 USC §1251[a]), removing jurisdiction from vast areas of those waterbodies will negatively impact drinking water and thus has "undermine[d] Congress's intent to protect consumers." *Riegel v Medtronic, Inc.*, 451 F3d 104, 130 (2d Cir 2006).

In sum, the Agencies rulemaking was arbitrary and capricious as the Agencies failed to consider "an important aspect of the problem" - the protection and maintenance of the Nation's water quality. *Motor Vehicle Mfrs. Ass'n v State Farm Mut. Auto. Ins. Co.*, 463 US 29, 43 (1983); and see *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009), an agency may not disregard facts and circumstances that underlay a policy it is replacing.

## POINT II

### THE 2020 RULE VIOLATES THE CWA'S ANTI-DEGRADATION PROVISIONS

Plaintiffs' Amended Complaint's ninth cause of action alleged the 2020 Rule violates the CWA's anti-degradation provisions. Docket No. 17.

[P]ursuant to the Clean Water Act's "antidegradation policy," a state's water quality standards must "be sufficient to maintain existing beneficial uses of navigable waters, preventing their further degradation." *Pud No. 1 v Wash. Dep't of Ecology*, 511 US 700, 705 (1994); citing 33 USC §1313(d)(4)(B). The mandate's broad reach is reflected in 40 CFR §131.12(a)(2), which provides that states "shall assure water quality adequate to protect existing uses fully." Thus, no activity that would "'partially or completely eliminate any existing use'" is permitted, even if it would leave the majority of a given body of water undisturbed. *Islander East Pipeline Co., LLC v. McCarthy*, 525 F3d 141, 144 (2nd Cir 2008).

24

EPA's "total maximum daily load" (TMDL) program is designed to bring impaired water supplies back into compliance with water quality standards.

However, as above, a significant percentage of the Nation's waters fail to meet water quality standards.

The record, most notably the Science Report, details the important roles wetlands and ephemeral streams play in maintaining and improving water quality. Due to the connectivity of waters, the filling of wetlands and ephemeral streams degrades water quality due to pollutant loadings comprised of sediment and nutrients migrating into already impaired waterbodies.

Despite this fact, in adopting the 2020 Rule, the Agencies did not identify nor consider how removing federal jurisdiction from millions of acres of wetlands and hundreds of miles of ephemeral streams will impact the CWA's anti-degradation provisions or the TMDL program.

Therefore, the Agencies' failure to consider the impacts upon the CWA's anti-degradation and TMDL provisions renders void the 2020 Rule.

## POINT III

### THE AGENCIES' PRE-DETERMINING CRITICAL ISSUES WAS ARBITRARY AND CAPRICIOUS AND PREVENTED MEANINGFUL ADMINISTRATIVE REVIEW

Plaintiffs' first, third, fourth and seventh causes of action relate to the Agencies operating with an unalterably closed mind in repealing and replacing the 2015 Rule.

To alter an administrative policy, the agency must "show that there are good reasons" to do so and the new policy must be informed by the agency's expertise and rest upon principles that are rational and neutral. *FCC v Fox TV Stations, Inc*., 567 US 239, 250 (2012); and see *FCC v Fox TV Stations, Inc*., 556 US 502, 535-536 (2009).

25

Rulemaking is defective where the agency exhibits "an unalterably closed mind on matters critical to the disposition of the proceeding." *Association of National Advertisers, Inc. v FTC*, 627 F2d 1151, 1170 (DC Cir 1979), *cert. denied*, 447 US 921 (1980); accord *United Steelworkers of Am. v Marshall*, 647 F2d 1189, 1210 (DC Cir 1981).

Here, numerous factors show by clear and convincing evidence that the Agencies' rulemaking followed a pre-determined course with no meaningful review.

First, the Agencies followed a pre-determined course to repeal and replace the 2015 Rule on the pretext of States' rights, hyperbole and misinformation and in the absence of an assessment of water quality repercussions.

President Trump and former Administrator Pruitt repeatedly portrayed the 2015 Rule as a "power grab" that would regulate filling "as much as a puddle" knowing that the 2015 Rule explicitly exempted puddles. See former 33 CFR §328.3(b)(4)(vii).

In stark contrast to the 2015 Rule's objective use of science and years of deliberative process and multiple peer reviews, Administrator Pruitt signed the notice of intent to repeal and replace the 2015 Rule just eight minutes after the President finished attacking the 2015 Rule when signing Executive Order No. 13778.

Thus, the Trump Administration has followed a pre-determined course to repeal and replace the 2015 Rule thwarting the public's "meaningful opportunity for comment" as required by the APA. See *S.C. Coastal Conservation League v. Pruitt*, 318 F Supp 3d 959 (DSC 2018). and *Puget Soundkeeper Alliance v Wheeler*, No. C15-1342-JCC, 2018 WL 6169196, at *5 (WD Wash Nov. 26, 2018).

Second, while the 2015 Rule was informed by EPA's the full findings of its Science Report, the 2020 Rule cites partial data from its Science Report to support limiting the definition

of WOTUS to those waters with "a specific surface connection to traditional navigable waters." 85 Fed. Reg. 22273.

The Second Circuit addressed this piecemeal approach in *Guertin v United States*, 743 F3d 382 (2d Cir 2014), where the United States Department of Housing and Urban Development, (HUD), denied reimbursement of legal fees incurred in the successful defense of criminal charges. There, the District Court held HUD's denial was proper as HUD had "relied on the nature of the criminal action" and examined "the relevant data and articulate[d] a satisfactory explanation for its action." 743 F3d at 388-389. However, the Circuit Court reversed because HUD relied principally upon the circumstances surrounding "only one of the seven loans underlying the [criminal] charges" rather than the entirety of the state trial court's record and thus "offered an explanation for its decision that runs counter to the evidence before the agency," citing *Bechtel v Admin. Review Bd.*, 710 F3d 443, 446 (2d Cir 2013). Thus, the Court held:

> HUD may not rely on an explanation that runs counter to the relevant evidence presented to the agency, including the indictment, nor could HUD ignore relevant evidence in the verdict by relying solely on portions favorable to its own position. State Farm, on which the district court relied, states as much. See *Islander E. Pipeline Co., v. McCarthy*, 525 F.3d 141, 151 (2d Cir. 2008) (describing State Farm as requiring an examination of "all relevant data" (emphasis added)). By articulating an explanation unsupported by the relevant facts, HUD thus acted arbitrarily and capriciously.

Here, the 2020 Rule states "the agencies used the Connectivity Report to inform certain aspects of the definition of "waters of the United States," 85 Fed. Reg. 22261. Specifically, the Agencies cited and relied upon a "connectivity gradient" table from the SAB's 2014 draft review of the Science Report in defining the terms "perennial," "intermittent," "ephemeral" and jurisdictional wetlands . (*Id.* at 22271 and 22288: "the SAB developed a figure as part of its review of the Draft Connectivity Report. See id. at 54 figure 3.")

The fuller context indicates the SAB described Figure 3 as a "[h]ypothetical illustration of connectivity gradient and potential consequences to downstream waters."  EPA-HQ-OW-2018-0149-0386 at pg. 54.

The 2020 Rule however, fails to address the central point of the Science Report as to the "potential consequences to downstream waters" resulting from the Agencies' new WOTUS definitions.

Moreover, the arbitrary nature of the Agencies' undue reliance on a portion of Figure 3, is demonstrated by the text under Figure 3 stating "[a]ll streams (including perennial, intermittent, and ephemeral streams) have a connection to downstream waters" and the fact that the 2020 Rule no longer defines ephemeral streams as WOTUS.

The Agencies' selective reading of the SAB's comments will decrease water quality protection as the 2020 Rule fails to credit the underlying science of the connectivity of waters which the Science Report comprehensively addressed in seeking to support the CWA's goals of protecting and maintaining the Nation's water quality. Thus, the SAB criticized the draft 2020 Rule stating:

> The SAB finds that the proposed revised definition of WOTUS (84 FR 4154) (hereafter, the proposed Rule) decreases protection for our Nation's waters and does not support the objective of restoring and maintaining "the chemical, physical and biological integrity" of these waters….
>
> The departure of the proposed Rule from EPA recognized science threatens to weaken protection of the nation's waters by disregarding the established connectivity of ground waters and by failing to protect ephemeral streams and wetlands which connect to navigable waters below the surface. These changes are proposed without a fully supportable scientific basis, while potentially introducing substantial new risks to human and environmental health.

EPA-HQ-OW-2018-0149-11589  at pgs. 2 and 4.

Like the 2015 Rule, the courts have recognized that the maintenance of the entire hydrologic system is critical in protecting water quality as in *Puerto Rico v Alexander*, 438 F Supp 90, 96 (DDC 1977), which affirmed the CWA's jurisdiction over unnavigable waters:

> Part of an aquatic ecosystem cannot be degraded or destroyed without adversely affecting the remaining parts of that system. Since water moves in hydrologic cycles, real protection of water must include protection of the complete aquatic system.

The 2020 Rule's restrictive definitions of WOTUS simply cannot be reconciled with the fact that that "real protection of water must include protection of the complete aquatic system" as EPA recognized and fully discussed in its 2015 Science Report.

Thus, the Agencies' adoption of the 2020 Rule was arbitrary and capricious as the new rule relies upon selected language from the Science Report rather considering its entirety as Plaintiffs' allege in their third cause of action. And again, the 2020 Rule makes no comparison of how its new definitions of WOTUS will affect water quality. Thus, the new rule violates the CWA's core principles and negates EPA's mission to effect water quality improvement.

Third, because the Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States," the Agencies have overreached their authority in removing millions of acres and many stream miles from federal jurisdiction with no regard for water quality contrary to EPA's mission to protect water resources and the public health.

Fourth, the Agencies' pre-determination to replace the 2015 Rule is shown by the abrupt alteration of EPA's wetland economic analysis.

"[W]hen an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable…" *Nat'l Assn'n of Home Builders v EPA*, 682 F3d 1032, 1039-50 (DC Cir 2012).

As above, EPA estimated the 2015 Rule would result in a net 90 million dollar benefit as its economic analysis reported on May 20, 2015.

However, in June 2017, EPA's new leadership ordered EPA analysts to reverse these findings.

Thus, instead of valuing wetlands benefits at up to $500 million per year, EPA excluded all wetlands values in its 2017 analysis prepared in advance of, and in support of, repealing and replacing the 2015 Rule.

The 2020 Rule will cause roughly half of the remaining jurisdictional wetlands to lose federal regulatory status. The cost of losing 40-50 million acres of wetlands would be in the hundreds of trillions of dollars.

Therefore, the Agencies' replacement of the 2015 Rule is arbitrary, capricious and an abuse of discretion and must be annulled.

Fifth, from its inception, the Agencies sought to replace the 2015 Rule on the claim that the States should primarily control water pollution regulation.

The 2020 Rule repeatedly cites its purpose "to preserve States' primary authority over land and water resources" and "preserv[e] States' sovereign authority." 85 Fed. Reg. at 22250, 22269 and 22271.

Thus, the Agencies found that there are "certain waters that are more appropriately left solely in the jurisdiction of States." 84 Fed. Reg. 56654 and 85 Fed. Reg. 22252.

These "certain waters" include "relatively permanent bodies of water that are connected to downstream jurisdictional waters only via groundwater," (85 Fed. Reg. 22278), "interstate waters without any surface water connection to traditional navigable waters," (*Id.* at 22284), tributaries that do not have a "relatively permanent flow," (*Id.* at. 22287), "ephemeral streams,

swales, gullies, rills, and pools, and excludes diffuse stormwater run-off and directional sheet flow over upland." *Id.* at 22317.

Yet again, the Agencies miss the point of the CWA – to improve water quality. No estimate is given as to the extent of the waters to be re-classified. And, no analysis is provided as to how to the loss of federal jurisdiction over these unmeasured water resources will impact quality. And, there is no analysis as to whether the States have the resources, or the political will, to bring former federal jurisdictional areas under state control.

In fact, it was the States' inability to control pollution that spurred the creation of EPA and passage of the CWA in the first place. History and the record show lackluster and non-uniform state water pollution control efforts.  And, as demonstrated during this rulemaking, a survey EPA sent to the States shows less than half of the States even responded:

> The results showed twelve respondent states with provisions mentioning water quality management or protection, and ten not mentioning anything about water quality protection.  However, provisions cited as mentioning water quality protection varied greatly in their language and purpose. For example, The Ohio Constitution in Art. I, § 19b provides an "Affirmation of certain property interests with respect to ground water and other water on or flowing through a property owner's land", and the Washington constitution (Article VII, §10) creates a natural resources and outdoor recreation trust fund to be used to enhance water quality, but the trust has never been funded….

> Thirteen respondent states have definitions of waters of the state broader than the EPA definition: WI, CA, MA, IN, WA, OH, MN, NY, NH, OR, IA, MI, and VA. The other eight respondent states have definitions that are narrower than the EPA definition: MI, MT, NV, SD, WY, AK, HI, and DC…

> Eleven state respondents had statutory or regulatory limitations prohibiting water quality protection requirements more stringent than federal requirements: IN, MN, OH, WA, WI, IA, MI, MT, NV, SD, WY.

"Survey on State Authority, Jurisdiction, and Flexibility regarding Surface Water Regulation," EPA-HQ-OW-2018-0149-0075 at pgs. 22-24.

The lack of complete responses by the States indicates that deferring water quality protection efforts to the States will not improve the Nation's water quality.

And, given the disparate and incomplete response data, the rulemaking concedes EPA did not examine how the loss of federal jurisdiction might be addressed by the States, *i.e.* "some States may regulate only a subset of affected waters, but the agencies did not have sufficient information to incorporate that level of detail into the analysis… States may or may not choose to regulate that [non-jurisdictional] water," (85 Fed. Reg. 22334), and "States are free to evaluate the most effective means of addressing their waters and may weigh the costs and benefits of doing so." 85 Fed. Reg. 22271. Further, the Agencies speculated that future mapping might lead to water quality improvements; "[f]or Federal, State, and tribal agencies, such geospatial datasets could improve the administration of CWA programs and attainment of water quality goals." 85 Fed. Reg. 22330.

Shifting the burden of protecting 40-50 million acres of wetlands and hundreds of miles of ephemeral streams from the federal government to state governments is in direct opposition to the Congressional intent underpinning the CWA which sought a broad, centralized and uniform approach to improving and maintaining the integrity of the Nation's waters.

Indeed, in 1977, Congress reiterated that broad and robust federal jurisdiction was needed precisely because state enforcement was severely lacking due to an absence of funding and political will. (See Comm. on Env't & Pub. Works, Committee Print, 95th Cong., 2d Sess., Legislative History of the Clean Water Act of 1977, at 908, 920, 922 and 923 [Oct. 1978]).

However, as above, EPA's water quality reports prove that the water protection programs administered by the States have failed to protect water quality as much of the Nation's waters violate water quality standards.

In sum, there is no evidence from history or the record that deferring administration of water quality enforcement to the states will result in promoting the CWA's goals "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

Instead, the 2020 Rule will allow the loss of millions of acres of wetlands across the U.S. costing the economy billions of dollars and imperiling the public health and ecosystems upon which the public welfare depends.

Sixth, as alleged in the Amended Complaint's eighth cause of action, the 2020 Rule's narrow definitions of WOTUS are contrary to the Rivers and Harbors Act, codified at 33 USC §407. The RHA extended federal jurisdiction to tributaries and their banks where refuse might be "washed" into tributaries to navigable waters "by storms or floods."  The Court in *Wyoming v Hoffman*, 437 F Supp 114, 117 (D Wyo 1977), affirmed that the CWA included the RHA's provisions as a minimum baseline:

> "The Committee further intends that as a minimum any discharge which would be subject to the Refuse Act of 1899 would be subject to the provisions of Title IV." H. Rept. No. 92-911, 128, 92d Cong., 2d Sess. (1972).The Refuse Act of 1899, 33 U.S.C. § 407, makes it unlawful to discharge refuse matter not only into "any navigable water of the United States" but also into any "*tributary of any navigable water.*" It further makes it unlawful to deposit material "in any place on the bank of any navigable water, or on the bank of any *tributary of any navigable water.*" See *United States v. Pennsylvania Industrial Chemical Corp*., 411 U.S. 655, 662, 93 S. Ct. 1804, 36 L. Ed. 2d 567 (1973). Thus, the House Report shows that the House bill would have extended Federal jurisdiction beyond waters that meet the traditional tests of navigability to, "as a minimum," *tributaries* of such waters and their banks.

Thus, because "the statute is not restricted to direct deposits," (*United States v Granite State Packing Co*., 470 F2d 303 [1st Cir 1972]), defendants were liable where diesel oil spilled and flowed across a road and neighboring property into the waters of St. Croix, (*United States v Esso Standard Oil Co. of Puerto Rico*, 375 F2d 621 [3rd Cir 1967]), and for the "indirect

percolation" of oil through soils that migrated into Boston harbor. *United States v White Fuel Corp.*, 498 F2d 619 (1st Cir 1974).

Here, the 2020 Rule's restricting federal jurisdiction to waters with "relatively permanent flowing" or waters with a "specific surface water connection to traditional navigable waters," (85 Fed. Reg. 22273), is contrary to the RHA's jurisdiction over upstream areas that may be dry most of the year, such as ephemeral streams, but where storms or flooding may wash refuse from ephemeral streams into tributaries of navigable waters.

Therefore, the Agencies' pre-determination of critical issues, selective use of science and economics, overreach of authority, deferring water quality protection to the States and adoption of WOTUS definitions contradicting the RHA demonstrate the Agencies' adoption of the 2020 Rule was arbitrary, capricious and an abuse of discretion and must be judicially annulled as antithetical to the CWA's water quality objectives.

## POINT IV

### PLAINTIFFS' CIRCUMSTANCES ILLUSTRATE PRECISELY HOW THE 2020 RULE'S ELIMINATION OF FEDERAL JURISDICTION THREATENS PUBLIC HEALTH AND SAFETY

A core purpose of the CWA is to protect public health by maintaining and improving water quality. Enforcement of the statute is encouraged by its citizen suit provisions. 33 USC 1365. (See *Massachusetts v United States Veterans Admin.*, 541 F2d 119 (1st Cir 1976), citizens' suit provisions were designed to supplement and expedite administrative action to abate violations of the CWA.)

Plaintiffs own property at 263 Rt. 32 North, in the Town of New Paltz in Ulster County, New York (Tax Map 78.15-1-34). See Docket No. 17, Attachment 2, (Exhibit A attached to Affirmation in Support.)

34

Plaintiffs' property includes approximately 0.46 acres of wetlands designated as "PEM1E" by the United States Fish and Wildlife Service's (USFWS), National Wetland Inventory (NWI) map. PEM1E has no specific surface water connection to any other waterbody. Docket No. 17, Attachments 2 and 3.

However, PEM1E is about 425 feet from a wetland designated as PFO1E which does have surface water connections to tributaries of the Wallkill River. *Id.* at Attachments 3 and 4.

PEM1E and PFO1E are linked by hydric soils identified as "probable wetlands" by New York State Department of Environmental Conservation (NYSDEC). *Id.* at Attachment 4.

The 2015 Rule defined adjacent wetlands as WOTUS "on the basis of functional relationships." 80 Fed. Reg. 37064; former 33 CFR 328.3(a)(6). Thus, the exchange of water through saturated soils would be sufficient connectivity to define a wetland as WOTUS:

> Because of their close physical proximity to nearby jurisdictional waters, bordering or contiguous waters readily exchange their waters through the saturated soils surrounding the traditional navigable water… or covered tributary…

80 Fed. Reg. 37084.

Therefore, the hydric soils connection between PEM1E and PFO1E along with PEM1E being located "at the head of the tributary system" would define PEM1E as "adjacent waters" and thus jurisdictional under the 2015 Rule. 80 Fed. Reg. 37080.

PEM1E is also within 4,000 feet of the Wallkill River, (*Id.* at Attachment 5), a traditional navigable water and is presumptively jurisdictional but subject to the "case-by-case" significant nexus test. Former 33 CFR 328.3(a)(8). 80 Fed. Reg. 37059, 37105-37106.

The 2015 Rule's significant nexus test relied upon science to interpret Justice Kennedy's "similarly situated" discussion:

35

> [W]aters are similarly situated under paragraph (a)(8) where they perform similar [aquatic] functions or are located sufficiently close to each other, regardless of type. The agencies will consider the hydrologic, geomorphic, and ecological characteristics and circumstances of the waters under consideration. Examples include: Documentation of chemical, physical, or biological interactions of the similarly situated waters; aerial photography; USGS and state and local topographical or terrain maps and information; NRCS soil survey maps and data; other available geographic information systems (GIS) data; National Wetlands Inventory maps where wetlands meet the CWA definition; and state and local information.

80 Fed. Reg. 37092.

As above, the NWI and NYSDEC maps identify PEM1E as part of a system of wetlands and tributaries of the Wallkill River and hydric soils connect PEM1E with other jurisdictional wetlands 425 feet away.  Due to PEM1E's hydric soil connection and "sufficiently close" proximity to PFO1E and its hydrologic connection to the underlying aquifer, PEM1E meets many of the 2015 Rule's "significant nexus" functions including "sediment trapping… nutrient recycling… pollutant trapping, transformation, filtering… … runoff storage… [and] contribution of flow." See 80 Fed. Reg. 37106 citing former 33 CFR 328.3(c)(5)(i-vi).

Thus, PEM1E meets the 2015 Rule's definition of jurisdictional waters in two respects – by being "adjacent" waters, (80 Fed. Reg. 37080), and "similarly situated" waters.

Plaintiffs' residence is served by a private well approximately 150 feet deep which relies upon unconsolidated aquifer No. 77512462 located beneath all of PEM1E on Plaintiffs' property. Docket No. 17, Attachment 6.

Wetlands such as PEM1E, recharge aquifers, such as aquifer No. 77512462, which are subject to pollution from the surface. *Id.* at Attachment 1, ¶8.

Although the 2015 Rule would define PEM1E as a federal jurisdictional, the 2020 Rule does not.

PEM1E is not "adjacent to the territorial seas or a traditional navigable water, tributary, lake, pond or impoundment of a jurisdictional water."  It does not "touch" another jurisdictional water, is not "inundated" by another jurisdictional water and is not separated from other jurisdictional waters by "a natural berm, bank, dune, or similar natural feature," nor is there any "direct hydrological surface connection" with other jurisdictional waters. 85 Fed. Reg. at 22279-22280. And, PEM1E shares  no "specific surface water connection" with any other waterbody. 85 Fed. Reg. at 22273.

As a result, there is no federal restriction preventing the filling of PEM1E.

Immediately adjacent and north of Plaintiffs' property is a commercial paving business known as Dean's Paving.  Dean's Paving has filled in portions of PEM1E and loads, parks and stores asphalt-laden trucks on portions of PEM1E. Docket No. 17, Attachments 7 and 8.

Continued filling in of PEM1E will cause stormwater laden petroleum products to enter the remaining areas of PEM1E on Plaintiffs' property and these pollutants will ultimately gravitate into aquifer No. 77512462.

Absent federal jurisdiction, the Agencies cannot prevent further filling of PEM1E or require remediation.  And, Plaintiffs cannot seek federal redress under the CWA's citizen suit provisions, (33 USC §1365), to prevent the filling of PEM1E or force remediation of PEM1E to protect the quality of Plaintiffs' drinking water.

This is precisely the type of non-point pollution that has persisted nationwide and contributes to preventing attainment of the CWA's goals. By removing millions of wetlands acreage from federal jurisdiction, Plaintiffs' circumstances may be repeated in countless scenarios across the United States thwarting the CWA and perpetuating the decline of water quality thereby threatening human health and safety.

In sum, in carrying out President Trump's Executive Order directing EPA to repeal and replace the 2015 Rule, the 2020 Rule implements Justice Scalia's *Rapanos* definition of WOTUS rather than advancing the CWA's primary goal "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  33 USC §1251(a).

Instead of being guided by a "good faith" NEPA-like reasoned environmental analysis, as envisioned by the Court in *Portland Cement Ass'n v Ruckelshaus*, 486 F2d 375, 386 (1973), the Agencies stated their goal as replacing the 2015 Rule and set forth a legal argument supporting their pre-determination citing incomplete science and economic data and deferring water quality protection responsibilities to the States.

While EPA's mission "is to protect human health and the environment" by ensuring Americans have clean water, no effort is made in the 2020 Rule to discuss how the 2020 Rule will affect water quality.  Thus, the Agencies failed to examine an "important aspect of the problem" - the imperiled status of the Nation's waters - and failed to identify whether the 2020 Rule would prevent or promote water pollution. *Motor Vehicle Manufacturers Ass'n v State Farm Mutual Auto. Insurance Co.*, 463 US 29, 43 (1983).

## CONCLUSION

Of the hundreds of thousands of anonymous comments on the 2020 Rule, the following comment sums up the problem with the Agencies' rulemaking:

> It seems to me that the purpose of the Clean Water Act should be protection of water. This proposed rule does nothing to further that end. Rather, it proposes to actually eliminate, eliminate, entire categories of waterways from the protection. Where is the sense in that? Nowhere [sic] to be found here.

> Furthermore the proposed rule will have a terrible and disproportionate effect on New Mexico, Arizona and Nevada. Why is that? What is the point?

There is good science that suggests that the approach to watersheds should look at them as interconnected. Watersheds… [and] the proposed rule undermines that science. Why?

Ephemeral streams and wetlands will no longer be protected. What is the reason for that?

These wholesale changes to the Clean Water Act to limit its jurisdiction provide loopholes in the law and give polluters incentives to discharge dangerous pollutants into unprotected waterways. In fact, the proposed rule seems to be designed to benefit the polluters and harm the environment.

Citizens of areas affected by these changes will be denied the ability to defend certain categories of waterways and wetlands near their homes or where they recreate by suing under the Clean Water Act['] s citizen suit provision.

This rule change to revise the definition of water is a bad idea. I urge you to reconsider.

EPA-HQ-OW-2018-0149-1904.

For the above reasons, Plaintiffs respectfully request the Amended Complaint's claims for relief be granted with the Court vacating and setting aside the 2020 Rule since there is "compelling evidence in the record" concerning the Agencies' decisionmaking that "would not change" if the matter were remanded rather than vacated.  See *Guertin v United States*, 743 F3d 382, 388 (2d Cir 2014) citing *Middle Rio Grande Conservancy Dist. v Norton*, 294 F3d 1220, 1226 (10th Cir 2002); vacatur proper as the agency was "predisposed to their conclusions without a thorough examination of the facts or situation presented."

Respectfully submitted this 10th day of September, 2020.

Dated: New Paltz, New York

James Bacon

Attorney for Plaintiffs
baconesq@yahoo.com
P.O. Box 575
New Paltz, New York 12561
Telephone: (845) 419-2338

39

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 10, 2020, I caused a true and correct copy of the

foregoing to be served via the Court's CM/ECF system on all registered counsel.

James Bacon