**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM MURRAY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No. 1:19-cv-01498-LEK/TWD |
| | ) |
| ANDREW WHEELER, in his official | ) |
| capacity as Administrator of the U.S. | ) |
| Environmental Protection Agency, et al., | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR
SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents .................................................................................................... i

Table of Authorities ............................................................................................. iii

Introduction ............................................................................................................ 1

Background ............................................................................................................. 3

    I.      Statutory and Regulatory Background .................................................. 3

          A.    Prior Regulatory Definitions of "Waters of the United States" and Litigation ...................................................................................... 3

                1.    The 2015 Rule ............................................................... 5

                2.    The Repeal Rule and the Navigable Waters Protection Rule ......... 6

Procedural History ................................................................................................. 7

Standard of Review ................................................................................................ 9

Argument ................................................................................................................ 9

    I.      Plaintiffs Lack Standing to Challenge the NWPR. .............................. 10

          A.    Plaintiffs Fail to Demonstrate that the Wetland Would Be Jurisdictional Under the 2015 Rule ........................................... 11

          B.    Plaintiffs Fail to Demonstrate that Dean's Paving Will Discharge Fill or Polluted Stormwater As a Result of the NWPR. ......................... 13

                1.    Plaintiffs Fail to Show Dean's Paving Will Engage in Further Filling of Wetland PEM1E ................................ 14

                2.    Plaintiffs Fail to Show that New York Would Regulate Stormwater Runoff from Dean's Paving under the 2015 Rule. ....................................................................... 16

    II.     The NWPR Is Permissible Under the CWA and Should Be Upheld ................... 18

          A.    The NWPR Is a Reasonable Construction of Ambiguous Statutory Terms. ............................................................................ 19

i

B.      The Various Snippets of the CWA Cited By Plaintiffs Do Not
        Unambiguously Preclude the Agencies' Interpretation of "Waters
        of the United States." ................................................................................ 21

C.      The NWPR Is Consistent with the Rivers and Harbors Act. ................... 24

D.      The NWPR Does Not Impinge Upon Legislative Powers. ...................... 26

III.    The NWPR Is Neither Arbitrary Nor Capricious Under the APA ........................ 26

A.      The Agencies' Decision Was Well-Explained and Adequately
        Discussed the Effects of the NWPR on the Nation's Waters. ................. 27

        1.      The Agencies Considered the Effects of the New Rule. ............... 27

        2.      The Scope of "Waters of the United States" Is Not Affected
                by the CWA's Anti-Degradation Provision, and the
                NWPR's Effect on Total Maximum Daily Loads (TMDLs)
                Was Well-Explained. ................................................................... 34

B.      The Agencies' Decision Was Not Predetermined. ................................... 36

IV.     The Court Should Defer Ruling on a Remedy Until After Deciding the
        Cross-Motions for Summary Judgment. ............................................................. 38

Conclusion ......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*,
   988 F.2d 146 (D.C. Cir. 1993) ................................................................................ 39

*Arbaugh v. Y & H Corp.*,
   546 U.S. 500 (2006) ................................................................................................. 9

*ASARCO Inc. v. Kadish*,
   490 U.S. 605 (1989) ............................................................................................... 15

*Atlantic States Legal Foundation v. Babbitt*,
   140 F. Supp. 2d 185 (N.D.N.Y. 2001) ..................................................................... 9

*Baltimore Gas & Electric Co. v. NRDC, Inc.*,
   462 U.S. 87 (1983) ..................................................................................... 3, 28, 32

*Cacchillo v. Insmed, Inc.*,
   638 F.3d 401 (2d Cir. 2011) .................................................................................. 17

*California v. Wheeler*,
   No. 20-CV-03005-RS, 2020 WL 3403072 (N.D. Cal. June 19, 2020) ............ 22, 23, 26, 29, 40

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*,
   846 F.3d 492 (2d Cir. 2017) .................................................................................. 24

*Chevron, U.S.A., Inc. v. NRDC, Inc.*,
   467 U.S. 837 (1984) .................................................................. 4, 10, 18, 19, 26

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ................................................................................................. 9

*Clapper v. Amnesty International USA*,
   568 U.S. 398 (2013) ......................................................................................... 16, 18

*Colorado v. EPA*,
   445 F. Supp. 3d 1295 (D. Colo. 2020) .............................................................. 6, 40

*Cortlandt Street Recovery Corp. v. Hellas Telecommunications*,
  790 F.3d 411 (2d Cir. 2015) ............................................................................. 10, 18

*County of Maui, Hawaii v. Hawaii Wildlife Fund*,
  140 S. Ct. 1462 (2020) .......................................................................................... 3, 26

*Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*,
  565 F.3d 56 (2d Cir. 2009) ........................................................................................ 9

*Entergy Corp. v. Riverkeeper, Inc.*,
  556 U.S. 208 (2009) ................................................................................................ 20

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................ 26

*Georgia v. Wheeler*,
  418 F. Supp. 3d 1336 (S.D. Ga. 2019) ...................................................................... 6

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) ............................................................................................ 39

*Guertin v. United States*,
  743 F.3d 382 (2d Cir. 2014) .................................................................................... 32

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................... 9, 10, 14, 15

*Mayo Foundation for Medical Education & Research v. United States*,
  562 U.S. 44 (2011) .................................................................................................. 20

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) .................................................................................... 18, 39, 40

*Morrison v. National Australia Bank Ltd.*,
  561 U.S. 247 (2010) ................................................................................................ 22

*National Association of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ......................................................................... 37, 38

*National Cable & Telecommunications Association v. Brand X Internet Services*,
  545 U.S. 967 (2005) ....................................................................................... 2, 19, 20

*Natural Resources Defense Council v. EPA*,
  658 F.3d 200 (2d Cir. 2011) ...................................................................................... 9

*Ohio Valley Environmental Coalition v. Aracoma Coal Co.*,
556 F.3d 177 (4th Cir. 2009) ........................................................................ 9

*Puget Soundkeeper Alliance v. Wheeler*,
No. C15-1342-JCC, 2018 WL 6169196 (W.D. Wash. Nov. 26, 2018) ................................. 37

*Puget Soundkeeper Alliance v. Wheeler*,
No. C15-1342-JCC, 2019 WL 6310562 (W.D. Wash. Nov. 25, 2019) ................................. 6

*Rapanos v. United States*,
547 U.S. 715 (2006) .................................................. 2, 4, 5, 6, 19, 20, 25, 29, 30, 36

*Rodriguez v. United States*,
480 U.S. 522 (1987) ...................................................................................... 24

*Sackett v. EPA*,
566 U.S. 120 (2012) ..................................................................................... 2

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers ("SWANCC")*,
531 U.S. 159 (2001) ........................................................ 4, 19, 20, 21, 22, 23, 29, 34

*South Carolina Coastal Conservation League v. Pruitt*,
318 F. Supp. 3d 959 (D.S.C. 2018) ................................................................... 37

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ............................................................................. 11, 39

*Texas v. EPA*,
389 F. Supp. 3d 497 (S.D. Tex. 2019) ................................................................ 6

*Town of Chester, New York v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ................................................................................ 39

*United States v. Eurodif S.A.*,
555 U.S. 305 (2009) .................................................................................... 20

*United States v. Mendoza*,
464 U.S. 154 (1984) .................................................................................... 40

*United States v. Riverside Bayview Homes, Inc.*,
474 U.S. 121 (1985) ........................................................................ 4, 19, 20, 32

*United States v. White Fuel Corporation*,
  498 F.2d 619 (1st Cir. 1974) ........................................................................... 24

*Virginia Society for Human Life, Inc. v. FEC*,
  263 F.3d 379 (4th Cir. 2001), *overruled on other grounds by*
  *The Real Truth About Abortion, Inc.,* 682 F.3d 544 (4th Cir. 2012) ........................................ 39

*Warth v. Seldin*,
  422 U.S. 490 (1975) ........................................................................................ 10

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ........................................................................................ 39

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ........................................................................................ 16

**Statutes**

5 U.S.C. § 706(2) ............................................................................................ 39

5 U.S.C. § 706(2)(A) ......................................................................................... 9

33 U.S.C. §§ 1251 et. seq .................................................................................... 3

33 U.S.C. § 1251(a) .................................................................................. 3, 21, 22

33 U.S.C. § 1251(b) .............................................................................. 3, 20, 21, 22

33 U.S.C. § 1311(a) ........................................................................................... 3

33 U.S.C. § 1313(d) .......................................................................................... 34

33 U.S.C. § 1313(d)(4)(A) ................................................................................... 34

33 U.S.C. § 1313(d)(4)(B) ................................................................................... 34

33 U.S.C. § 1342 ............................................................................................. 16

33 U.S.C. § 1344 ............................................................................................. 15

33 U.S.C. § 1362(7) ............................................................................... 3, 6, 20, 35

## Code of Federal Regulations

33 C.F.R. § 328.3(a) (1987) ............................................................ 3

33 C.F.R. § 328.3(a)(8) (2016) ...................................................... 12

33 C.F.R. § 328.3(c)(5) (2016) ...................................................... 13

40 C.F.R. § 110.1(3)(v) (2016) ...................................................... 13

40 C.F.R. § 131.12 ......................................................................... 34

40 C.F.R. § 232.2(q) (1988) ............................................................ 4

40 C.F.R § 110.1(3)(v) (2016) ....................................................... 13

## Federal Registers

39 Fed. Reg. 12,115 (Apr. 3, 1974) ............................................... 3

42 Fed. Reg. 37,122 (July 19, 1977) ......................................... 3, 20

80 Fed. Reg. 37,054 (June 29, 2015) ........................................ 5, 33

82 Fed. Reg. 55,542 (Nov. 22, 2017) ........................................... 36

83 Fed. Reg. 5200 (Feb. 6, 2018) ................................................. 36

84 Fed. Reg. 56,626 (Oct. 22, 2019) .............................................. 6

85 Fed. Reg. 22,250 (Apr. 21, 2020) ............................ 3, 6, 7, 19-22, 24-26, 28-30, 32-34, 36, 37

## Miscellaneous

Exec. Order No. 13778 ............................................................... 6, 35

## INTRODUCTION

Plaintiffs William Murray and June Omura seek to invalidate the Navigable Waters Protection Rule ("NWPR"), a regulation promulgated earlier this year by the U.S. Environmental Protection Agency ("EPA") and U.S. Army Corps of Engineers ("Corps") (collectively, the "Agencies"). The NWPR revised prior regulations defining the "waters of the United States" that are subject to federal regulation under the Clean Water Act ("CWA"). In a nutshell, Plaintiffs contend that the NWPR removed CWA protections from a wetland (and associated aquifer) that runs through their property and extends into 0.3 acres of their neighbor's property, an asphalt paving business. But Plaintiffs have not shown that the wetland at issue would have been a "water of the United States" under the CWA regulations that preceded the NWPR. Further, even if the wetland had been jurisdictional under prior regulations, the neighbor's future, speculative activities that Plaintiffs are concerned about would likely have been allowed. As a result, Plaintiffs have not demonstrated that the NWPR is the cause of their alleged injuries, and they therefore lack standing to challenge the NWPR.

This Court need not look past Plaintiffs' lack of standing, but if it does, it should uphold the NWPR. The NWPR brings decades of debate regarding the jurisdictional limits of the CWA to a close. Under prior regulations, CWA jurisdiction turned largely on the question of whether certain wetlands and other waters had a "significant nexus" to traditionally navigable waters. This vague standard muddied the waters of CWA jurisdiction and spawned years of litigation. The NWPR replaces that subjective standard with clearly defined categories of covered waters. Those wondering whether a water or wetland constitutes a "water of the United States" are now able to review the Agencies' regulations, and with more clarity than the preceding regulations have provided, determine if a CWA permit is needed to discharge pollutants, including dredged

and fill material, into a particular water.

When the Supreme Court considered the prior, "notoriously unclear" regulatory regime, *Sackett v. EPA*, 566 U.S. 120, 133 (2012) (Alito, J., concurring), Chief Justice Roberts urged the Agencies to issue new regulations to "develop[] *some* notion of an outer bound to the reach of their authority," *Rapanos v. United States*, 547 U.S. 715, 757-58 (2006) (Roberts, C.J., concurring). The Agencies responded to this guidance when they adopted the NWPR. While Plaintiffs may not agree with the Agencies' policy judgments, the Agencies are "delegated rulemaking authority under . . . the Clean Water Act [and] are afforded generous leeway by the courts in interpreting the statute they are entrusted to administer." *Id*.

Because the CWA is ambiguous in material respects, this Court should afford deference to the Agencies' construction of the CWA reflected in the NWPR. Indeed, what constitutes a "water of the United States" is a textbook example of statutory ambiguity for which agencies are "delegat[ed] . . . authority to . . . fill the statutory gap in reasonable fashion." *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967, 980 (2005). Interpreting ambiguous language "involves difficult policy choices," so judicial deference is critical, as "agencies are better equipped to make [such choices] than courts." *Id.* at 980. A reasonable "agency construction" even displaces prior *judicial* decisions unless such holdings "follow[ed] from the unambiguous terms of the statute." *Id.* at 982.

The extensive analyses in the NWPR's preamble, Resource and Programmatic Assessment, Economic Analysis, and Response to Comments establish that the Agencies appropriately considered, and thoroughly explained, both the legal and scientific aspects of their decisions. Contrary to Plaintiffs' hyperbolic forecasts of environmental harm, the NWPR and the Agencies' partnership with states in the CWA's cooperative federalism regime could provide

comparable environmental protection, at less societal cost, for a net public benefit. On these issues "within [the Agencies'] area of special expertise," "a reviewing court must generally be at its most deferential." *Baltimore Gas & Electric Co. v. NRDC, Inc.*, 462 U.S. 87, 103 (1983).

The Agencies are therefore entitled to summary judgment, both because Plaintiffs lack standing, and because the NWPR should, in any event, be upheld on the merits.

## BACKGROUND

I. **Statutory and Regulatory Background**

Congress enacted the CWA, 33 U.S.C. §§ 1251 et seq., with the objective "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," *id*. § 1251(a), while declaring its policy to "recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution." *Id*. § 1251(b). The Act prohibits "the discharge of any pollutant by any person," *id*. § 1311(a), to "navigable waters," which "means the waters of the United States," *id*. § 1362(7), unless otherwise authorized under the Act. The Act and the NWPR *also* prohibit certain discharges to non-jurisdictional waters that are conveyed downstream to jurisdictional waters and that are not authorized under the Act. *See* 85 Fed. Reg. at 22,250, 22,289 (Apr. 21, 2020); *see also County of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1477 (2020) (holding that the CWA applies to discharges to non-jurisdictional groundwater that reach navigable waters by a "functional equivalent" of a direct discharge).

A. **Prior Regulatory Definitions of "Waters of the United States" and Litigation**

The Corps first promulgated regulations defining "waters of the United States" in the 1970s, including only waters that were navigable in fact. 39 Fed. Reg. 12,115 (Apr. 3, 1974). Thereafter, the Corps substantially broadened its interpretation. *See,* e.g., 42 Fed. Reg. 37,122,

37,144 (July 19, 1977). In the 1980s, the Agencies adopted regulatory definitions substantially

similar to the 1977 definition that remained in place until 2015. *See* 33 C.F.R. § 328.3(a) (1987)

(Corps); 40 C.F.R. § 232.2(q) (1988) (EPA) (collectively, the "1986 Regulations").

Over time, the Agencies refined their application of the 1986 Regulations, informed by

three Supreme Court decisions. In *Riverside Bayview*, the Court applied *Chevron, U.S.A., Inc. v.

NRDC, Inc.*, 467 U.S. 837 (1984), to hold that the Corps' assertion of jurisdiction over wetlands

"actually abut[ting]" a traditional navigable water was reasonable. *United States v. Riverside

Bayview Homes, Inc.*, 474 U.S. 121, 131-35 & n.9 (1985). But in *Solid Waste Agency of

Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"), the

Court held "the text of the statute will not allow" the extension of CWA jurisdiction to "ponds

that are not adjacent to open water." *Id.* at 168.

In *Rapanos*, the Supreme Court reviewed the Corps' application of the 1986 Regulations

to assert jurisdiction over four wetlands. *Rapanos*, 547 U.S. at 719-20, 729-30. Pursuant to

Justice Scalia's plurality opinion and a concurrence by Justice Kennedy, the Court remanded the

Corps' assertion of CWA jurisdiction. *Id*. at 757 (Scalia, J., plurality); *id*. at 786-87 (Kennedy, J.,

concurring). The plurality stated that "the traditional term 'navigable waters' . . . carries some of

its original substance" and "includes, at bare minimum, the ordinary presence of water." *Id*. at

734 (Scalia, J., plurality). But the plurality stated the term "waters of the United States" does

"not necessarily exclude *seasonal* rivers, which contain continuous flow during some months of

the year but no flow during dry months." *Id*. at 732 n.5. Further, the plurality would have

excluded from jurisdiction wetlands "with only an intermittent, physically remote hydrologic

connection to 'waters of the United States.'" *Id*. at 742.

In concurring in the judgment, Justice Kennedy opined that jurisdiction may extend to

wetlands with a "'significant nexus' to waters that are or were navigable in fact or that could reasonably be so made." *Id.* at 759 (Kennedy, J., concurring). But Justice Kennedy rejected the view of the dissenting justices, which would have held the Corps' application of its regulations "reasonable," and would have upheld its findings of jurisdiction. *Id.* at 778, 797, 810.

### 1.    The 2015 Rule

In 2015, the Agencies revised the regulatory definition of "waters of the United States." 80 Fed. Reg. 37,054 (June 29, 2015) ("2015 Rule"). Using Justice Kennedy's "significant nexus" discussion as its legal touchstone, *id.* at 37,060, the 2015 Rule had the "objective of enhancing regulatory clarity, predictability and consistency." *Id.* at 37,090. The 2015 Rule defined the geographic scope of the CWA by placing waters into three categories: (A) waters that were categorically "jurisdictional by rule" in all instances (i.e., without the need for any additional analysis); (B) waters that were subject to case-specific analysis to determine whether they were jurisdictional; and (C) waters that were categorically excluded from jurisdiction. Waters considered "jurisdictional by rule" included (1) waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (2) interstate waters, including interstate wetlands; (3) the territorial seas; (4) impoundments of waters otherwise identified as jurisdictional; (5) tributaries of the first three categories of "jurisdictional by rule" waters; and (6) waters adjacent to a water identified in the first five categories of "jurisdictional by rule" waters, including "wetlands, ponds, lakes, oxbows, impoundments, and similar waters." *See id.* at 37,104.

Multiple parties sought review of the 2015 Rule in courts across the country. A court of appeals and multiple district courts stayed or enjoined the 2015 Rule, concluding plaintiffs were likely to succeed on the merits of their challenge to the 2015 Rule. Two courts ruled on summary

judgment that the 2015 Rule was "unlawful" and remanded the Rule to the Agencies. *Georgia v. Wheeler*, 418 F. Supp. 3d 1336, 1372 (S.D. Ga. 2019); *Texas v. EPA*, 389 F. Supp. 3d 497, 504- 06 (S.D. Tex. 2019). In doing so, the Southern District of Georgia found that "the definition of waters of the United States in the [2015] WOTUS Rule extends beyond [the Agencies'] authority under the CWA." *Georgia*, 418 F. Supp. 3d at 1360, 1366. Another court dismissed a challenge to the 2015 Rule's waste treatment system exclusion on standing grounds. It held that none of the plaintiffs' members had identified "any project, proposed or existing, that is causing or will soon cause the harms he is concerned about." *Puget Soundkeeper Alliance v. Wheeler*, No. C15-1342-JCC, 2019 WL 6310562, at *7 n.8 (W.D. Wash. Nov. 25, 2019).

## 2.    The Repeal Rule and the Navigable Waters Protection Rule

In 2017, the President issued Executive Order ("E.O.") 13778, which directed the Agencies to "review" the 2015 Rule and "consider interpreting the term 'navigable waters,' as defined in 33 U.S.C. 1362(7), in a manner consistent with the opinion of Justice Antonin Scalia in *Rapanos v. United States*." After a notice-and-comment rulemaking process, the Agencies repealed the 2015 Rule, and reinstated the 1986 Regulations' definition of "waters of the United States." *See* 84 Fed. Reg. 56,626 (Oct. 22, 2019) ("Repeal Rule" or "2019 Rule"). A number of parties filed suits challenging the 2019 Rule. The 2019 Rule became effective nationwide on December 23, 2019. On January 23, 2020, the Agencies then signed a separate final rule—the NWPR—that takes a new approach to defining "waters of the United States." The NWPR went into effect on June 22, 2020, 85 Fed. Reg. 22,250 (Apr. 21, 2020), except in Colorado where a preliminary injunction applies. *See Colorado v. EPA*, 445 F. Supp. 3d 1295, 1299 (D. Colo. 2020), appeals docketed, Nos. 20-1238, 20-1262, 20-1263 (10th Cir.) (argument scheduled for Nov. 18, 2020). The NWPR establishes four categories of jurisdictional waters: (1) the territorial

6

seas and traditional navigable waters; (2) tributaries of such waters; (3) certain lakes, ponds, and impoundments of jurisdictional waters; and (4) wetlands adjacent to other jurisdictional waters (other than jurisdictional wetlands). 85 Fed. Reg. at 22,273. The Rule also specifies "exclusions for many water features that traditionally have not been regulated, and define[s] the operative terms used in the regulatory text." *Id*. at 22,270; *see also id*. at 22,340-41.

The NWPR relies on "a unifying legal theory for federal jurisdiction over those waters and wetlands that maintain a sufficient surface water connection to traditional navigable waters or the territorial seas." *Id*. at 22,252. It asserts jurisdiction over tributaries that "flow[] continuously during certain times of the year and more than in direct response to precipitation." *Id*. at 22,338. The NWPR includes wetlands abutting jurisdictional waters. The NWPR also includes non-abutting, but "adjacent wetlands" that are (1) "inundated by flooding" from a jurisdictional water during a typical year, (2) physically separated from a jurisdictional water only by certain natural features (e.g., a berm, bank, or dune), or (3) physically separated from a jurisdictional water by an artificial barrier that "allows for a direct hydrologic surface connection" during a typical year to a jurisdictional water. *Id*. at 22,338.

## PROCEDURAL HISTORY

Plaintiffs filed an initial complaint on December 4, 2019, challenging the 2019 Rule. Dkt. No. 1. Plaintiffs' original allegations of injury were quite limited:

> Plaintiffs William Murray and June Omura reside and own property within the Northern District of New York in Ulster County, New York. Their property in New Paltz, New York, includes ephemeral streams and tributaries that were considered WOTUS prior to the agencies' adoption of the Repeal Rule. Plaintiffs have standing as the agencies' Repeal Rule terminates the status of plaintiffs' ephemeral streams and tributaries as federally protected WOTUS.

*Id*. at ¶ 17.

On March 16, 2020, the Agencies moved to dismiss Plaintiffs' complaint, or

alternatively, to hold the case in abeyance pending publication of the NWPR. Dkt. No. 9. The parties subsequently stipulated to stay briefing on the Agencies' motion to dismiss given Plaintiffs' plan to amend their complaint to include a challenge to the NWPR. Dkt. No. 12. On May 11, 2020, Plaintiffs amended their complaint to add a challenge to the NWPR. Dkt. No. 17.

Plaintiffs also substantially amended their allegations regarding standing. Dkt. No. 17 at ¶¶ 19-32. Plaintiffs allege (1) that a wetland[1] runs through their property, *id*. ¶ 20; (2) that the wetland extends into 0.3 acres of an adjacent property used by a commercial paving business, Dean's Paving, *id*. ¶ 26; (3) that the wetland would constitute a jurisdictional wetland under the 2015 Rule, but not under the NWPR, *id*. ¶¶ 28-29; (4) that Dean's Paving will discharge more fill or allow stormwater runoff into the wetland in question if not for federal prohibition, *id*. ¶ 30; and (5) that therefore "untreated stormwater runoff containing petroleum products will enter [wetland] PEM1E and gravitate onto plaintiffs' neighboring property and . . . thereby threaten[] the safety of plaintiffs' drinking water [from an underground aquifer]," *id*. ¶ 31. These allegations are supported by an affirmation by their attorney, James Bacon. Dkt. No. 17-1.

On July 10, 2020, the Agencies filed an Answer to the First Amended Complaint. Dkt. No. 20. Upon request of the Agencies, this Court agreed to a two-phased approach to summary judgment briefing, with briefing regarding Plaintiffs' challenge to the NWPR to precede any briefing on their challenge to the 2019 Rule. Dkt. No. 22. Plaintiffs filed their initial motion for summary judgment on September 10, 2020. Dkt. No. 26 (hereinafter "Brief").

---

[1] Plaintiffs refer to PEM1E as the wetland's name, Brief at 35, however, it is actually the specific class of wetland identified—palustrine, emergent, persistent, seasonally flooded/saturated. *See* U.S. Fish and Wildlife, Wetlands Code Interpreter, https://fwsprimary.wim.usgs.gov/decoders/wetlands.aspx, *last visited* Oct. 23, 2020.

## STANDARD OF REVIEW

"Federal courts are courts of limited [subject matter] jurisdiction." *Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont*, 565 F.3d 56, 62 (2d Cir. 2009) (internal quotation marks omitted).

> The determination of whether Article III standing exists also must comport with the "manner and degree of evidence required at the successive stages of the litigation." At the summary judgment stage, a plaintiff cannot rest upon mere allegations of injury to show standing, but must produce affidavits or other evidence to support its claims. Furthermore, the party invoking federal jurisdiction bears the burden of establishing these elements.

*Atlantic States Legal Foundation v. Babbitt*, 140 F. Supp. 2d 185, 188 (N.D.N.Y. 2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). When a federal court lacks subject matter jurisdiction, "the court must dismiss the complaint in its entirety." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

"Under the Administrative Procedure Act, a reviewing court 'shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Natural Resources Defense Council v. EPA*, 658 F.3d 200, 215 (2d Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)). This standard "is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Environmental Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). The court's only role is to determine whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.*

## ARGUMENT

The Court should grant Defendants' motion for summary judgment and deny Plaintiffs'

motion for summary judgment. First, this Court does not have jurisdiction to hear Plaintiffs'

challenge to the NWPR because they lack standing. Even if the court determines it has

jurisdiction, the NWPR reflects a reasonable interpretation of the CWA's ambiguous term,

"waters of the United States," and thus should be upheld under *Chevron*. Additionally, the

NWPR is neither arbitrary nor capricious under the Administrative Procedure Act ("APA"), as

the Agencies' decision was fully explained. Lastly, although the Agencies believe that no relief

whatsoever should be afforded to Plaintiffs, if the Court holds that Plaintiffs have standing, and

finds deficiencies in the NWPR, it should request separate briefing from the parties on what

remedy would be appropriate based upon the specific problems found by the Court.

## I.   Plaintiffs Lack Standing to Challenge the NWPR.

Plaintiffs lack standing to challenge the NWPR for two independent reasons. First,

Plaintiffs have failed to demonstrate that a wetland that crosses their property would be deemed a

jurisdictional wetland under the 2015 Rule. And, if the wetland would not be jurisdictional under

the 2015 Rule, Plaintiffs do not have a "'personal stake in the outcome of the controversy.'"

*Cortlandt Street Recovery Corp. v. Hellas Telecommunications*, 790 F.3d 411, 417 (2d Cir.

2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975)).

Second, Plaintiffs allege the discharge of fill or stormwater by their neighbor, Dean's

Paving, may harm Plaintiffs' groundwater. But Plaintiffs fail to show that any such potential

injuries are caused *by the NWPR*. "[I]t is entirely conjectural whether the nonagency activity that

affects [Plaintiffs] will be altered or affected by the agency activity they seek to achieve." *Lujan*,

504 U.S. at 571. Indeed, the very activity Plaintiffs complain of has already occurred and would

likely be permissible under *either* the 2015 Rule, the 2019 Rule,[2] or the NWPR. Accordingly, Plaintiffs have neither demonstrated "an injury in fact," nor that such injury "is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

### A.    Plaintiffs Fail to Demonstrate that the Wetland Would Be Jurisdictional Under the 2015 Rule.

Plaintiffs have failed to demonstrate that the wetland that crosses their property and extends into that of their neighbor, Dean's Paving, would be jurisdictional under the 2015 Rule.

Through Mr. Bacon's affirmation, Plaintiffs allege that a 2.47-acre wetland was designated by the U.S. Fish and Wildlife Service's ("FWS") National Wetlands Inventory ("NWI") map as existing in the vicinity of the properties. Bacon Affirmation at ¶ 3. But the designation of a wetland on the NWI, based on quarter-century-old information, Bacon Affirmation ¶ 4, does not definitively indicate that the area designated as such currently meets the Agencies' longstanding regulatory definition of "wetlands." used by EPA and the Corps under the CWA. FWS, NWI, Data Limitations, Exclusions and Precautions Website, https://www.fws.gov/wetlands/Data/Limitations.html, *last visited* Oct. 23, 2020 ("Federal, state, and local regulatory agencies with jurisdiction over wetlands may define and describe wetlands in a different manner than that used in this inventory."); *see also infra* pp. 28-29. The NWI was not created for regulatory purposes and cannot be used as a standalone tool to determine the scope of CWA jurisdiction, regardless of the definition of "waters of the United States." *See* Limitations of the National Hydrography Dataset at High Resolution and the National Wetlands Inventory, EPA-HQ-OW-2018-0149-11585, *available at*

---

[2] The Plaintiffs' challenge to the 2019 Rule is not being briefed at this time. *See* Dkt. No. 22. However, we presume Plaintiffs do not believe the wetland would be jurisdictional under the 2019 Rule given that they are challenging that rule as well.

https://www.regulations.gov/document?D=EPA-HQ-OW-2018-0149-11585. Even if there was a

wetland in the vicinity of Plaintiffs' property in 1995, FWS acknowledges that "[w]etlands or

other mapped features may have changed since the date of the imagery and/or field work." FWS,

NWI, *Data Limitations, Exclusions and Precautions*. Further, the NWI map is based primarily

on aerial photography. *Id*. FWS specifically notes that a "margin of error is inherent in the use of

imagery; thus, detailed on-the-ground inspection of any particular site may result in revision of

the wetland boundaries or classification established through image analysis." *Id*.

Regardless, even if the 2.47 acres are all wetland under the NWI's definition—or were in

1995—Plaintiffs fail to demonstrate that the wetland would be jurisdictional under the 2015

Rule. Indeed, FWS expressly cautions against the very assumptions Plaintiffs make.

> **Precautions** - . . . There is no attempt, in either the design or products of this
> inventory, to define the limits of proprietary jurisdiction of any Federal, state, or
> local government or to establish the geographical scope of the regulatory
> programs of government agencies. Persons intending to engage in activities
> involving modifications within or adjacent to wetland areas should seek the
> advice of appropriate federal, state, or local agencies concerning specified agency
> regulatory programs and proprietary jurisdictions that may affect such activities.

*Id*.

Importantly, even if it was clear that the area in question meets the Agencies' regulatory

definition of "wetlands," Plaintiffs fail to demonstrate that this particular wetland would be

jurisdictional under the 2015 Rule's definition of "waters of the United States," on which their

standing arguments appear to depend:

> Water[] located within 4,000 feet of the high tide line or ordinary high water mark
> of a water identified in paragraphs (a)(1) through (5) of this section *where they
> are determined on a case-specific basis to have a significant nexus to a water*
> identified in paragraphs (a)(1) through (3) of this section.

33 C.F.R. § 328.3(a)(8) (2016) (emphasis added). The Agencies do not dispute that the NWI-

mapped wetland is within 4,000 feet of the Wallkill River, a traditional navigable water, and

therefore the NWI-mapped wetland PEM1E would have constituted a jurisdictional wetland under the 2015 Rule *if* it met the regulatory definition of "wetlands" and *if* it had a significant nexus to the river. But, Plaintiffs fail to set forth facts needed to demonstrate that such a "significant nexus," per the 2015 Rule, exists. Plaintiffs rely on Mr. Bacon's affirmation:

> Upon information and belief, pursuant to the 2015 Clean Water Rule's definitions of "adjacent waters," "similarly situated" waters and "significant nexus," PEM1E would be classified as a federal jurisdictional water due to its linkage with downstream wetlands by hydric soils, proximity to the Wallkill River and proximity to other wetlands and tributaries and being located at the headwaters of a tributary/wetland branch extending from the Wallkill River.

Bacon Affirmation ¶ 9. Yet, "information and belief," *id.*, is simply not enough.

For the specific wetland to fall within the jurisdictional scope of the 2015 Rule, it and any other similarly situated wetlands would need a "significant nexus" to the Wallkill River, which would depend on consideration of the factors codified in 33 C.F.R. § 328.3(c)(5) (2016) (Corps Regulations) or 40 C.F.R § 110.1(3)(v) (2016) (EPA Regulations). These factors include the wetland's functions of sediment trapping, nutrient recycling, pollutant trapping, water retention and attenuation, runoff storage, contribution of flow, export of organic matter, export of food resources, and provision of life cycles dependent on the aquatic habitat. 33 C.F.R. § 328.3(c)(5) (2016) ; 40 C.F.R § 110.1(3)(v) (2016). *Id.* Here, Plaintiffs fail to provide enough information on the underlying factors to demonstrate the wetland would have been jurisdictional under the 2015 Rule, which is a critical premise underlying their allegations of injury from the NWPR. Plaintiffs have therefore failed to carry their burden of demonstrating standing to challenge the NWPR for this reason alone.

### B.   Plaintiffs Fail to Demonstrate that Dean's Paving Will Discharge Fill or Polluted Stormwater As a Result of the NWPR.

Even if it were assumed, *arguendo*, that the wetland in question would have been

jurisdictional under prior rules, Plaintiffs still have failed to carry their burden of demonstrating standing to challenge the NWPR because they have failed to show the *activities* they are concerned about are anything more than sheer speculation, or that those activities would, in any event, have been prohibited prior to the NWPR.

Plaintiffs' alleged injury derives from Dean's Paving's "further filling of PEM1E" and "stormwater laden petroleum products" flowing from asphalt piles on Dean's Paving into the wetland that crosses its property. Brief at 37. As a result of these two activities, "the quality of Plaintiffs' drinking water" is allegedly at risk. *Id*. However, Plaintiffs fail to demonstrate that Dean's Paving will actually further fill the wetland if it is not prohibited from doing so under the CWA. Nor do Plaintiffs show that Dean's Paving would be required to address stormwater runoff from its property under the CWA, even if the wetland was jurisdictional. Plaintiffs have neither shown an injury-in-fact, nor that such an injury would be redressed by a favorable decision in this Court, both of which are required for Plaintiffs to have standing.

### 1. Plaintiffs Fail to Show Dean's Paving Will Engage in Further Filling of Wetland PEM1E.

"Dean's Paving has [*already*] filled in portions of [wetland] PEM1E . . . ." Brief at 37. Thus any injury to Plaintiffs is dependent upon *future speculative* filling of the wetland.

*First*, Plaintiffs fail to present any evidence that Dean's Paving intends to fill the wetland if it is not required to obtain a CWA Section 404 permit to do so under the NWPR. As the Supreme Court explained in *Lujan*, this presents a high bar for Plaintiffs, which they fail to meet.

> When . . . a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction— and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and

legitimate discretion the court cannot presume either to control or to predict . . . ."
*Lujan*, 504 U.S. at 562 (quoting *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615, (1989)). Moreover,
Plaintiffs also fail to present any clear evidence that any of wetland PEM1E still exists on Dean's
Paving, such that further filling could occur at all.

*Second*, Plaintiffs fail to demonstrate that their speculative injuries will be redressed by
this Court. This is because Dean's Paving may well be allowed to fill any remaining wetlands on
their property under a CWA Section 404 permit from the Corps *even if* the wetlands were
jurisdictional under the CWA, as Plaintiffs allege they would be under the 2015 Rule. If Dean's
Paving can lawfully fill the remaining wetlands on their property regardless of their jurisdictional
status, Plaintiffs' injury cannot be redressed by this lawsuit.

Under CWA Section 404, 33 U.S.C. § 1344, the Corps issues general permits that allow
parties to discharge dredge or fill material into waters of the United States as part of specific
types of activities. For instance, Nationwide Permit 39 (Commercial and Institutional
Developments) generally allows for discharges that do not cause the loss of greater than a half-
acre of non-tidal waters of the United States for constructing or expanding commercial and
institutional facilities. *See* Corps, 2017 Nationwide Permits, General Conditions, District
Engineer's Decision, Further Information, and Definitions, *available at*
https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/8593.

Plaintiffs allege that 0.3 acres of wetlands existed on Dean's Paving's property in 1995,
Bacon Affirmation at ¶ 10, *prior to* Dean's Paving filling much of the wetland on their property.
While the Agencies are unsure whether any wetlands now remain, filling any such wetlands—no
more than 0.3 acres in total—would likely be permitted by at least one of the Corps' general
permits, such as Nationwide Permit 39. Of course, the Agencies cannot state with certainty that

any such activity would be permitted because there is no evidence as to what Dean's Paving intends to do. With respect to additional filling of wetlands by Dean's Paving, Plaintiffs have alleged only "'*possible* future injury.'" *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). That is not enough to establish injury in fact.

      **2.**      **Plaintiffs Fail to Show that New York Would Regulate Stormwater Runoff from Dean's Paving under the 2015 Rule.**

Plaintiffs assert that "[w]ith the NWPR's removal of federal protection for [wetland] PEM1E, there is no federal prohibition on Dean's Paving . . . allowing untreated stormwater into the wetland," and that "[u]ntreated stormwater runoff containing petroleum products will enter [wetland] PEM1E and gravitate onto plaintiffs' neighboring property." Bacon Affirmation ¶¶ 12-13. But, Plaintiffs fail to demonstrate that Dean's Paving would be required to address such untreated stormwater *even if* the wetland on Plaintiffs' property were jurisdictional.

Stormwater discharges to "waters of the United States" are generally governed by Section 402 of the CWA, 33 U.S.C. § 1342, which creates the National Pollutant Discharge Elimination System ("NPDES"). As in almost all the states, New York has assumed responsibility for implementing the NPDES program. New York does so under its State Pollutant Discharge Elimination System ("SPDES") Permit Program.

> New York's SPDES program has been approved by the United States Environmental Protection Agency for the control of surface wastewater and stormwater discharges in accordance with the Clean Water Act. However, the SPDES program is broader in scope than that required by the Clean Water Act as it controls point source discharges to groundwaters as well as surface waters.

N.Y. Dep't of Environmental Conservation ("NYSDEC"), SPDES Permit Program Website, https://www.dec.ny.gov/permits/6054.html, *last visited* Oct. 23, 2020.

Plaintiffs fail to discuss whether New York's SPDES program would impose any

limitation on the actual activities alleged at Dean's Paving—storing asphalt uncovered. By failing to do so, Plaintiffs have not met their burden of establishing standing. *See*, e.g., *Cacchillo v. Insmed, Inc*., 638 F.3d 401, 404 (2d Cir. 2011) (It is a "plaintiff's burden to demonstrate standing[, which] increases over the course of litigation.").

Further, based on the facts alleged, it appears that New York would *not* require any action by Dean's Paving if the wetland was jurisdictional under the CWA. To the extent that Dean's Paving would be required to have an SPDES permit, such activity would likely be addressed by NYSDEC's Multi-Sector General Permit ("MSGP") for Stormwater Discharges Associated with Industrial Activities. *See* NYSDEC, Stormwater Website, https://www.dec.ny.gov/chemical/8468.html, *last visited* Oct. 23, 2020. NYSDEC has published an MSGP Decision Tree that helps explain which commercial activities qualify for the MSGP. Exhibit 1 to the Dupré Declaration. In addition to requiring a discharge of stormwater to waters of the United States, a facility in New York must meet two additional criteria. First, "the facility [must] conduct industrial activities identified within 40 CFR Part 122.26(b)(14)(i) through (ix) and (xi)." *Id*. This appears to be met, as 40 C.F.R. Part 122.26(b)(14)(i) includes "storage areas . . . for raw materials, and intermediate and final products." *Id*.

Second, "the facility [must] have a Primary Industrial Activity that has an SIC code listed in Appendix B [by NYSDEC]." *Id.* New York lists facilities that *manufacture* asphalt paving materials, but not facilities that merely store such materials. *See* NYSDEC, SPDES MSGP for Stormwater Discharges Associated with Industrial Activity at 58 (emphasis added), March 4, 2020, *available at* https://www.dec.ny.gov/docs/water_pdf/msgppermit.pdf ("The requirements . . . apply to *stormwater discharges associated with industrial activity* from facilities engaged in the following activities: manufacturing asphalt paving and roofing materials . . . .").

Plaintiffs do not allege that Dean's Paving manufactures asphalt paving materials. Thus, it appears that Dean's Paving's facility would *not* be subject to an SPDES permit by New York. As a result, Plaintiffs fail to demonstrate that the jurisdictional status of these wetlands under the CWA will meaningfully affect how New York regulates Dean's Paving under its delegated authority under CWA Section 402.[3] Accordingly, whatever injury Plaintiffs may incur as a result of stormwater discharges from Dean's Paving, it appears that such injury may not be "'redressable by a favorable ruling'" in the matter before this Court. *Clapper*, 568 U.S. at 409 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).

The sincerity of Plaintiffs' concerns and convictions do not create a "personal stake" in whether the NWPR is a valid exercise of the Agencies' rulemaking authority under the CWA. *Cortlandt Street Recovery*, 790 F.3d at 417. Accordingly, this Court must find Plaintiffs lack standing and therefore dismiss this case for lack of Article III subject matter jurisdiction.

## II.    The NWPR Is Permissible Under the CWA and Should Be Upheld.

Given Plaintiffs' lack of standing, this Court need not look to the merits of the NWPR. But, should it do so, it should uphold the rule. Where a challenged rule contains an interpretation of statutory language, this Court reviews that interpretation under *Chevron*, 467 U.S. 837. At Step One, this Court determines "whether Congress has directly spoken to the precise question at issue." *Id.* at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to Step Two to determine "whether the agency's answer is based on a

---

[3] Plaintiffs also make vague reference to the ability to redress unpermitted discharges through the CWA citizen suit provision at CWA Section 505. *See* Brief at 37. Importantly, Plaintiffs provide no information about how the citizen suit provision could remedy their injuries here. Moreover, this Court may not assume that—should Plaintiffs win this lawsuit—they will also win a separate lawsuit against Dean's Paving and that the Court in that separate matter will award relief redressing Plaintiffs' injuries in this matter. Such a theory of injury and redressability is the sort of "merely speculative" allegation that cannot provide standing. *Lujan*, 504 U.S. at 561.

permissible construction of the statute." *Id.* at 843. The NWPR reflects a reasonable interpretation of "navigable waters" defined as "waters of the United States."

A.     **The NWPR Is a Reasonable Construction of Ambiguous Statutory Terms.**

*Chevron* "established a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows." *Brand X*, 545 U.S. at 982 (internal quotation marks omitted). Accordingly, under *Brand X*, because "waters of the United States" is ambiguous, the Agencies were empowered to reconsider their prior statutory interpretation. Plaintiffs' brief does not cite or address fundamental Supreme Court precedent on administrative law. *Chevron* and *Brand X* hold that a "court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference ***only if*** the prior court decision holds that its construction follows from the ***unambiguous*** terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982 (emphasis added).

The Supreme Court has repeatedly recognized ambiguity in what waters (i.e., "waters of the United States") are covered under the CWA, including in *Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring); *id.* at 752 (Scalia, J., plurality) (the CWA "is in *some* respects ambiguous"); *id.* at 796 (Stevens, J., dissenting) (noting "ambiguity inherent in the phrase 'waters of the United States'"); *SWANCC*, 531 U.S. at 170-71. No opinion in *Rapanos* addresses the question of what waters the Agencies *must* regulate under the CWA. And neither *Rapanos* nor any other Supreme Court case said that the CWA unambiguously precludes the Agencies' interpretation set forth in the NWPR. This is because a "court's choice of one reasonable reading of an ambiguous statute does not preclude an implementing agency from later adopting a

different reasonable interpretation." *United States v. Eurodif S.A.*, 555 U.S. 305, 315 (2009).

To be sure, *Rapanos*, *SWANCC*, and *Riverside Bayview* articulate principles that served as guideposts for the Agencies' rulemaking. *See* 85 Fed. Reg. at 22,255-57. The Agencies particularly analyzed and incorporated the "commonalities" between the fractured *Rapanos* opinions. *Id*. at 22,268. The question at *Chevron* Step Two is "whether the agency's answer [to the interpretive question] is based on a permissible construction of the statute." *Mayo Foundation for Medical Education & Research v. United States*, 562 U.S. 44, 54 (2011) (quoting *Chevron*, 467 U.S. at 843). This need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Interpreting ambiguous language "involves difficult policy choices," so judicial deference is critical, as "agencies are better equipped to make [such choices]." *Brand X*, 545 U.S. at 980.

Given the longstanding and difficult issues in interpreting the ambiguous phrase "waters of the United States," Chief Justice Roberts specifically noted in *Rapanos* that the Agencies should be "afforded generous leeway" for "developing *some* notion of an outer bound" to their CWA jurisdiction. *Rapanos*, 547 U.S. at 758 (Roberts, C.J., concurring) (emphasis in original). The NWPR falls well within the broad leeway allowed the Agencies. The interpretation is consistent with the text, structure, objective, and policies of the Act. And the Agencies supported and explained their choices.

The NWPR is principally based on the text of the statute, informed by Supreme Court decisions. Congress defined "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C § 1362(7). The Corps originally defined these terms to encompass only waters that were navigable in fact. 39 Fed. Reg. 12,115. After the Agencies broadened their

statutory reading, the Court confirmed that Congress intended this language to extend to some

"waters" that would not actually be "'navigable' under the classical understanding of that term."

85 Fed. Reg. at 22,262 (citing *Riverside Bayview*, 474 U.S. at 133). But "the term 'navigable'

indicates 'what Congress had in mind as its authority for enacting the CWA.'" *Id*. (citing

*SWANCC*, 531 U.S. at 172). The Supreme Court has found nothing in the CWA's legislative

history that indicates "Congress intended to exert anything more than its commerce power over

navigation." *Id.* (citing *SWANCC*, 531 U.S. at 168 n.3). The NWPR thus avoids federally

regulating non-navigable, nonadjacent waters that lack a sufficient connection to traditional

navigable waters.

When enacting the CWA, Congress also sought "to preserve and protect" the power of

states to regulate water resources and land within their borders. 33 U.S.C. § 1251(b). The NWPR

honors that policy. At bottom, the NWPR's "unifying legal theory"—consistent with this

statutory text—asserts "federal jurisdiction over those waters and wetlands that maintain a

sufficient surface water connection to traditional navigable waters." 85 Fed. Reg. at 22,252.

### B. The Various Snippets of the CWA Cited By Plaintiffs Do Not Unambiguously Preclude the Agencies' Interpretation of "Waters of the United States."

Plaintiffs do not argue that the NWPR is an unreasonable interpretation under *Chevron*;

in fact, they do not even discuss the effect of *Chevron* on this case. Instead, Plaintiffs solely rely

upon the congressional "objective" to restore and maintain the "integrity of the Nation's waters,"

Brief at 20 (citing 33 U.S.C. § 1251(a), (b)). From this, Plaintiffs suggest their preferred policy

preference for obtaining this "objective" should override the Agencies' delegated discretion to

balance other statutory elements and policy considerations. It does not.

Importantly, Plaintiffs omitted a key portion of Section 101(b) of the CWA, 33 U.S.C.

§ 1251(b), when quoting it in their brief. Brief at 20.

> *It is the policy of the Congress to recognize, preserve, and protect the primary*
> *responsibilities and rights of States to prevent, reduce, and eliminate pollution, to*
> *plan the development and use (including restoration, preservation, and*
> *enhancement) of land and water resources, and to consult with the Administrator*
> *in the exercise of his authority under this chapter.* It is the policy of Congress that
> the States manage the construction grant program under this chapter and
> implement the permit programs under sections 1342 and 1344 of this title. It is
> further the policy of the Congress to support and aid research relating to the
> prevention, reduction, and elimination of pollution and to provide Federal
> technical services and financial aid to State and interstate agencies and
> municipalities in connection with the prevention, reduction, and elimination of
> pollution.

33 U.S.C. § 1251(b) (language omitted by Plaintiffs italicized).

Plaintiffs attempt to excise this key provision of the CWA. They argue that the Agencies

may adhere to Congress' policy of preserving and protecting "the primary responsibilities and

rights of States to prevent, reduce, and eliminate pollution, 33 U.S.C. § 1251(b), only where state

action will "promot[e] the CWA's goals 'to restore and maintain the chemical, physical, and

biological integrity of the Nation's waters.'" Brief at 33. *But*, "[i]t is [a court's] function to give

the statute the effect its language suggests, however modest that may be; not to extend it to

admirable purposes it might be used to achieve." *Morrison v. National Australia Bank Ltd.*, 561

U.S. 247, 270 (2010). Plaintiffs' "arguments that the narrowness of the [NWPR] serves poorly to

carry out the objectives of the CWA . . . do not provide a sufficient basis for a court to substitute

its judgment for the policy choices of the Agency," *California v. Wheeler*, No. 20-CV-03005-RS,

2020 WL 3403072, at *6 (N.D. Cal. June 19, 2020), "to plan the development and use (including

restoration, preservation, and enhancement) of land and water resources, and to consult with the

Administrator in the exercise of his authority under this chapter," 33 U.S.C. § 1251(b).

Unlike Plaintiffs, the Agencies acknowledged the *full* directive of Congress. As the

Agencies explained, the "oft-quoted objective of the CWA to 'restore and maintain the chemical,

physical, and biological integrity of the Nation's waters,' [33 U.S.C. § 1251(a)], must be

implemented in a manner consistent with Congress' policy directives to the agencies," which

includes "recogniz[ing] and respect[ing] the primary responsibilities and rights of States to

regulate their land and water resources . . . ." 85 Fed. Reg. at 22,269.

      Plaintiffs erroneously suggest that certain cherry-picked snippets of CWA legislative

history override the Supreme Court's subsequent holding that the CWA imposes statutory limits.

Brief at 23. They do not. In *SWANCC*, the Court considered the same legislative history now

cited by Plaintiffs and recognized that "neither this, nor anything else in the legislative history . .

. signifies that Congress intended to exert anything more than its commerce power over

navigation." *SWANCC*, 531 U.S. at 168 n.3. Authority under the Commerce Clause "though

broad, is not unlimited." *Id.* at 173. Where an agency's interpretation of a statute "invokes the

outer limits of Congress' power," the Court expects "a clear indication that Congress intended

that result." *Id* at 172. The Court found no such clear statement of Congress' intent that the CWA

should reach the waters at issue in *SWANCC*. *Id.* at 174.

      Thus, *SWANCC* fully rejects Plaintiffs' same argument here that the Agencies must

interpret the CWA to the broadest extent constitutionally permissible. *See id.* at 166 (reversing

holding that "the CWA reaches as many waters as the Commerce Clause allows"); *id*. at 176-77

(Stevens, J., dissenting) (describing the majority's decision as "invalidat[ing] . . . the Corps'

assertion of jurisdiction over all waters except for actually navigable waters, their tributaries, and

wetlands adjacent to each"). In denying a preliminary injunction, the *California* court similarly

recognized that the CWA does not "compel[] the Agencies to extend federal regulation to the

broadest permissible extent under the Commerce Clause, in the name of providing *all* of the

benefits for water quality the science suggests might be achievable." 2020 WL 3403072, at *7.

      At bottom, Plaintiffs attempt to use the general water quality objective of CWA Section

101(a) to override the Agencies' discretion. The Second Circuit has explicitly rejected this argument. In *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, the Second Circuit sustained a CWA rule concerning water transfers—even though it may not be "the interpretation best designed to achieve the Act's overall goal of restoring and protecting the quality of the nation's water." 846 F.3d 492, 501 (2d Cir. 2017). It was "an interpretation supported by valid considerations: The Act does not require that water quality be improved whatever the cost or means, and the Rule preserves state authority over many aspects of water regulation." *Id.*; *see also Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) ("[N]o legislation pursues its purposes at all costs."). Here, too, nothing in the CWA unambiguously precludes the Agencies' interpretation of the CWA set forth in the NWPR.

### C.   The NWPR Is Consistent with the Rivers and Harbors Act.

Plaintiffs also argue that the NWPR is "contrary to the Rivers and Harbors Act ["RHA"], codified at 33 U.S.C. § 407." Brief at 33. Plaintiffs argue that "restricting federal jurisdiction to waters with 'relatively permanent flowing' or waters with a 'specific surface water connection to traditional navigable waters,' (85 Fed. Reg. 22,273), is contrary to the RHA's jurisdiction over upstream areas that may be dry most of the year, such as ephemeral streams, but where storms or flooding may wash refuse from ephemeral streams into tributaries of navigable waters.'" Brief at 34. This novel argument is based on a faulty reading of both the RHA and the CWA.

The RHA prohibits the discharge or deposit of refuse to "navigable waters of the United States." 33 U.S.C. § 407. Courts have held that such discharges need not be direct. *See United States v. White Fuel Corporation*, 498 F.2d 619, 621 (1st Cir. 1974) (cited by Plaintiffs). In *White Fuel*, oil from a tank farm leaked into the ground and then travelled to Boston Harbor. *Id.* at 620-21. The Court held that this *indirect* discharge to navigable waters of the United States

was prohibited under the RHA. *Id.* at 622.

Plaintiffs misread *White Fuel* to argue that the RHA asserts "jurisdiction" over non-navigable waters—and presumably the dry land in *White Fuel*. Plaintiffs then claim that because courts have held "waters of the United States" under the CWA includes waters covered under the RHA, Brief at 33, the CWA must cover such non-navigable waters, e.g., the dry land in *White Fuel*. But the RHA clearly does not exert jurisdiction over ephemeral streams or other non-navigable waters, nor do Plaintiffs cite any case that so states. Instead, the RHA's prohibition on discharges of refuse to navigable waters of the United States includes *indirect* discharges to navigable waters of the United States. But, the RHA's jurisdiction is nonetheless limited to "navigable waters of the United States."[4]

Not only do Plaintiffs misunderstand the RHA, but they ignore that the CWA's Section 402 permit program is well equipped to deal with indirect discharges, as the Agencies anticipated and explained:

> One potential effect of the final rule that may be *misunderstood by the public* and the regulated community is that existing NPDES permits may still be needed even if an existing jurisdictional water, such as an ephemeral stream that was found to have a significant nexus to a TNW under the 2019 Rule/*Rapanos* Guidance practice, may no longer be jurisdictional under the final rule. That is because the test for NPDES permit coverage is whether a release of a pollutant from a point source travels to a water of the United States. If a pollutant is conveyed through an ephemeral stream to a jurisdictional water, an NPDES permit may likely still be required.

Resource and Programmatic Assessment for the Navigable Waters Protection Rule ("RPA") at 79 (emphasis added), attached as Exhibit 2 to the Dupré Declaration. The Agencies explained this "longstanding approach," which holds that discharges to a water that "is non-jurisdictional

---

[4] "The term 'navigable water of the United States' is a term of art used to refer to waters subject to federal jurisdiction under the RHA." 85 Fed. Reg. at 22,252.

but conveys pollutants to downstream jurisdictional waters" may still be regulated because that

water "may be a point source that subjects a discharger . . . to section 402 permitting

requirements." 85 Fed. Reg. at 22,297. In fact, Justice Kavanaugh recently noted this same

aspect of the CWA in his concurrence in *County of Maui*. *See* 140 S. Ct. at 1478.

> **D.     The NWPR Does Not Impinge Upon Legislative Powers.**

Plaintiffs also argue that the NWPR impinges upon the legislative powers of Congress in

that "the Agencies have overreached their authority in removing millions of acres and many

stream miles from federal jurisdiction with no regard for water quality contrary to EPA's mission

to protect water resources and the public health." Brief at 29. But, as the Northern District of

California clearly explained, "waters of the United States" is ambiguous, and thus the Agencies

are entitled—under *Chevron*—to establish a reasonable definition of the term:

> In the absence of [Supreme Court] precedent construing what *must* be included as
> "waters of the United States," plaintiffs are left with little more than policy
> arguments that the narrowness of the 2020 Rule serves poorly to carry out the
> objectives of the CWA. As compelling as those arguments may be, they do not
> provide a sufficient basis for a court to substitute its judgment for the policy
> choices of the Agency.

*California*, 2020 WL 3403072, at *6.

**III.     The NWPR Is Neither Arbitrary Nor Capricious Under the APA.**

To change a policy, an agency must merely provide "a satisfactory explanation for its

action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (internal quotation marks

omitted). This does not require reasons any "more substantial than those required to adopt a

policy in the first instance." *Id.* at 514. And an agency "need not demonstrate to a court's

satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it

suffices that the new policy is permissible under the statute, that there are good reasons for it,

and that the agency *believes* it to be better." *Id.* at 515 (emphasis in original).

The Agencies' more than 1,500 pages of NWPR preamble (from the pre-publication version, as compared to the Federal Register version), programmatic and economic analyses and appendices, and response to comments documents thoroughly explained why "the agenc[ies] believe[] [the NWPR] to be better" than prior regulations. 556 U.S. at 515. That is all the law requires. The summary of key elements spanned almost 60 pages in the NWPR preamble. 85 Fed. Reg. at 22,273-329. The Agencies further analyzed the legal opinions of numerous courts as to the infirmities of the 2015 Rule, including the decision of the Southern District of Georgia granting summary judgment against the 2015 Rule and remanding it to the Agencies. E.g., *id*. at 22,272. The Agencies also analyzed relevant Supreme Court cases—including how Justice Kennedy's concurring opinion and the plurality opinion in *Rapanos* share commonalities, which the NWPR applied. E.g., *id*. at 22,268. This analysis is further supplemented by almost 600 pages of responses to comments. *See generally* Response to Comments (Topics 1-13) ("RTC"), *available at* https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-11574.

### A.  The Agencies' Decision Was Well-Explained and Adequately Discussed the Effects of the NWPR on the Nation's Waters.

Plaintiffs contend that "the Agencies' failure to consider water quality and discuss how the elimination of federal jurisdiction [sic] 50 million acres of wetlands and hundreds of miles of streams squares with the CWA's purpose to maintain the water quality and integrity of the Nation's waters renders its 2020 Rule void as arbitrary, capricious and an abuse of discretion." Brief at 22. They further assert that the NWPR "violates the CWA's anti-degradation provisions." Brief at 25. But neither of these contentions holds up against the administrative record.

### 1.  The Agencies Considered the Effects of the New Rule.

Plaintiffs claim that "the rulemaking did not assess baseline data regarding water quality

and examine how the new rule would impact water quality," Brief at 19, and that "[w]ith no nationwide water quality baseline, the Agencies could not draw any comparisons between how water quality might fair under the 2020 Rule compared to prior law," Brief at 21. This, too, is refuted by the Agencies' administrative record. The Agencies thoroughly reviewed the science, including their prior scientific report (the "Connectivity Report"), and considered impacts on water quality by conducting case studies in three separate areas of the country. Notwithstanding that science may inform the Agencies' interpretation, the Agencies recognized that ultimately the definition of "waters of the United States" must be grounded in a legal analysis of the limits on CWA jurisdiction reflected in the statutory text and Supreme Court precedent.

*First*, Plaintiffs fail to note the Agencies' reasoned explanation for why they did not conclude the NWPR "would result in 18% of ephemeral streams and 51% of wetlands nationwide losing federal jurisdiction." Brief at 21. Plaintiffs rely on data from the National Hydrography Dataset ("NHD") and the NWI in an attempt to support these allegations. Brief at 17 (citing EPA-HQ-OW-2018-0149-11767, which relies on the NHD and NWI). However, the expert analysis of the Agencies (owed great deference by courts, *Baltimore Gas*, 462 U.S. at 103) explains that there are critical technical deficiencies for estimating changes in the definition of "waters of the United States" that cannot be resolved within these datasets. For example, whereas intermittent streams meeting the NWPR's "tributary" definition are categorically jurisdictional under the rule and ephemeral streams are categorically non-jurisdictional, the NHD does not differentiate between intermittent or ephemeral flows in most parts of the country. Additionally, the NWI uses a different definition of "wetlands" than the Agencies' longstanding (and unchanged) regulatory definition of the term. *See also supra* pp. 11-12 (explaining why the NWI does not demonstrate that the wetlands on Plaintiffs' property are jurisdictional under the

2015 Rule). The NHD and NWI thus cannot indicate the scope of CWA jurisdiction and must not be misused for that purpose. RPA at 34-35. In fact, former EPA Administrator McCarthy testified to Congress in 2015 that the datasets Plaintiffs rely upon are "not used to determine jurisdiction and not intended to be used for jurisdiction," "are not relevant to the jurisdiction of the 'waters of the U.S.," and "are not consistent with how we look at the jurisdiction of the [CWA]." 85 Fed. Reg. at 22,330. And in 2014, when developing the 2015 Rule, an EPA blog post entitled "Mapping the Truth" stated, "While these [U.S. Geological Survey and FWS] maps are useful tools for water resource managers, they cannot be used to determine Clean Water Act jurisdiction – now *or ever*." (emphasis added). *Id*. at 22,329-30.

The Agencies' balance of relevant considerations is neither arbitrary nor capricious. Science does not and cannot offer a precise answer to the question of what constitutes a "water of the United States." *See id*. at 22,262-71 (discussing *SWANCC* and *Rapanos*). As the *California* court found in declining to preliminarily enjoin the NWPR, the CWA does not "compel[] the Agencies to extend federal regulation to the broadest permissible extent under the Commerce Clause, in the name of providing *all* of the benefits for water quality the science suggests might be achievable." *California*, 2020 WL 3403072, at *7. But, as explained above, Plaintiffs' inaccurate claims that science, the Science Advisory Board, the Connectivity Report and the like were ignored or disregarded by the Agencies is flatly refuted by the record.

**Second**, Plaintiffs object to the Agencies' consideration of the Connectivity Report (what Plaintiffs call the "Science Report) first prepared in support of the 2015 Rule, and allege that the Agencies failed to address the "potential consequences to downstream waters" resulting from the NWPR as discussed there. Brief at 26-29; *see also id*. at 29 (asserting that the NWPR "relies upon selected language from the Science Report rather considering its entirety"). In making this

argument, Plaintiffs ignore the actual administrative record for the NWPR. Using the

Connectivity Report, the Agencies accepted and considered the "connectivity gradient," and the

potential consequences between perennial, intermittent, and ephemeral streams and downstream

waters within a tributary system. 85 Fed. Reg. at 22,288. And the Agencies' extensive record

also includes many sections specifically discussing, for example, the "Prior Findings in the

Connectivity Report," "Consideration of Forgone Environmental Benefits," the intersection of

"Scientific Rationale and Legal Authority," "The Connectivity Report," and "Other Comments

on Science." Exhibit 3 Dupré Decl. (RTC: Legal Argument) §§ 1.5.5.3, 1.5.5.7, 1.7; Exhibit 4,

Dupré Decl. (RTC: Rulemaking Process) §§ 13.1.7.1, 13.1.7.2.

Further, the preamble summarized why concepts in the Connectivity Report *support* the

Agencies' exclusion of ephemeral streams from CWA jurisdiction. 85 Fed. Reg. at 22,288. The

Agencies relied on principles of hydrologic connectivity to develop, among other things, the

flow classifications (perennial, intermittent, ephemeral) used in the NWPR, the incorporation of

inundation by flooding as a surface water connection establishing jurisdiction for certain waters

and wetlands, and the use of the "typical year" concept that relies upon a large body of

precipitation and other climatic data to inform what may be in a normal range for a particular

geographic region. E.g., *id*. Citing EPA's Science Advisory Board's review of the draft

Connectivity Report, the Agencies recognized the connectivity gradient and potential

consequences between perennial, intermittent, and ephemeral streams and downstream waters

and a decreased "probability that changes . . . will be transmitted to downstream waters" at flow

regimes less than perennial and intermittent. *See id*. The Agencies similarly based the NWPR's

definition of "tributary" "upon a reasonable inference of ecologic interconnection" between such

a tributary and paragraph (a)(1) waters. *See id.* (citing *Rapanos*, 547 U.S. at 780 (Kennedy, J.,

concurring)). And the rule's definition and categorical jurisdiction of "adjacent wetlands" were informed by the Connectivity Report's finding that "areas that are closer to rivers and streams have a higher probability of being connected than areas farther away." *Id.* at 22,314 (internal quotation marks omitted); *see also* Exhibit 4, Dupré Decl. (RTC: Legal Arguments) at 67, 114-15, 137; Exhibit 5, Dupré Decl. (RTC: Adjacent Wetlands) at 42.

The Agencies "determined that requiring surface water flow in a typical year from relatively permanent bodies of water to traditional navigable waters and wetlands adjacent to such waters as a core requirement of [jurisdiction] is the most faithful way of interpreting the Federal government's CWA authority over a water." 85 Fed. Reg. at 22,271. Because ephemeral features "only flow during or in immediate response to rainfall," *id.* at 22,274, they are not "relatively permanent bodies of water," *id.* at 22,271; *see also id.* at 22,289. As the Agencies reasonably explained, ephemeral streams *are* scientifically different from intermittent or perennial streams. E.g., *id.* at 22,275-76 (describing differences in source of water and duration of flow). This difference includes that ephemerals "flow only in direct response to precipitation." *Id.* at 22,251; *see also id.* at 22,275. The Agencies again considered here the "connectivity gradient," including the "decreased 'probability that changes . . . will be transmitted to downstream waters' at flow regimes less than perennial or intermittent." *Id.* at 22,288 (quoting the EPA Science Advisory Board's review of the Draft Connectivity Report). As such, the Agencies reasonably concluded ephemeral streams "are more appropriately regulated by States and Tribes under their sovereign authorities." *Id.* at 22,287. The Agencies also noted that such a "clear regulatory line between jurisdictional and excluded waters has the additional benefit of being less complicated than prior regulatory regimes that required a case-specific significant nexus analysis." *Id.* at 22,288.

31

Likewise, the NWPR's exclusion of certain wetlands is principled and well-explained as the result of considering both law and science. "Adjacent wetlands" are included in the rule's definition of "waters of the United States" because they are "'inseparably bound up with the "waters" of the United States.'" *Id.* at 22,308 (quoting *Riverside Bayview*, 474 U.S. at 134). The Agencies noted that "science cannot dictate where to draw the line between Federal and State or tribal waters, as those are legal distinctions that have been established within the overall framework and construct of the CWA." *Id.* Classifying all wetlands as jurisdictional would be inconsistent with the CWA and Supreme Court guidance. *Id.* So would inclusion of isolated wetlands that lack a hydrological surface connection to other jurisdictional waters, or that connect only infrequently. *Id.* The NWPR therefore provides objective, categorical tests for adjacency, with improved clarity and ease of administration. *Id.* at 22,307-08.

Plaintiffs attempt to analogize this case to *Guertin v. United States*, 743 F.3d 382 (2d Cir. 2014). *Guertin* involved "the refusal by the United States Department of Housing and Urban Development ('HUD') to authorize reimbursement of the defense costs of plaintiff Richard Guertin, . . . Corporation Counsel for the City of Middletown, New York," who was "defending criminal charges stemming from a series of transactions that involved Middletown's use of funds it received from HUD." *Id.* at 383-84 (holding that HUD acted arbitrarily and capriciously in denying the attorney's request for reimbursement). But the comparison misses the mark. In contrast to *Guertin*, the Agencies fully explained their rationale for including certain waters within the NWPR's definition of "waters of the United States" and excluding others. Again, on such issues "within [the Agencies'] area of special expertise," "a reviewing court must generally be at its most deferential." *Baltimore Gas*, 462 U.S. at 103.

The record also supports the Agencies' principled distinction between natural and

artificial barriers separating wetlands from jurisdictional waters. Certain natural features indicate a sufficient connection between jurisdictional waters and wetlands to render such wetlands jurisdictional, while artificial barriers do not. *Id.* at 22,311-14. The Agencies relied on their scientific record "in establishing that wetlands separated from jurisdictional waters only by a natural berm, bank, dune, or similar natural feature are 'inseparably bound up with' and adjacent to those waters." *Id.* at 22,271. Such natural features indicate "a sufficient hydrologic surface connection between the jurisdictional water and the wetland," making the wetlands "part of" adjacent jurisdictional waters. *Id.* at 22,280 (quoting *Rapanos* plurality); *id.* at 22,307, 22,311. Thus, the Agencies' inclusion of wetlands separated only by natural barriers and exclusion of wetlands separated by artificial barriers that lack a direct hydrologic surface connection is rational and well-explained.

**Third**, Plaintiffs are also wrong to say the agencies failed to address the effect of the NWPR on water quality. Brief at 17. The Response to Comments includes numerous discussions directly or cross-referencing the effect of NWPR on water quality, including (but not limited) to § 11.3.3.2 ("Reduction in Jurisdictional Waters"), § 11.3.2.3 ("Concerns with States' Abilities to 'Fill the Gap'"), § 11.3.2.5 ("Interstate Impacts from the Proposed Rule"), § 11.4 ("CWA Programmatic Analysis"), § 11.6 ("Aquatic Resource Benefits and Ecosystem Services"). *See* RTC, Economic Analysis and Resource and Programmatic Assessment, *available at* https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-11574. The Agencies also prepared a 101-page (excluding attachments) Resource and Programmatic Assessment for the final rule that "describes the agencies' assessment of the potential effects of the revised definition on the federal regulation of aquatic resources across the country, as well as the potential effects of the revised definition on CWA programs and certain other programs under

other federal statutes." RPA at 6.

Ultimately, Plaintiffs appear to argue that the Agencies acted improperly by considering factors in addition to scientific considerations. Yet the Supreme Court rejected this position long ago. *SWANCC*, 531 U.S. at 168 (concluding "the text of the statute will not allow" that "the jurisdiction of the Corps extends to ponds that are *not* adjacent to open water") (emphasis added). In fact, the Agencies have long stated that science alone cannot dictate the CWA's line between federal and state waters. *See,* e.g., 80 Fed. Reg. at 37,055. The 2015 Rule "interpretation [wa]s based not only on legal precedent and the best available peer-reviewed science, but also on the agencies' technical expertise and extensive experience in implementing the CWA over the past four decades." *Id*. EPA's Science Advisory Board similarly stressed in 2015: "'significant nexus' is a legal term, not a scientific one." *Id*. at 37,065. So as both the 2015 Rule and the NWPR recognized, "science does not provide a precise point along the continuum at which waters provide only speculative or insubstantial functions to downstream waters." *Id*. at 37,090.

In the NWPR, the Agencies once again correctly explained that the contours of CWA jurisdiction require a balancing of various factors and evidence, including both legal and scientific considerations. E.g., 85 Fed. Reg. at 22,288. These include the statutory limits on the Agencies' legal authority (including the CWA text and structure), e.g., *id*. at 22,283-89, what would sufficiently embody the statutory link to what is "navigable," and what would give due deference and respect for state authority. *See,* e.g., *id*. at 22,270; Exhibit 3, Dupré Decl. (RTC Legal Argument) at 64-68, 114-15.

> ### 2. The Scope of "Waters of the United States" Is Not Affected by the CWA's Anti-Degradation Provision, and the NWPR's Effect on Total Maximum Daily Loads (TMDLs) Was Well-Explained.

Plaintiffs assert that the Agencies failed "to consider the impacts upon the CWA's anti-

degradation and TMDL provisions[, which] renders void the 2020 Rule." Brief at 25. But this is clearly not the case.

Plaintiffs' argument that the NWPR violates the CWA's anti-degradation provisions rests upon a misreading of the CWA. The CWA's anti-degradation provision is set forth in 33 U.S.C. § 1313(d)(4)(B). Even where a waterbody is found to meet water quality standards, a state may generally not reduce limits on discharges of pollutants into that water through NPDES permits or changes to TMDLs[5] if such activities will lead to a degradation of existing water quality. *See* 33 U.S.C. § 1313(d)(4)(A); *see also* 40 C.F.R. § 131.12. These provisions are **not** affected by the NWPR. The NWPR simply addresses which waters are regulated under the CWA. For those waters that remain regulated, this anti-degradation provision remains in full effect.

Further, the Agencies fully examined and set forth the NWPR's potential effects on impaired waters and state TMDL programs in the section of its Resource and Programmatic Assessment titled *CWA Section 303(d) Listing and TMDL Programs*. *See* RPA at 61-63. The Agencies explained that "changes in CWA jurisdiction could potentially affect state and federal 303(d) programs in several ways, including by changing the total number, stream miles, or acres of waters covered under the scope of CWA 303(d) and the number of TMDL restoration plans developed under the CWA." RPA at 62 ("Potential Effects" subsection).

> TMDLs for impaired waters consist of waste load allocations for point sources, load allocations for nonpoint sources, and a margin of safety. Changes in jurisdiction may prompt questions regarding the status of waste load allocations and load allocations in existing TMDLs, as well as water quality-based effluent limits in existing NPDES permits that are based on a current TMDL waste load allocation. This has the potential to prompt requests for TMDL revisions that may shift additional pollutant reduction responsibility to those sources discharging to jurisdictional waters. As noted elsewhere, however, existing dischargers may still

---

[5] CWA Section 303(d), 33 U.S.C. § 1313(d), among other things, requires States to provide lists of waters within their boundaries which are "impaired," and to develop "total maximum daily loads" ("TMDLs") to implement State water quality standards.

> require NPDES permits if pollutants are conveyed downstream to jurisdictional
> waters even if the intervening water or feature is not jurisdictional. Some states
> and NPDES permittees may request review and revision of existing permits and
> TMDLs to account for potential jurisdictional changes.

RPA at 63.

Thus the Agencies were not restricted by the CWA's anti-degradation provisions and

adequately discussed the NWPR's effects on TMDLs.

### B.       The Agencies' Decision Was Not Predetermined.

The Agencies proposed the NWPR on December 12, 2018, received, reviewed, and

considered hundreds of thousands of comments, and then, on January 23, 2020, issued a final

rule that contained enhancements from the proposed rule. Despite these facts, Plaintiffs argue

that Executive Order No. 13778 demonstrated that the Agencies' decision was predetermined.

*First*, and most importantly, the Executive Order did not mandate a particular outcome.

Instead, the Order directed the Agencies to "review the [2015 Rule] . . . and publish for notice

and comment a proposed rule rescinding or revising the rule, as appropriate and consistent with

law." The Order further advised the Agencies to "*consider* interpreting the term 'navigable

waters,' as defined in 33 U.S.C. § 1362(7), in a manner consistent with the opinion of Justice

Antonin Scalia in *Rapanos v. United States*, 547 U.S. 715 (2006)." (Emphasis added).

> E.O. 13778 does not require the agencies to promulgate a definition of "waters of
> the United States" consistent with the plurality opinion in *Rapanos* or any other
> opinion; it simply requires that the agencies consider the plurality opinion in
> proposing to revise its interpretation of an ambiguous legislative term. The
> agencies have complied with the E.O.

RTC Legal Arguments at p. 60.

*Second*, the Agencies did not simply codify the plurality opinion from *Rapanos*. Indeed,

"some commenters stated that the proposed rule would include more waters and wetlands than

appropriate under a strict reading of Justice Scalia's plurality opinion." 85 Fed. Reg. at 22,273.

Any doubt that the Agencies' decision was not predetermined is put to rest by the fact that "the agencies considered . . . public comments [and] made modifications in the final rule to better incorporate common principles of [both] the *Rapanos* plurality and concurring opinions." *Id.*

     *Third*, Plaintiffs argue that the Agencies' Applicability Date Rule, which was struck down by two district courts, demonstrates that the Agencies "followed a pre-determined course to repeal and replace the 2015 Rule." Brief at 26. The Applicability Date Rule, which plaintiffs call the "Suspension Rule," simply moved the effective date of the 2015 Rule to February 2020. 83 Fed. Reg. 5200 (Feb. 6, 2018). But, the Agencies followed the very process in for the NWPR that the courts found lacking in the Applicability Date Rule. When proposing the Applicability Date Rule, the Agencies "explicitly restricted public comments to 'whether it [was] desirable and appropriate to add an applicability date' to the WOTUS rule and whether the two-year delay in implementing what would be an ultimately revised definition of the 'waters of the United States' should be 'shorter or longer.'" *South Carolina Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 965 (D.S.C. 2018) (quoting 82 Fed. Reg. 55,542, 55,544 (Nov. 22, 2017)). It was this limitation on the solicitation of public comments that was a basis on which two courts invalidated the Applicability Date Rule. *See id.*; *see also Puget Soundkeeper Alliance v. Wheeler*, No. C15-1342-JCC, 2018 WL 6169196, at *5 (W.D. Wash. Nov. 26, 2018). Here, the Agencies "solicited comment on all aspects of the proposed rule," RTC: Legal Arguments § 1.5.5.8, rather than "restricting the content of the comments solicited and considered" as they did in the Applicability Date Rule. *Puget Soundkeeper Alliance*, 2018 WL 6169196, at *5.

     *Fourth*, Plaintiffs also argue that "the Agencies' pre-determination to replace the 2015 Rule is shown by the abrupt alteration of EPA's wetland economic analysis." Brief at 29. Plaintiffs quote from *National Association of Home Builders v. EPA*, 682 F.3d 1032, 1039-50

(D.C. Cir. 2012), for the proposition that "when an agency decides to rely on a cost-benefit analysis as part of its rulemaking, a serious flaw undermining that analysis can render the rule unreasonable." Brief at 29. But the Agencies expressly *disclaimed* reliance on the economic analysis as relevant under *National Association of Home Builders*.

> While the economic analysis is informative in the rulemaking context, the agencies are not relying on the economic analysis performed pursuant to Executive Orders 12866 and 13563 and related procedural requirements as a basis for this final rule. *See, e.g.*, *NAHB*, 682 F.3d at 1039–40 (noting that the quality of an agency's economic analysis can be tested under the APA *if* the "agency decides to rely on a cost benefit analysis as part of its Rulemaking").

85 Fed. Reg. 22,335.

The Agencies followed the President's Executive Order and *considered* adopting the definition of "waters of the United States" set forth in Justice Scalia's plurality opinion in *Rapanos*, but ultimately adopted a definition that drew from both the plurality opinion and Justice Kennedy's concurrence and made meaningful changes after consideration of comments on the proposed rule.

## IV.   The Court Should Defer Ruling on a Remedy Until After Deciding the Cross-Motions for Summary Judgment.

If the Court perceives an APA violation, rather than set aside the entire NWPR, the Court must impose "a less drastic remedy (such as partial . . . vacatur . . . ) [if] sufficient to redress respondents' injury." *See Geertson Seed Farms*, 561 U.S. at 165-66. Because remedy issues are complex—and the implications for setting aside a nationwide rule like the NWPR significant—the Agencies request further detailed briefing on any issues of remedy that may arise. A blanket, nationwide vacatur or injunction against the NWPR would be improper.

Without detailed briefing of its implications, Plaintiffs generically ask the court to "vacat[e] and set[] aside the 2020 Rule." Brief at 39. But courts should not simply vacate agency

regulations as a matter of course. *See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (deciding whether to vacate or remand without vacatur based on seriousness of agency action's deficiencies and vacatur's disruptiveness). A remedy must impact no more than the specific deficiencies identified and consider whether the agency may fix them. *See id.*; *Monsanto*, 561 U.S. at 165-66 (requiring "partial" vacatur if "sufficient"). Thus, the APA does not require blanket disruption of the NWPR for the entire country. *Virginia Society for Human Life, Inc. v. FEC*, 263 F.3d 379, 394 (4th Cir. 2001), *overruled on other grounds by The Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544 (4th Cir. 2012).

Critically, Supreme Court precedent regarding jurisdictional and prudential limits of Article III—and how those limits apply to challenges to government action—has expanded exponentially since passage of the APA in 1948. Congress may not expand the Article III powers of the courts through statutory provisions. *See,* e.g., *Spokeo*, 136 S. Ct. at 1549. So Article III's jurisdictional limits have been grafted onto the APA's general instruction that unlawful agency action "shall" be "set aside." 5 U.S.C. § 706(2).

As a result, the Supreme Court has held that § 706(2) does not mandate a "depart[ure] from established principles" of equitable discretion. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982). A "Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," so a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1931, 1933-34 (2018). APA § 706 does not supplant the Article III requirement that, for "all relief sought, there must be a litigant with standing." *Town of Chester, New York v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017). Thus, if "a less drastic remedy (such as partial or complete vacatur of [an agency's challenged] decision) was sufficient to redress respondents' injury, no recourse to the additional and

extraordinary relief of an injunction was warranted." *Monsanto*, 561 U.S. at 165-66.

As a court acting in equity deciding only the case or controversy before it, *see Romero-Barcelo*, 456 U.S. at 313, an appropriate remedy must take into account the jurisdiction of other district courts and the parties before those courts, debating similar issues about the NWPR, throughout the country. "Government litigation frequently involves legal questions of substantial public importance," so "[a]llowing only one final adjudication would deprive this [Supreme] Court of the benefit it receives from permitting several courts of appeals to explore a difficult question before this Court grants certiorari." *United States v. Mendoza*, 464 U.S. 154, 160 (1984). One district court already found that 17 states—including the State of New York—did not show a likelihood of successfully defeating the NWPR on the merits, and refused a nationwide injunction. *California*, 2020 WL 3403072, at *5-8. Another court granted a Colorado-only injunction. *Colorado*, 445 F. Supp. 3d at 1299.

Any judicial remedy here cannot be nationwide, but must both be narrowly tailored to the Article III injuries proven and not unnecessarily interfere with other district courts and parties' rights throughout the country. That tailoring of remedy should occur pursuant to separate briefing, specific to any issues identified, and based on the facts and circumstances at that time.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied and Defendants' cross-motion for summary judgment should be granted.

Respectfully submitted,

JONATHAN D. BRIGHTBILL
    *Principal Deputy Assistant Attorney*
    *General*

*Of Counsel:*

DAVID FOTOUHI
    *Acting General Counsel*
    *Environmental Protection Agency*

   *s/Phillip R. Dupré* _____
PHILLIP R. DUPRÉ
DANIEL PINKSTON

CRAIG R. SCHMAUDER
    *Deputy General Counsel*
    *Department of the Army*

    *Attorneys, Environmental Def. Section*
    *Environment and Natural Res. Div.*
    *U.S. Department of Justice*

DAVID R. COOPER
    *Chief Counsel*
    *U.S. Army Corps of Engineers*

    *P.O. Box 7411*
    *Washington, D.C. 20044*
    *(202) 616-7501*
    *phillip.r.dupre@usdoj.gov*

DATED: OCTOBER 23, 2020

## CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2020, the foregoing document was served on counsel of record via the Court's electronic case filing system.

    *s/ Phillip R. Dupré* _____
    PHILLIP R. DUPRÉ

41