**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

)
WILLIAM MURRAY and JUNE OMURA,                    )
                                                  )  Case No.  1:19-cv-1498
                        Plaintiffs,               )              LEK/TWD
                                                  )
        -against-                                 )
                                                  )
ANDREW WHEELER, in his official capacity as Administrator of the    )
U.S. Environmental Protection Agency, the  U.S. ENVIRONMENTAL       )
PROTECTION AGENCY and R.D. JAMES, in his official capacity as       )
the Assistant Secretary of the Army (Civil Works) and the U.S. ARMY )
CORPS OF ENGINEERS,                               )
                                                  )
                        Defendants.               )

_____

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

James Bacon
Attorney for Plaintiffs
N.D.N.Y. Bar No. 700116
P.O. Box 575
New Paltz, New York 12561
(845) 419-2338
Baconesq@yahoo.com

## <u>TABLE OF CONTENTS</u>

**<u>TABLE OF AUTHORITIES</u>**…………………………………………………...………….…...ii

**<u>PRELIMINARY STATEMENT</u>**………………………………………...……..………………1

**<u>STATEMENT OF FACTS</u>**………………………..……………………….……….…..…..2

**<u>POINT I</u>**

**PLAINTIFFS HAVE STANDING**………………………………………………………..8

**<u>POINT II</u>**

**THE AGENCIES' ADOPTION OF THE FINAL RULE WAS ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION**………………………………………..16

**<u>CONCLUSION</u>**………………………………………………………………………....…19

i

# **TABLE OF AUTHORITIES**

**United States Supreme Court Cases**

*Association of Data Processing Service Organizations, Inc. v. Camp*, 397 US 150 (1970)……8

*Barlow v Collins*, 397 US 159 (1970)……………………………………………………..8

*Chevron, U.S.A., Inc. v NRDC, Inc.*, 467 US 837 (1984)………………………………16

*Clapper v Amnesty International USA,* 568 US 398 (2013)…………………………………10

*Lujan v Defenders of Wildlife*, 504 US 555 (1992)…………………………………..10-11

*Motor Vehicle Manufacturers Ass'n v State Farm Mutual Auto. Insurance Co.,* 463 US 29 (1983)………………………………………………………………………………1, 16

*Sierra Club v Morton*, 405 US 727, 732 (1972)…………………………………………9

*Rapanos v United States*, 547 US 715 (2006)……………………………………………19

*Solid Waste Agency of Northern Cook County v U.S. Army Corps of Engineers*, 531 US 159 (2001)…………………………………………………………………………...…..7, 19

*Spokeo, Inc. v Robins,* 136 S Ct 1540 (2016)……………………………………………10

*United States v Students Challenging Regulatory Agency Procedures (SCRAP),* 412 US 669 (1973)……………………………………………………………………14

*Warth v Seldin*, 422 US 490 (1975)…………………………………………………...10

*Whitmore v Arkansas*, 495 US 149 (1990)………………………………………………10

**Federal Cases**

*Am. Canoe Ass'n, Inc. v Murphy Farms, Inc*., 326 F.3d 505, 517 (4th Cir 2003)…………….…..9

*Anchorage v United States*, 980 F2d 1320 (9th Cir 1992)………………………………...7

*Ashley Creek Phosphate Co. v Norton*, 420 F3d 934 (9th Cir 2005)…………………………..8

*Atl. States Legal Found., Inc. v Hamelin*, 182 F Supp 2d 235 (NDNY 2001)……...…………...14

*Baur v Veneman*, 352 F3d 625 (2d Cir 2003)……………………………………….......12- 14, 16

*Borough of Upper Saddle River v Rockland Cty. Sewer Dist. #1*, 16 F Supp 3d 294 (SDNY 2014)…………………………………………………………………………9, 16

*Catskill Mountains Chapter of Trout Unlimited, Inc. v EPA*, 846 F3d 492 (2d Cir 2017)………19

*California v Wheeler*, No. 20-CV-03005-RS, 2020 WL 3403072 (ND Cal June 19, 2020)…….18

*Cortlandt Street Recovery Corp. v Hellas Telecommunications*, 790 F 3d 411 (2d Cir 2015)….10

*Dubois v United States Dep't of Agric.*, 102 F3d 1273 (1st Cir 1996)…………………11-13, 16

*Entergy Nuclear Fitzpatrick, LLC v Zibelman*, No. 5:15-CV-230 (NDNY Mar. 7, 2016)……..13

*Friends of the Earth, Inc. v Gaston Copper Recycling Corp.*, 204 F3d 149 (4th Cir 2000)...10, 13

*Guertin v United States*, 743 F3d 382 (2d Cir 2014)………………………………………16, 18, 20

*In re Penn Cent. Transp. Co.*, 440 F Supp 569 (ED Pa 1977)…………………………………..9

*International Harvester Co. v Ruckelshaus,* 478 F2d 615 (DC Cir 1973)………………………7

*N.C. Shellfish Growers Ass'n v Holly Ridge Assocs., LLC*, 278 F Supp 2d 654 (EDNC 2003)…14

*Nulankeyutmonen Nkihtaqmikon v Impson*, 503 F3d 18 (1st Cir 2007)………………………..8-9

*Ohio Coal Ass'n v. Perez*, 192 F Supp 3d 882 (SD Ohio 2016)………….…………………….9

*Portland Cement Ass'n v Ruckelshaus*, 486 F2d 375 (1973) ........................................................ 8

*Public Interest Research Group of N.J., Inc. v Powell Duffryn Terminals Inc.*, 913 F2d 64 (3rd Cir 1990)………………………………………………………………………………14

*United States v AVX Corp.*, 962 F2d 108 (1st Cir. 1992)……………………………..………11

*Vt. Pub. Interest Research Grp. v. United States Fish & Wildlife Serv.*, 247 F Supp 2d 495 (D Vt 2002)…………………………………………………………………………..14, 15

## United States Code

5 USC §702………………………………………………………………...…………….9

33 USC §1251(a) .................................................................................................................... 18

## Federal Register

85 Fed. Reg. 22,332, 22,334…..……………………………………………………….......2

85 Fed. Reg. 22,339……………………………………………………………... ………..11

## PRELIMINARY STATEMENT

Plaintiffs William Murray and June Omura submit this memorandum of law with an Affidavit from William Murray in opposition to Defendants' cross motion for summary judgment.

Plaintiffs moved for summary judgment on September 10, 2020, arguing that pursuant to the Administrative Procedure Act, (APA), Defendants' adoption of the "Navigable Waters Protection Rule (2020 Rule or final rule), was arbitrary, capricious and an abuse of discretion and requested vacatur. On October 23, 2020, Defendants United States Environmental Protection Agency, (EPA), and the Army Corps of Engineers, (the Agencies), cross moved for summary judgment claiming Plaintiffs lack standing and arguing that the Agencies' adoption of the 2020 Rule should not be disturbed principally due to the degree of deference to be afforded the Agencies in conducting rulemaking.

This reply addresses Defendants' standing defense and re-focuses attention upon the significant procedural errors of the Agencies, especially failing to consider "an important aspect of the problem," - the state of the Nation's water quality and how those waters would be impacted by eliminating federal jurisdiction over millions of acres of wetlands and hundreds of miles of ephemeral streams. See Plaintiffs' memorandum of law, (PMOL), Dkt. No. 26, pgs. 9-11, 19-24, citing *Motor Vehicle Mfrs. Ass'n v State Farm Mut. Auto. Ins. Co*., 463 US 29 (1983).

**STATEMENT OF FACTS**

Plaintiffs set forth the material facts and the applicable standard of review in their PMOL. Dkt. No. 26, pgs. 1-19.

Defendants' memorandum of law, (DMOL, Dkt. No. 35), includes distortions of Plaintiffs' claims which are corrected herein.[1]

The most significant factual error is Defendants' assertion that the Agencies considered the final rule's impacts on water quality based upon three cited sources in the record.

Specifically, Defendants claim the Agencies 1) "considered impacts on water quality by conducting case studies in three separate areas of the country" and Defendants cited 2) the Agencies' "Response to Comments," ¶¶11.3.3.2, 11.3.2.3, 11.3.2.5, 11.4 and 11.6, as well as 3) an "Economic Analysis and Resource and Programmatic Assessment" for the final rule. DMOL at pgs. 28 and 33.

However, scrutiny of these documents underscores that the Agencies did not in fact examine the final rule's impacts on water quality.

First, the three case studies examined potential <u>economic</u> effects of the final rule and thus were "presented in the economic analysis." 85 Fed. Reg. 22,332, 22,334.   These case studies did <u>not</u> examine the final rule's impacts upon aquatic resources, wetland hydrology or water quality standards nor did the case studies discuss whether the final rule would advance CWA water quality objectives.

---

[1] See DMOL, "Plaintiffs suggest their preferred policy preference for obtaining this [water quality] "objective" should override the Agencies' delegated discretion to balance other statutory elements and policy considerations," (at 21), "Plaintiffs attempt to excise this key provision of the CWA," (at 22), "the Agencies must interpret the CWA to the broadest extent constitutionally permissible," (at 23), "Plaintiffs attempt to use the general water quality objective of CWA Section 101(a) to override the Agencies' discretion," (at 23-24), "Plaintiffs appear to argue that the Agencies acted improperly by considering factors in addition to scientific considerations motion and characterization of the record requires review of certain critical facts." At 34.

Second, the Agencies' "Response to Comments,"[2] claimed the Agencies did not have adequate datasets to determine the full extent of wetland and watercourses to lose federal jurisdiction and framed the inquiry as an economic issue rather than addressing water quality impacts. The Agencies deferred questions of water quality impacts to the states and tribal authorities while justifying the final rule with legal arguments.

Detailed review of the Agencies' "Response to Comments" proves the point:

> The agencies agree with commenters who stated that available data from national geospatial datasets may be incomplete, outdated, inaccurate, limited in scope, or that data are missing information crucial for an analysis of the full scope of CWA jurisdiction.

Section 11.1, pg. 5.

> Comments regarding whether states are currently failing to meet their regulatory requirements under the CWA were noted, but do not change the agencies' legal authority in defining "waters of the United States."

Section 11.3.2.3 at pg 18.

> The final rule establishes the boundary between waters of the United States and waters solely under state and tribal authority. The CWA's longstanding regulatory permitting programs, coupled with the controls that states, tribes, and local entities choose to exercise over their land and water resources, will continue to address the discharge of pollutants into "waters of the United States," and the CWA's non-regulatory measures will continue to address pollution of the nation's waters generally. These programs and measures collectively pursue the objective of restoring and maintaining the chemical, physical, and biological integrity of the nation's waters.

11.3.3.2 "Reduction in Jurisdictional Waters" at pg 30.

> The agencies are establishing this line-drawing based primarily on their interpretation of their authority under the Constitution and the language, structure, and legislative history of the CWA, as articulated in decisions by the Supreme Court. Indeed, states and tribes may establish more protective standards or limits than the CWA to manage waters subject to CWA jurisdiction or waters that fall

---

[2] "Public Comment Summary Document 11" "Topic 11 : Economic Analysis And Resource And Programmatic Assessment." https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-11574.

beyond the jurisdictional scope of the Act, and may choose to address special concerns related to the protection of water quality and other aquatic resources within their borders.

11.3.3.2 "Reduction in Jurisdictional Waters" at pg 31.

> …the agencies evaluated potential effects of the final rule across CWA regulatory programs. The supporting documents describe certain potential short-term effects for CWA regulatory programs; however, the potential long-term effects will depend on whether or how states and tribes choose to modify their existing regulatory programs. As discussed further in the preamble for the final rule, the agencies are finalizing their proposal to regulate perennial and intermittent tributaries to traditional navigable waters, while excluding ephemeral streams from CWA jurisdiction as those features are more appropriately regulated by states and tribes under their sovereign authorities.

11.3.3.2 "Reduction in Jurisdictional Waters" at pg 32.

> … the final rule likely will reduce the scope of CWA jurisdiction in comparison with the baseline of the 2019 Rule. The agencies note that, after considering public comments, they have made modifications in the final rule to strike a careful balance between the clear directive from Congress to ensure that states maintain primary authority over land and water resources, and the importance of maintaining federal authority over those waters that Congress determined should be regulated by the federal government under its Commerce Clause powers.

11.4 pg 43.

> And most clearly, in Section 11.4.6.5 "Effects on Water Quality/Supply":
>
> Under this rule, the agencies do not view the definition of "waters of the United States" as conclusively determining which of the nation's waters warrant environmental protection and which do not; rather, the agencies interpret the definition as drawing the boundary between those waters subject to federal requirements under the CWA and those waters that states and tribes are free to manage under their independent authorities. The agencies are establishing this line-drawing based primarily on their interpretation of their authority under the Constitution and the language, structure, and legislative history of the CWA, as articulated in decisions by the Supreme Court.

*Id.* at pgs 54-55.

Third, the Agencies repeat these same themes in their "Resource and Programmatic Assessment for the Proposed Revised Definition of 'Waters of the United States'" Docket (EPA-HQ-OW-2018-0149):

> Nothing in the CWA prohibits states from determining what kinds of aquatic resources they can regulate under state law in order to protect the interests of their citizens, as recognized in CWA section 101(b).

*Id.* at pg. 11.

> Should the scope of CWA jurisdiction change, those states with authorized CWA section 402 programs may choose to continue issuing permits as they have been for "waters of the state." Alternatively, if the discharge is no longer into a "water of the United States," states may rewrite permits to recognize that the discharge requiring an NPDES permit is farther from the pollutant source. In addition, the EPA, on its own, would not enforce permits issued for discharges to "waters of the state," if beyond the scope of the CWA.

*Id.* at pg 14.

> The question that arises in assessing potential effects is whether states and tribes will continue to apply and enforce WQS that are no longer federally enforceable for waters that are newly excluded from CWA jurisdiction. Therefore, while the development and adoption of state and tribal WQS may not change significantly, impacts could occur for CWA implementing programs, such as establishing water quality-based effluent limits and TMDLs.

*Id.* at pg. 72:

> The agencies attempted to analyze the potential effects by comparing the locations of streams currently listed as impaired as well as the locations of established TMDLs to categories of streams mapped in the NHD at high resolution. However, due to data limitations of the NHD, the agencies have concluded that such an analysis does not appropriately or accurately assess the potential effects of the proposed rule on the 303(d) and TMDL programs.

*Id.* at pg. 73.

And, again, most glaringly, the report's section entitled "Water Quality Impacts" states:

> For future 303(d) actions, a change in the scope of CWA jurisdiction could cause "non-jurisdictional" waterbodies to not be assessed or otherwise identified as impaired pursuant to section 303(d); TMDL restoration plans would not be developed and implemented for those waters. This could result in reduced

protection for aquatic ecosystems if other mechanisms for restoration are not available or utilized (e.g., CWA section 319 program watershed plans). Absent the application of the CWA to certain waters following a revised definition of "waters of the United States," states may apply their own state law-based programs to identify and restore impaired waters, although this would not be required under the CWA. All states have WQS in some form or another, as well as monitoring and assessment programs. They also have existing laws and programs that they may choose to utilize to address any water quality challenges. If states do not require public notice and participation components in state regulations and policies for "waters of the state," and impaired waters were not identified via the current CWA 303(d) public notice requirements, the public could be less likely to be aware of impairments or less likely to become involved in restoration action for waters that do not fall within the definition of "waters of the United States."

*Id.* at pg. 74.

Although section 401 certification can be an effective tool for protecting water quality, its applicability is limited in scope to situations involving a federal permit or license that may result in a discharge to "waters of the United States." As a result, a change in the definition of "waters of the United States" such as that contemplated in this proposed rulemaking would change both where federal permits are required and where section 401 certification applies. If, for example, a reduction in the scope of jurisdictional waters reduces the number of federal permits, availability of section 401 as a water quality tool similarly will be reduced.

*Id.* at 86.

The proposed rule would reduce the scope of waters subject to the CWA when compared to the baseline of the 2015 Rule and the alternate baseline of pre-2015 practice, and as such, the agencies anticipate that the regulated public would need to prepare fewer permit applications.

*Id.* at pg. 99.

The proposed changes to the definition of "waters of the United States" would decrease the scope of the CWA geographic jurisdiction compared to the 2015 Rule and pre-2015 practice.

*Id.* at pg 105. (See https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-0005.)

Where is the hard analysis of water quality impacts?

It does not exist.

Yet, the record proves the Nation's water quality is suffering.

As Plaintiffs have thoroughly briefed, EPA's "Clean Water Act Enforcement Action Plan" (2009), determined 44% of the Nation's river and stream miles, 64% of lake and reservoir acres and 30% of bay and estuary square miles were "impaired." And, EPA's 2011 water quality assessment found that 32% of the Nation's wetlands were in "poor condition." PMOL at pg. 10.

Moreover, in 2017, EPA reported that more than half the rivers and streams of the United States were polluted. EPA-HQ-OW-2018-0149-3110 citing EPA's "2017 National Water Quality Inventory Report to Congress." PMOL at pg. 9.

These are not "cherry-picked snippets" of facts and law as Defendants suggest. These facts strike at the heart of the final rule which is designed to irresponsibly eliminate federal jurisdiction over large swaths of wetlands and watercourses under the guise of states' rights with no analysis of how water quality will suffer either cumulatively, or state by state.

And, these issues have not been litigated previously in *Solid Waste Agency of Northern Cook County v U.S. Army Corps of Engineers*, 531 US 159 (2001), (*SWANCC*) as Defendants suggest, as the Agencies have never embarked on such a crusade to so broadly eliminate federal jurisdiction over the Nation's wetlands and watercourses.

Defendants do not even acknowledge, much less explore, the state of the Nation's water quality.

In sum, while the Agencies recognized the final rule would result in reduced federal jurisdiction over wetlands and ephemeral streams, they did not identify or discuss the impact on water quality - as they must - because the Agencies' rulemaking must be the functional equivalent of a detailed environmental impact review conducted pursuant to the National Environmental Procedure Act. PMOL at 20-21 relying upon *Anchorage v United States*, 980 F2d

7

1320 (9th Cir 1992), *Portland Cement Ass'n v Ruckelshaus*, 486 F2d 375, 386 (1973) and

*International Harvester Co. v Ruckelshaus*, 478 F2d 615, 650 n.130 (DC Cir 1973).

And, in eviscerating the CWA's goals, EPA has violated its very purpose for existing.

PMOL pgs. 2-4.

## POINT I

## PLAINTIFFS HAVE STANDING

Defendants allege the relationship between the CWA's purposes and Plaintiffs'

ownership of wetlands and personal impacts upon them from the filling of wetlands next-door

are insufficient to confer standing. However, if property owners with wetlands affected by the

final rule do not have standing, then no one would have standing since wetland property owners

are certainly more directly impacted by the rule than non-wetland owners.

Defendants raised standing as a defense in their first motion to dismiss, (Dkt. No. 9),  and

Plaintiffs' amended their complaint, and filed a supporting affirmation with exhibits and a

memorandum of law. Dkt. No. 17.

Plaintiffs devoted 7 pages to the subject and summed up the issue as follows:

The Supreme Court has greatly expanded the class of persons entitled to seek
judicial review of agency action by examining the "zone of interests" sought to be
protected by the statute in question. *Association of Data Processing Service
Organizations, Inc. v. Camp*, 397 US 150, 153 (1970); *Barlow v. Collins*, 397 US
159 (1970). "Judicial review of such administrative action is the rule, and
nonreviewability an exception which must be demonstrated." *Barlow v. Collins*,
*supra*, at 166. "Plaintiffs need only show that [the laws at issue] were 'designed to
protect some threatened concrete interest' personal to plaintiffs. *Nulankeyutmonen
Nkihtaqmikon v Impson*, 503 F3d 18 (1st Cir 2007) citing *Lujan*, 504 US at 572-
73 nn.7-8 (1992) and *Ashley Creek Phosphate Co. v Norton*, 420 F3d 934, 938 &
n.2 (9th Cir 2005).

Here, the APA incorporates the "broad zone of interest test" under which an
aggrieved party need only establish that the interest he or she seeks to protect, is
arguably within the zone of interests to be protected by the statute under which

8

the plaintiff sues. *Ohio Coal Ass'n v. Perez*, 192 F Supp 3d 882, 903 (SD Ohio 2016).

Dkt. No. 17, item #9.

Defendants now spend another 6 pages advancing the argument yet fail to address the precedent cited above and fail to identify that the basis for this action, 5 USC § 702, supports Plaintiffs' standing:

A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

Indeed, judicial review of administrative agency adjudications is the rule rather than the exception. *In re Penn Cent. Transp. Co*., 440 F Supp 569 (ED Pa 1977). Initially:

[T]he inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff."

*Sierra Club v Morton*, 405 US 727, 732 (1972).

 "In the environmental litigation context, the standing requirements are not onerous."

*Am. Canoe Ass'n, Inc. v Murphy Farms, Inc*., 326 F.3d 505, 517 (4th Cir 2003).

Moreover, in the context of the CWA:

As a general matter, there is a low bar for standing in the context of Clean Water Act litigation: "the issue is whether [the] plaintiff has established the 'identifiable trifle' of an injury that either has or will imminently occur as a result of the conduct." *Mancuso v. Consol. Edison Co. of New York*, 130 F. Supp. 2d 584, 590 (S.D.N.Y. 2001), aff'd sub nom., *Mancuso v. Consol. Edison Co. of New York, Inc*., 25 F. App'x 12 (2d Cir. 2002) ("Every appellate court that has considered standing under the [Clean Water Act] has adopted a low threshold of entry.")

*Borough of Upper Saddle River v Rockland Cty. Sewer Dist. #1*, 16 F. Supp 3d 294, 315 (SDNY 2014).

Rather than citing cases involving challenges to EPA's compliance with the APA in conducting rulemaking interpreting the CWA, Defendants largely rely on matters that do not involve agency review.

For example, *Cortlandt Street Recovery Corp. v Hellas Telecommunications*, 790 F 3d 411 (2d Cir. 2015) and *Warth v Seldin*, 422 US 490 (1975), involved private disputes that did not involve consideration of an agency's rulemaking.

Likewise, *Spokeo, Inc. v Robins,* 136 S Ct 1540 (2016), involved a federal class-action complaint against the Spokeo corporation which operated a "people search engine."

Similarly, *Clapper v Amnesty International USA,* 568 US 398 (2013), is inapplicable as there, the plaintiff alleged that a statute unconstitutionally authorized the government to intercept foreign communications from certain entities. *Whitmore v Arkansas*, 495 US 149, 158 (1990) is also inapplicable as there, the plaintiff sought to challenge a death row inmate's waiver of appeal on the inmate's behalf without the inmate's consent.

Defendant's reliance upon the single case involving challenge to an administrative ruling is also misplaced. *Lujan v Defenders of Wildlife*, 504 US 555, 562, 564 (1992), involved a challenge to a regulation where standing was based upon "affiants' profession of an 'intent' to return to the places they had visited before" which were overseas.

Here, because the Plaintiffs own property and are personally affected by the final rule *Lujan* actually supports Plaintiffs' standing:

> [S]tanding depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury….

*Lujan,* 504 US at 561.

Closer to the point is the matter of *Dubois v United States Dep't of Agric*., 102 F3d 1273, 1281 n.10 (1st Cir 1996), where plaintiff challenged rulemaking concerning Loon Lake in the White Mountain National Forest:

> Violations of procedural rights, such as those created by NEPA and CWA, receive "special" treatment when it comes to standing. "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Defenders of Wildlife*, 504 U.S. at 572 n.7. As an example, the Supreme Court points to "the procedural requirement for an environmental impact statement before a federal facility is constructed next door" to the plaintiffs. Id. at 572. The contrasting example -- where the disregard of procedural requirements would be held not to impair the plaintiffs' concrete interests -- is "persons who live (and propose to live) at the other end of the country" from the project. Id. at 572 n.7.

*Dubois*, 102 F3d at 1281 n.10; See also *Friends of the Earth, Inc. v Gaston Copper Recycling Corp.*, 204 F3d 149, 160 (4th Cir 2000) where "reasonable fear and concern" of a wastewater discharge "requires no abstraction or conjecture to understand" and thus reversing the district court's "constructing barriers to an injured citizen's vindication of indisputably private interests in the use of his property and in the health of his family. Article III does not command such a judicial evisceration of the Clean Water Act's protections."

Here, Plaintiffs more than meet the *Dubois* standard. Plaintiffs are property owners of wetlands that are the subject of the challenged Agencies' rulemaking. Plaintiffs are concerned with threats to their drinking water from the re-classification of PEM1E located on their property and the adjacent property of Dean's Paving. In response to Defendants' motion to dismiss, Plaintiffs submitted mapping[3] showing PEM1E is an isolated wetland and therefore would not be considered jurisdictional under the final rule. Plaintiffs now file an Affidavit from William Murray explaining that the filling of wetlands by Dean's Paving has blocked the water flow

---

[3] While Defendants' attack the NWI maps as deficient, the final rule recognizes that "the NHD and NWI are the most comprehensive hydrogeographic datasets mapping waters and wetlands in the United States." 85 Fed. Reg. 22,329.

causing flooding of his property and heightening concerns regarding threats to his water supply from tons of buried asphalt within that fill. (See Affidavit of Murray herewith.).

Threats to enjoyment of one's property and drinking water have long been recognized as evidence of a potential direct injury in fact giving rise to standing. (See *Dubois* at 102 F3d 1282).[4]

Also instructive is the matter of *Baur v Veneman*, 352 F3d 625, 632 (2d Cir 2003). There, the lower court had held the plaintiff did not have standing because the claimed harm was too remote and speculative to constitute a cognizable injury regarding the Department of Agriculture's refusal to prohibit the use of downed livestock for human consumption. The Second Circuit reviewed standing principles and reversed the District Court finding the plaintiff had standing primarily because the statute in question was designed to prevent the injuries the plaintiff complained of:

> Thus, in this case, there is a tight connection between the type of injury which Baur alleges and the fundamental goals of the statutes which he sues under - reinforcing Baur's claim of cognizable injury. See *Gaston Copper*, 204 F.3d at 156 (affirming plaintiff's standing to sue where the plaintiff "alleged precisely [those] types of injuries that Congress intended to prevent by enacting the Clean Water Act"); *Cutler*, 475 F. Supp. at 848-49 (recognizing that "plaintiffs' claim of injury must be considered in the context of the comprehensive regulatory scheme created by the FFDCA," and concluding that plaintiffs' alleged exposure to drugs marketed in violation of the statute "constitutes a distinct and palpable injury to plaintiffs' statutory interests as drug consumers"); see also Cass R. Sunstein, Standing Injuries, 1993 SUP. CT. REV. 37, 58 (1994) (reasoning that where the very purpose of the regulatory statute is risk minimization, it should be presumed that plaintiffs "should be allowed to bring suit to prevent the sorts of injuries that the regulatory scheme was designed to prevent . . . to ensure that the agencies adhere to the will of Congress"); Jerry L. Mashaw, "Rights" in the Federal

---

[4] See  *Dubois* at 102 F3d at 1283 comparing the *Dubois* plaintiff with *United States v AVX Corp*., 962 F2d 108, 115 (1st Cir 1992); where plaintiff did not have standing due to conclusory allegations that its "members have been and will continue to be harmed by the releases that [were] the subject of [that] litigation"; its "averment [had] no substance: the members [were] unidentified; their places of abode [were] not stated; the extent and frequency of any individual use of the affected resources [was] left open to surmise."

> Administrative State, 92 YALE L.J. 1129, 1168 (1983) (noting that some
> Supreme Court precedent "suggests that increased risk will satisfy the
> requirement of injury in fact, at least where the statutory scheme that gives rise to
> the complaint is itself essentially concerned with restructuring risks").

*Baur*, 352 F3d at 635.

Here, again, the "very purpose of the regulatory statute" at issue – the CWA - is maintaining and restoring the Nation's water quality to protect public health and safety. And contrary to those purposes, Dean's Paving has already filled in portions of PEM1E, and uncontrolled runoff is entering PEM1E and the aquifer. Moreover, as Plaintiff makes clear, "the stream's natural course of drainage into the marshy land, and its route to drain further across several other properties leading to the Wallkill River, has been blocked." Murray Affidavit ¶4.

Thus, Plaintiffs have standing to bring suit to address the final rule which strips away federal jurisdiction concerning the types of injuries the CWA was designed to prevent – namely the flooding of their property and contamination of their water supply.[5] And, it is indisputable that Plaintiffs' concerns "fall within the zone of interests protected by the law invoked.'" (See *Dubois* at 102 F3d 1282; and see *Entergy Nuclear Fitzpatrick, LLC v Zibelman*, No. 5:15-CV-230 (N.D.N.Y. Mar. 7, 2016) at pg. 21 "the test for prudential standing is 'not a rigorous one,' and simply requires that 'the interest sought to be protected by [plaintiffs] is arguably within the zone of interests to be protected or regulated…"

Further, as in *Baur*, "this case is not solely about future injury," 352 F3d at 640, as the Dean's Paving fill is causing flooding undermining Plaintiffs' garage. See also *Gaston Copper*,

---

[5] Defendants argue for a level of proof far greater than necessary to confer standing in challenging an administrative rulemaking proceeding. Compare *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 161 (4th Cir. 2000); "Rather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern.")

204 F.3d at 160 noting that plaintiff "need not wait until his lake becomes barren and sterile or assumes an unpleasant color and smell before he can invoke the protections of the Clean Water Act."

Plaintiffs' level of harm proves Defendants' claims of no injury-in-fact are inaccurate. Moreover, "the more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing." *Baur*, 352 F3d at 637. (See also *Public Interest Research Group of N.J., Inc. v Powell Duffryn Terminals Inc*., 913 F.2d 64, 71 (3d Cir 1990) (holding that the injury "need not be large, an 'identifiable trifle' will suffice." (citing *United States v Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 US 669, 689 n.14, (1973)).

Moreover, there are legions of cases holding that environmental groups have standing if a particular member happens to own a home or regularly visits the area affected by an agency's rulemaking.[6]

For example, in *Atl. States Legal Found., Inc. v Hamelin*, 182 F. Supp 2d 235 (NDNY 2001), this Court held the plaintiff had standing where plaintiff's member formerly "walked the perimeter of the wetland every day" and stated:

> With respect to the "injury in fact" requirement, the focus is not on the injury to the environment, but rather on the injury to the plaintiff. See id. 528 U.S. 167 [*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)]. According to the Supreme Court, "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Id. 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S.

---

[6] See *Vt. Pub. Interest Research Grp. v United States Fish & Wildlife Serv.*, 247 F Supp 2d 495 (D. Vt. 2002) where plaintiff had standing  due to "use and enjoyment of the area" affected by the regulation and *N.C. Shellfish Growers Ass'n v Holly Ridge Assocs., LLC*, 278 F Supp 2d 654, 665 (EDNC 2003): "Plaintiffs need only demonstrate that their concerns about Defendants' activities are reasonable under the circumstances and have diminished their use and enjoyment of the area."

727, 735, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972)) (other citation omitted); see also *Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals Inc*., 913 F.2d 64, 71 (3d Cir. 1990) (holding that the injury "need not be large, an 'identifiable trifle' will suffice." (citing *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14, 93 S. Ct. 2405, 2417 n.14, 37 L. Ed. 2d 254 (1973)))).

*Atl. States Legal Found.* 182 F Supp 2d at 239.

Here again, Plaintiffs' ownership of the wetlands represents a far greater interest than one who simply visits the resource affected by an agency's rulemaking.

Regarding redressability, the court in *Vt. Pub. Interest Research Grp. v United States Fish & Wildlife Serv.*, 247 F Supp 2d 495, 513 (D Vt 2002), explained how this requirement is lessened in the context of a challenge to administrative review:

> Redressability requires that "it is likely, as opposed to merely speculative, that the injury [to Plaintiffs] will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. The requirement of redressibility is relaxed in the NEPA context. Plaintiffs need not demonstrate that the ultimate agency decision would change upon compliance with NEPA's procedures. See *Lujan II*, 504 U.S. at 572 n.7 (noting that because the normal standard of redressibility is lessened, the Court would not require plaintiffs to demonstrate with any certainty that informed decisionmaking would create an outcome favorable them); *Hall*, 266 F.3d at 977; *Comm. to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 452 (10th Cir. 1996).

Plaintiffs maintain that if they are ultimately successful in this litigation, the Navigable Waters Protection Act will be vacated as will be the repeal of the 2015 Clean Water Rule. With reinstatement of the 2015 Clean Water Rule in New York, Plaintiffs may proceed to petition the Army Corps of Engineers for an order removing the fill placed in PEM1E resulting in restoration of that marsh area and thereby alleviating flooding of their property. Removal of the buried petroleum laden asphalt would also eliminate the source of pollutants that are a continuing threat to Plaintiffs' drinking water supply. If the Army Corps fails to take action then Plaintiffs may seek judicial intervention under the CWA's citizen suit provisions. This is precisely the purpose of the CWA – to allow citizens to act in the absence of federal action in order to maintain and

15

restore the Nation's water quality and protect human health. See above discussion of *Baur*, 352 F3d at 635 and *Borough of Upper Saddle River,* 16 F Supp 3d at 301; "Citizen suits 'play an important role in the Act's enforcement scheme.'"

For these reasons, Plaintiffs have standing.

## POINT II

### THE AGENCIES' ADOPTION OF THE FINAL RULE WAS ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION

Plaintiffs' memorandum of law detailed the facts supporting the reasons why Agencies' adoption of the final rule should be judicially vacated. PMOL pgs. 19-38.

In response, Defendants attempt to shield Plaintiff's allegations with the broad brush of deference afforded agencies in conducting rulemaking citing *Chevron, U.S.A., Inc. v NRDC, Inc.*, 467 US 837 (1984).

However, no deference is afforded where the rulemaking "entirely failed to consider an important aspect of the problem." *Guertin v United States*, 743 F3d 382, 385 (2d Cir 2014) and see *Dubois* at 102 F3d 1285 citing *Motor Vehicle Mfrs. Ass'n v State Farm Mut. Auto. Ins. Co*., 463 US 29, 43 (1983).

As detailed above, the Agencies may have identified water quality in the context of shifting the administrative burden of CWA enforcement to the states, but the Agencies missed the critical issue of identifying the status of water quality nationwide and then taking a hard look at how the final rule would impact that water quality.

The Agencies' error in this regard is made all the more glaring by its professed inability, or more likely its unwillingness, to prepare appropriate data sets in determining how much of the

16

Nation's waters will be impacted by the final rule.[7] See DMOL at pg. 28 "there are critical technical deficiencies for estimating changes in the definition of "waters of the United States" that cannot be resolved within these datasets."

While Defendants now attack the Agencies' National Wetland Inventory, (NWI), mapping as deficient, it was EPA itself that relied upon these maps to report that 51% of wetlands and 18% of streams nationwide, (300 miles of ephemeral streams), would no longer be jurisdictional under the 2020 Rule. See EPA-HQ-OW-2018-0149-11767; describing the data as "key takeaways" based upon pouring over "the totality of the briefing materials" given to the EPA Administrator in advance of adopting the final rule.

How will the removal of these large expanses of wetlands and watercourses affect water quality? The Agencies have no answer.

Rather than admitting the Agencies failed to consider water quality, Defendants manufacture and ascribe a new claim to Plaintiffs' argument stating "Plaintiffs appear to argue that the Agencies acted improperly by considering factors in addition to scientific considerations." DMOL at pg. 34.

---

[7] EPA is well aware that much of the Nation's waters are impaired:

> The National Wetland Condition Assessment (NWCA) 2011: A Collaborative Survey of the Nation's Wetlands presents the results of the first national evaluation of the ecological condition of the nation's wetlands. The NWCA is part of a broader effort by EPA and state, tribal, and federal partners to conduct national scale assessments characterizing the ecological condition of the nation's waters. Under the National Aquatic Resource Survey (NARS) program, studies have been completed for wadeable streams (2004), lakes (2007), rivers and streams (2008-2009), and coastal waters (2010). The issuance of the NWCA 2011 report marks the completion of the first full-cycle of assessments by EPA and its partners under the NARS program.

Docket (EPA-HQ-OW-2018-0149); https://beta.regulations.gov/document/EPA-HQ-OW-2018-0149-0036 and see PMOL pgs. 8-11.

That is entirely untrue because if the Agencies had in fact considered science, they would not have repealed the 2015 Rule which was based on years of peer-reviewed scientific analysis. PMOL pgs. 11-13. Unfortunately, to the detriment of the CWA, the Agencies repealed the 2015 Rule claiming the rule relied on too much science.

And, contrary to Defendants' claims, (DMOL at pgs. 21, 23 and 24), Plaintiffs are not trying to "override" any portion of the CWA's provisions.

Instead, Plaintiffs object to Defendants deflecting water quality concerns by simply asserting that wetlands and watercourses are being removed from federal jurisdiction based upon the current Administration's interpretation of the law and in the name of States' rights within the purview of the Agencies' authority. DMOL at pg 26 Citing *California v Wheeler*, No. 20-CV-03005-RS, 2020 WL 3403072, at *6 (ND Cal June 19, 2020).

As above, Plaintiffs maintain that removing federal jurisdiction without first evaluating impacts to water quality violates the APA. Nothing in *California* contradicts that point or excuses the Agencies' rulemaking from scrutiny under the arbitrary and capricious standards set forth in *Guertin*.

And, contrary to Defendants' claims, *Guertin* is precisely on point because the Agencies parsed out sections of the Connectivity Report instead of examining its entirety, as the Agencies did in adopting the 2015 Clean Water Rule. PMOL pgs. 27-30. And, the Agencies' manipulation of economic data was an abuse of discretion. PMOL pgs. 9-11, 29-30, 34 and 38.

Further, maintaining States' rights is not the CWA's prime objective.

The Agencies' reversible error lies in the final rule ignoring the primary goal of the CWA, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," (33 USC § 1251(a), requiring vacatur of the final rule.  *Guertin*, 743 F3d at 385.

18

And, while Defendants rely heavily upon *Rapanos v United States*, 547 US 715 (2006), while dismissing the dissent in *Solid Waste Agency of Northern Cook County v U.S. Army Corps of Engineers*, 531 US 159 (2001), it is well to note that Justice Stevens' *SWANCC* dissent received an equal number of votes as did the *Rapanos* plurality opinion.

Defendants also mischaracterize Plaintiffs' position to the extreme citing *Catskill Mountains Chapter of Trout Unlimited, Inc. v EPA*, 846 F3d 492, 501 (2d Cir 2017), which included the statement that "[t]he Act does not require that water quality be improved whatever the cost or means." DMOL pg. 24. That is not the issue in this litigation.

In sum, the final rule shifts the burden of costs and administration of the CWA to the States. In doing so, the Agencies never address whether water quality will be improved.

Finally, the Agencies' pre-determination of the final rule, improperly deferring water quality enforcement to the States, inconsistency with the Rivers and Harbors Act, impingement of legislative powers and failing to consider impacts to CWA's anti-degradation and Total Maximum Daily Load (TMDL) provisions have been fully briefed. PMOL pgs. 24-34.

Contrary to Defendants' objections these issues assist in demonstrating the Agencies' adoption of the final rule is contrary to these provisions and therefore must be annulled.

## <u>CONCLUSION</u>

For all of the above reasons and those set forth in prior memoranda, Plaintiffs respectfully request the Amended Complaint's claims for relief be granted with the Court vacating and setting aside the 2020 Rule on grounds that the Agencies' rulemaking was arbitrary, capricious and an abuse of discretion. And again, since there is "compelling evidence in the record" concerning the Agencies' rulemaking that "would not change" if the matter were

remanded, vacatur is the appropriate remedy.  See *Guertin v United States*, 743 F3d 382, 388 (2d Cir 2014).

Respectfully submitted this 9th day of December, 2020.

Dated: New Paltz, New York

James Bacon

Attorney for Plaintiffs
baconesq@yahoo.com
P.O. Box 575
New Paltz, New York 12561
Telephone: (845) 419-2338

20

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 9, 2020, I caused a true and correct copy of the

foregoing to be served via the Court's CM/ECF system on all registered counsel.

James Bacon